IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

ROUNDTABLE HEALTHCARE )
PARTNERS, L.P., a Delaware Limited )
Partnership, )
)
Plaintiff, )
)
v. )    08 CV 02968 (MGC)
)
ANGIOTECH PHARMACEUTICALS )
(U.S.), INC., a Washington Corporation )
)
Defendant. )

**ROUNDTABLE HEALTHCARE PARTNERS'
OPPOSITION TO ANGIOTECH PHARMACEUTICALS (U.S.), INC.'S
MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS**

Defendant Angiotech Pharmaceuticals (U.S.), Inc.'s ("Angiotech") Motion for Partial Judgment on the Pleadings ("the Motion" or "Mot.") should be denied. RoundTable Healthcare Partners L.P.'s ("RoundTable") Complaint (the "Complaint" or "Compl.") easily meets the standards necessary to survive the Motion.[1]

## PRELIMINARY STATEMENT

This dispute arises out of a stock purchase transaction in which RoundTable sold its interest in certain medical instrument companies to Angiotech for $780 million. Twenty million dollars of the purchase price was placed in an escrow designed to cover any reimbursement to Angiotech for breach of the transaction's representations and warranties. Roughly one week before the expiration of the representations and warranties, Angiotech made a claim for all $20 million but refused to provide proofs of its claims or access to books and records as the Parties'

---

[1] RoundTable is currently scheduled to file its Motion for Summary Judgment on August 13th for a September 4th hearing.

Agreements require. In addition, Angiotech has attempted to add certain claims and to insist on a 20% "contingency" long after the time for pursuing such claims expired.

RoundTable has filed suit in this Court challenging Angiotech's conduct and asserting its right to the escrow funds. RoundTable asserts that there were no breaches of the representations and warranties and that Angiotech's failure to comply with the proof disclosure obligations precluded its claims for the escrow funds. Angiotech has filed this Motion that seeks to dismiss RoundTable's claim that Angiotech has breached the disclosure requirements and cannot, therefore, avail itself of any of the escrow funds. It is a narrowly drawn pleading. The underlying dispute as to whether or not representations and warranties were actually breached remains unaffected by this Motion.

## FACTUAL BACKGROUND[2]

On January 31, 2006, RoundTable entered into a stock purchase agreement (the "Stock Purchase Agreement") with Angiotech pursuant to which Angiotech acquired all of the outstanding equity interests in American Medical Instruments Holdings, Inc. ("AMI") for approximately $780 million. (Compl. ¶ 2 and Ex. A.) In addition to the Stock Purchase Agreement, Angiotech and RoundTable (collectively, the "Parties"), along with LaSalle Bank, N.A. ("LaSalle Bank"), as Escrow Agent, executed an Escrow Agreement (the "Escrow Agreement," together with the Stock Purchase Agreement, the "Agreements"). (Compl. ¶ 2 and Ex. B.) Pursuant to the terms of the Escrow Agreement, Angiotech deposited $20 million of the purchase price with LaSalle Bank. (Compl. ¶ 2 and Ex. B.)

---

[2] "On a motion to dismiss or for judgment on the pleadings [the Court] 'must accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor.'" *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003) (quoting *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001)).

Pursuant to the Stock Purchase Agreement, RoundTable and the other equityholders of AMI agreed to indemnify Angiotech for *specific*, *identifiable* losses incurred for "any breach of or inaccuracy in (i) any representation or warranty made by [RoundTable]." (Compl. Ex. A, Article III.) The indemnification was time limited and not to be used simply to pass on the costs of operations. RoundTable's liability for any alleged breaches was limited by the Parties to the $20 million in escrow funds. (Compl. ¶ 4 and Ex. A at § 9.) The Agreements set forth specific procedures by which Angiotech must make claims against the escrow. The procedures were structured to enable the Parties to make informed decisions about claims and to facilitate resolution of any post-closing disputes.[3]

On April 4, 2007, one week before the expiration of the representations and warranties, Angiotech submitted to the Escrow Agent a one-page Escrow Claims Notice requesting the entire $20 million in the escrow account with 11 separate categories. The categories or claims had little or no detail. Some were clearly just place holders to preserve claims past the life of the representations and warranties. Nothing else was provided. (Compl. ¶ 16 and Ex. C.) RoundTable timely issued a Notice of Objection to the Notice of Claims. (Compl. ¶ 17 and Ex. D.) Simultaneously, RoundTable demanded that Angiotech comply with its obligations under the Agreements to provide documents supporting the claims and give RoundTable access to Angiotech's books and records in order to assess the claims.

The Stock Purchase Agreement makes clear that Angiotech had an obligation to make such materials available. The Agreement provides that Angiotech, after tendering a claim for indemnification, must provide "*as soon as practicable thereafter all information and documentation necessary to support and verify*" the submitted claim(s). (Compl. Ex. A at

---

[3] Angiotech, prior to entering into the Agreements, was provided with all of the operational documents of AMI and given access to all facilities for due diligence. It conducted an extensive review of these materials.

§ 9.5(a) (emphasis added); Compl. ¶ 19.)  Section 9.5(a) also requires that RoundTable "shall be given access to all books and records in the possession or under control" of Angiotech which RoundTable reasonably determines to be related to such claims.  (Compl. Ex. A at § 9.5(a), ¶ 20, and Ex. B at § 3(a) (setting forth claims procedures contained within the Escrow Agreement).) These requirements enable RoundTable to assess claims entered against it.

Repeatedly, RoundTable requested such materials; they have *never* been provided.  Nor has RoundTable been granted access to Angiotech's books and records.  (*See, e.g.,* Compl. ¶¶ 25-32, 35, 39, 48.)

By correspondence on February 21, 2008 Angiotech conceded that roughly one-third of its claims were meritless, and it agreed to release $6,512,319 in funds from the escrow account to RoundTable based upon its "revised estimate." It had become clear that a substantial portion of Angiotech's assertions could not be sustained.  (*Id.* at ¶¶ 35, 36 and Ex. N.)  After weeks of delay, Angiotech reluctantly executed a Joint Letter of Direction allowing the release of the $6,512,319 to RoundTable.  (Compl. ¶ 35 and Ex. O.)

The February 21, 2008, correspondence also improperly increased the damages for which it had argued on two of the eleven claims by $2,164,371 and added a wholly new component –an additional 20% "contingency" of $2,202,274, which is nowhere authorized by the Agreements. (Compl. ¶ 35, 36-39; *see also id.* Ex. P.)  These additions were submitted almost a year after the claims period expired in April, 2007.  These claims are time barred.  Section 9.1(b) of the Stock Purchase Agreement provides that "no claim for indemnification, reimbursement or other remedy" may be brought after the claims expiration date.  The added damages and wholly new contingency claims clearly fall within the reach of "indemnifications, reimbursement or other remedy."  (Compl. Ex. A at § 9.1(b).)  Accordingly, RoundTable advised Angiotech that the

4

Agreements did not permit Angiotech to increase its damages after the close of the claims period or to withhold a "contingency reserve." (Compl. Ex. P.) RoundTable demanded that Angiotech agree to release an additional $4,366,645. (Compl. ¶ 38 and Ex. P.) Angiotech refused. (Compl. ¶ 38.)

On March 21, 2008, RoundTable filed its Complaint in this Court, seeking compensatory damages, declaratory relief, attorney's fees and costs, along with pre-judgment and post-judgment interest as provided by law. (*Id.* ¶ 6.)[4] On April 17, 2008, Angiotech filed its Answer and Counterclaims. On July 9, 2008, Angiotech filed the instant Motion.

## INTRODUCTION

Angiotech now moves for partial judgment on the pleadings under Fed. R. Civ. P. 12(c), arguing that since its refusal to abide by the Agreements is justified, the claim that Angiotech cannot proceed against the escrow must fail. (Mot. at 1.) Under Rule 12(c), courts apply the same standard to a motion for a judgment on the pleadings as that applicable to a motion under Rule 12(b)(6). *DeMuria v. Hawkes,* 328 F.3d 704, 706 n. 1 (2d Cir. 2003) (the two standards "are indistinguishable"); *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir. 1994). The Court's "consideration is limited to the factual allegations in plaintiff's [complaint], which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiff['s] possession or of which plaintiff [] had knowledge and relied on in bringing suit." *Brass v. American Film Tech., Inc.,* 987 F.2d 142, 150 (2d Cir. 1993).

RoundTable sets forth in its Complaint the facts that demonstrate its entitlement to the remaining escrow funds. These must be taken as true for purposes of the Motion. (*See, e.g.,*

---

[4] RoundTable also seeks monies Angiotech owes it for a state tax refund Angiotech received and has refused to turn over to RoundTable in clear breach of its obligations under the terms of the Stock Purchase Agreement. (Compl. ¶ 66-73.) Those issues are not raised in the Motion and are therefore not addressed herein.

Compl. ¶ 40 ("Even if Angiotech is not barred from seeking indemnification due to its failure to comply with the procedures in the Agreements for submission of claims under the escrow account, upon information and belief, Angiotech's claims against the escrow account have no merit"); *id.* ¶ 46 ("RoundTable has been entitled to the $20 million plus interest being held in the Escrow Account as of the close of the claims period on April 9, 2007" (citing Escrow Agreement §4(a)); *id.* ¶ 47 ("RoundTable would have received the $20 million plus interest on or about April 9, 2007, if Angiotech had not wrongfully claimed entitlement to the escrow funds in its Escrow Notice of Claims" (citing Escrow Agreement §4(a))); *id.* ¶ 48.H ("Angiotech has submitted claims in its Escrow Notice of Claims that are without merit, in whole or in part."); *id.* ¶ 49 ("Angiotech's actions also constitute breaches of the covenant of good faith and fair dealing that is implied in every contract entered into under New York law").)

Angiotech does not address these issues nor is the Motion structured to do so.  It is limited to two issues designed to defeat claims made by RoundTable:  the first is that Angiotech's breach of the obligations to provide proof of its claims does not bar recovery of escrow funds, and the second asserts that the February modifications and additional claims are not time barred.

## ARGUMENT

**A.    Angiotech's Breach Of The Agreements Precludes A Claim Under The Escrow.**

Angiotech's $20 million escrow notice unquestionably triggered express contractual obligations that required Angiotech:  (1) to provide RoundTable with all information and documents necessary to support and verify its escrow claims; (2) to permit RoundTable access to all books and records in Angiotech's possession or control that *RoundTable* reasonably determined to be related to such claims; and (3) to attempt to resolve in good faith escrow claims

disputed by RoundTable within fifteen days. *Angiotech breached each and every one of these conditions.* Angiotech has not produced or provided RoundTable access to *a single page of documents* relating to its $20 million escrow claim. The obligation to negotiate in good faith cannot, obviously, be undertaken without knowledge of the proofs.

RoundTable requested substantiation of Angiotech's claims and access to the relevant books, records and personnel. Angiotech, thereafter, engaged in an extended dance of avoidance. *First*, it was silent; *then* it claimed it was evaluating the situation and would provide materials "in due course"; *then* it promised a "binder" of materials; *then*, after months had passed, it claimed for the first time that the materials were either "confidential" or "too voluminous;"[5] *finally*, after several more months had passed, Angiotech claimed for the first time in the Motion that it had no obligation to comply with *any* of the escrow claims procedures in order to recover escrow funds.

More than a year after Angiotech filed its original Notice of Claims, RoundTable does not know the basis of Angiotech's claims. And Angiotech remains in breach of its obligations under the Stock Purchase Agreement and the Escrow Agreement:

- Angiotech failed to provide RoundTable "as soon as practicable" after serving its Notice of Escrow Claims "all information and documentation necessary to support and verify" the submitted claims. (*See* Compl. Ex. A at § 9.5.) Sixteen months have now passed since the Notice was served and Angiotech has yet to comply.

- Angiotech failed to give RoundTable immediate "access to all books and records in the possession or under the control of [Angiotech] which [RoundTable] reasonably determines to be related to such claims." *Id.*

- Angiotech failed to give RoundTable immediate access to Angiotech's proofs to investigate and evaluate the claims, which includes RoundTable's right to utilize its own counsel, accountants or professional advisors. (*See* Compl. Ex. B at § 3(b).)

---

[5] The Agreements do not provide for "confidential" or "voluminous" exceptions to Angiotech's obligations, and Angiotech has not produced *any* documentation whatsoever. Indeed, much of the material cannot be confidential. For example, the $1.5 million "claim" for recalled items would be demonstrated, in part, by a public notice of recall issued by either Angiotech or its regulators. No such document has been produced.

- Angiotech failed "to attempt to resolve in good faith" any dispute regarding its claims "within 15 days after [RoundTable's] delivery of the Notice of Objection." *Id.*

### 1.    The Conditions Precedent In The Stock Purchase And Escrow Agreements Are Explicit And Clear.

Under New York law (and the law of virtually every other state), courts look to the language of the contract itself to determine whether a provision is a condition precedent or a material term of a contract. Where conditions precedent or material terms are clearly and unambiguously set forth in a contract, they are enforceable obligations. A party's failure to comply denies to it the benefits of the contract. Angiotech is certainly free to ignore its contractual duties; but in so doing, it forfeits any claim under the Agreements – including any claim to the remaining escrow funds. This is a straightforward and unremarkable conclusion of law. *See* FARNSWORTH ON CONTRACTS (THIRD) § 8.3.

The approach of the court in *Southward Investments LLC v. V-GPO, Inc.*, Case No. 06-6540T, 2007 WL 2859702, at *3 (W.D.N.Y. Sept. 26, 2007)[6] is instructive. The *Southward* Court rejected a breach of contract action to enforce a 3 million share stock sale, finding that the payment of $2,500,000 was a condition precedent to receiving stock under the stock purchase agreement. The court inferred the condition precedent from the use of the word "agrees" in the contract: "the Purchaser [Southward] *agrees* to purchase…[3,000,000 shares of stock] for an aggregate of $2,500,000…" *Id.* Notably, and contrary to Angiotech's position, the clause relied upon by the court was not part of any enumerated "Conditions" section of the agreement. It didn't matter because the *language* of the stock purchase agreement clearly created a condition precedent.

---

[6] Unpublished cases cited herein are attached as Appendix A.

Likewise, here, the language of the Stock Purchase Agreement unambiguously creates conditions precedent to claiming the escrow funds requiring that Angiotech: (1) "shall provide" RoundTable with documents supporting its claim (Compl. Ex. A at § 9.5(a)); (2) "shall give" RoundTable access to books and records (*Id.*); and (3) following RoundTable's written objection to Angiotech's claim, RoundTable and Angiotech shall "agree to attempt to resolve in good faith any dispute…" (Compl. Ex. B at § 3(b)).[7] These terms are mandatory and unequivocal.[8]

These obligations to provide proof may also be construed as material terms of the Agreement – as distinct from conditions precedent. The result, however, is absolutely the same: Angiotech is free to disregard such material terms, but in so doing forfeits any right to other

---

[7] In addition, Angiotech's conduct and its refusal to comply with the terms to which it agreed are further reason to deny its Motion. *See Rutgerswerke AG v. Abex Corp.*, 2002 WL 1203836, at *6-9 (S.D.N.Y. Jun. 4, 2002) (granting summary judgment to other party where one party engaged in improper conduct including "a covert campaign to generate grounds for their indemnity demands").

[8] Angiotech's cases to the contrary are inapplicable. *See, e.g., Am. Transit Ins. Co. v. B.O. Astra Mgmt. Corp.*, 814 N.Y.S.2d 849 (Sup. Ct. 2006), *aff'd as modified by* 835 N.Y.S.2d 106 (App. Div.). Angiotech cites this case to argue that failure to give notice of suit is a breach of condition that "*may* allow an insurer to disclaim its duty to provide coverage." (Met. Mot. n. 6.) Angiotech neglects to note, however, that the case very specifically applied to an *insurance company* and therefore implicated issues and arguments inapplicable here, including that specific insurance laws indicated that "the right of a claimant to seek recovery of insurance proceeds is not defeated by the insured's failure to perform its claim-related obligations." 835 N.Y.S. 2d at 106. The Court also distinguished between failure to give timely notice of a claim – the issue in this action – and failure to give timely notice of a lawsuit – not an issue in this action. The two are quite different, in part because, "[u]nlike failure to give timely notice of a claim, which relieves the insurer of its obligation to perform whether or not it can show prejudice (the 'no-prejudice' exception), the notice of law suit requirement is not always governed by the 'no-prejudice' rule." 814 N.Y.2d at 852-3 (footnote omitted). Furthermore, the Court found that the notice of lawsuit requirement *had* been satisfied. *Id.* at 855. Angiotech's reliance on *Am. Transit Ins. Co.* is misplaced. *See also Bestform, Inc. v. Herman*, 804 N.Y.S.2d 80, 81 (N.Y. Sup. Ct. App. Div. 2005) (finding trial court "properly construed the agreement to avoid a result that was absurd, commercially unreasonable and contrary to the reasonable expectation of the parties"; construing the agreement similarly here upholds RoundTable's positions); *Rooney v. Slomovitz*, 784 N.Y.S. 2d 189 (N.Y. Sup. Ct. App. Div. 2004) (involving the language of a real estate contract; this case does not involve a real estate contract); *Kass v. Kass*, 23 A.D. 2d 150 (N.Y. Sup. Ct. App. Div. 1997) (finding no condition precedent because language of the contract was contradictory and ambiguous; there has been no such finding here); *Cont'l Ins. Agency v. Albany Hous. Auth.*, 85 A.D. 2d 782 (N.Y. Sup. Ct. App. Div. 1981) (finding exclusion of provision in section labeled "Conditions Precedent" indicated parties' intent that the provision not be a condition precedent; as discussed *infra* A.1. the contract at issue here contains language expressly stating that its headings have no meaning); *Kalwall Corp. v. K. Capolino Design & Renovation*, 54 A.D. 2d 941 (N.Y. Sup. Ct. App. Div. 1976) (court found language governing payment did not expressly allow contractor to refuse to pay sub-contractor until it received final payment from customer, where customer had indicated his acceptance and approval and that final payment was forthcoming; no such facts are present here); *Spirits v. Village of Hempstead Commty. Develop. Agency*, 824 N.Y.S.2d 770, 2006 WL 2193047 (N.Y. Sup. Ct. July 28, 2006) (finding no "clear language" indicating parties' intent to make consultant's payment conditional on timely submission of time sheets; here such language exists).

benefits of the Agreement, including any claim on the escrow. *See Mowers v. Paul Revere Life Ins. Co.*, 27 F. Supp. 2d 135 (N.D.N.Y. 1998), relevant portion upheld, 204 F.3d 372 (2d Cir. 2000); *Cabe v. Aetna Casualty & Surety Co.*, 544 N.Y. S. 2d 862 (1st Dept. 1989) (" . . . Plaintiffs' continued failure, without explanation or excuse, to provide the requested information, constituted a material breach of the policy, precluding recovery by the Plaintiff.")

2.     **Angiotech's Defenses To Its Conduct Are Meritless.**

Angiotech attempts to absolve its failure to comply with these conditions of the Agreement by arguing (1) the only "conditions" in the Stock Purchase Agreement with which Angiotech must comply are those in Article VII (titled "Conditions"), and (2) its failure to comply with the disclosure procedures in Section 9.5(a) precludes Angiotech from recovery only if RoundTable demonstrates that it has been prejudiced by Angiotech's non-compliance. Neither of these arguments has merit.

a.     **Article VII of the Stock Purchase Agreement Has No Application To The Escrow Claims Procedures.**

Angiotech argues that, because the escrow claims procedures it breached are not referenced in the Article VII "Conditions" portion of the Stock Purchase Agreement, they are not "conditions precedent." (Mot. at 5-8.) Thus, Angiotech argues, it was free to disregard these parts of the contracts even though they were negotiated at arms length and even though the express language and logic of these terms are clear. Angiotech persists in this approach even though the Stock Purchase Agreement itself provides: "[t]he descriptive headings herein are inserted for convenience of reference only and are not intended to be part of, or to affect the meaning, construction or interpretation of, this Agreement." (Compl. Ex. A at § 11.10.) The language of the Stock Purchase Agreement, not the descriptive headings, is all that is relevant.

The text of Article VII demonstrates the weakness of the argument. The express purpose of Article VII is to "effect the [closing of] the transactions contemplated by the" Stock Purchase Agreement. (Compl. Ex. A at § 7.1) Article VII delineates a series of events that must occur or be waived "*at or prior to* the Closing." *Id.* (emphasis added). It has absolutely nothing to do with the post-closing obligations at issue here.

Procedures for breaches of representations of warranties (which are the subject of Angiotech's claim for indemnification) are, by definition, incapable of being invoked by either party until *after* the transaction closes. That is their purpose. It is foolish to suggest that the failure to include escrow claims procedures in the section that governs closing conditions somehow suggests an intention to make the post-closing escrow claims procedures non-binding. There is no language or evidence cited by Angiotech illustrating, somehow, that the conditions precedent to indemnification are "advisory" or "non-binding." Indeed, the reverse is true.

Angiotech's position ignores the fundamental requirement that each provision of a contract be interpreted to give it meaning. *See Duane Reade, Inc. v. Cardtronics, LP*, 2007 WL 2756961, at *2-3 (N.Y. Sup. Ct. 2007) (finding terms in a contract should be construed to give them meaning); *Bates Advertising USA, Inc. v. McGregor*, 282 F. Supp. 2d 209, 216 (S.D.N.Y. 2003) (finding that, under New York law, a court should analyze clauses in the context of the entire agreement to avoid rendering individual provisions superfluous); 11 WILLISTON ON CONTRACTS § 32:4 (4th ed. 2004) ("A contract will be read as a whole and every part will be read with reference to the whole. . . . A court will interpret a contract in a manner that gives reasonable meaning to all of its provisions, if possible"). Angiotech fails to offer an alternative explanation that would give the escrow claims procedures meaning; they cannot be mere "suggestions" as Angiotech postulates. Indeed, given the use of the word "shall" they are, in

fact, mandatory obligations.   To hold otherwise is to read mandatory and unambiguous provisions out of the contract – a legally unsustainable position.

### b.      RoundTable Need Not Allege Prejudice For Angiotech's Motion To Be Denied.

Angiotech argues that the claims procedures are binding only if prejudice is shown. (Mot. 7.)   Angiotech's argument is predicated on Section 9.5(a) of the Stock Purchase Agreement, which requires Angiotech to give RoundTable notice of a potential breach of a representation or warranty within 10 days of becoming aware of such breach.  This requirement is explicitly conditioned with the following language:   "the failure to so notify [RoundTable] shall not relieve [RoundTable] . . . of any liability it may have to [Angiotech]" unless prejudice can be shown.  (Compl. Ex. A at § 9.5(a).)  This, of course, is a different section of the contract and pertains not to the mandatory obligation to disclose proofs, but to the obligation to give notice of the circumstances of a potential breach close in time to its occurrence.  Section 9.5(a) involves terms different from and wholly independent of the contractual obligation to provide documents and access to books and records once a claim has been submitted.

The mandatory proof and access provisions of the Agreement contain no general provisions saying that the obligation to produce documentation or provide access to books and records is excused absent prejudice.  Such a reading requires *explicit* language which appears nowhere in the Agreements.   Angiotech's argument is directly contrary to the principle of contract construction that holds that the presence of an express exception precludes creation of additional exceptions; items not embraced by the exception are not subject to it.  *See, e.g., In re McDonald*, 116 Misc.2d 834 (N.Y. Sur. 1982).

Contracts are binding agreements.   They reflect the results of bargaining and consideration.  The language may not be expanded or restricted beyond what is on the page.

Courts assume, in instances like these, that the parties did not intend the prejudice exception to apply to anything other than the 10 day notice provision for which it was used. *See RJE Corp. v. Northville Indus. Corp.*, 198 F. Supp. 2d 249 (E.D.N.Y. 2002) (finding under New York law that an entire contract should be read together and holding that inclusion of a cap for environmental liabilities in one section of a contract meant that such liabilities were intended to be excluded in another section of a contract). There is nothing in the Agreements that remotely suggests that the limited terms of Section 9.5 apply more generally to other provisions of the contract.[9]

c.    **Angiotech's Motion Must Be Denied Because RoundTable *Has* Alleged Prejudice.**

Remarkably, Angiotech ignores the fact that RoundTable *has,* in fact, alleged such prejudice. This destroys Angiotech's argument that "RoundTable has not, and cannot, allege that it was materially prejudiced by any alleged failure of Angiotech to provide RoundTable adequate notice or documentation of Angiotech's claim." (Mot. at 12 n. 5.) Inexplicably, the Motion cites Paragraph 51 of the Complaint, which specifically states, "As a result of Angiotech's breaches of the Agreements, RoundTable has suffered Damages in the following ways:" and proceeds to list four ways, including the fact that the funds remain in escrow rather than being distributed to RoundTable and that "RoundTable continues to incur attorney's fees and costs litigating against Angiotech to obtain the escrow funds." (Compl. ¶ 51.) There are other comparable allegations in the Complaint. Paragraph 42, for example, describes the prejudice resulting from being denied the use of funds. For purposes of the Motion, the allegations must be taken as true.

---

[9] Angiotech tries to generalize Section 9.5, arguing that "[s]uch language makes clear that these provisions do not constitute conditions precedent, and the strict compliance that RoundTable alleges in the Complaint is not required under the parties' agreement." (Mot. at 7.) But the "such language" referred to is explicitly limited to the failure to provide notice within 10 days. (Compl. Ex. A at § 9.5(a)). It states "the failure to so notify." It does not also state "the failure to provide access to all books and records," "the failure to respond to a notice of objection within 15 days," etc.

**B.    The Post-Deadline Claims Must Be Stricken.**

The February, 2008 additions to Angiotech's claims are barred by the expiration of the claims process in April, 2007. Section 9.1(b) of the Stock Purchase Agreement provides: "No claim for indemnification, reimbursement or other remedy . . . may be brought with respect to breaches of representations and warranties after the applicable [claims] expiration date set forth in 9.1(a)(i)." (Compl. Ex. A at § 9.1(b).) As noted above, the $2 million increase in damages on two claims and the entirely new "contingency" amounts fall squarely within this prohibition. They are unquestionably new claims for "indemnification, reimbursement or other remedy." And they were made after the close of the claims process.

In response, Angiotech argues a non-sequitur. It asserts its 11 claims are "really" just one and its $4 million increase is just a "friendly amendment" to its initial claim. This is meritless. First, the number of claims is irrelevant. Section 9.1(b) of the Agreement bars the increases whether based on one claim or twenty. Second, Angiotech neglects its own statements that make clear it has made eleven separate, free-standing claims and certified them as complete in its April 4, 2007 Notice of Claims. (*See, e.g.,* Compl. Ex. F, wherein Angiotech's Senior Corporate Counsel refers to "the *claims* set forth in our Notice of *Claims* for Indemnification" (emphasis added); Compl. Ex. H (where Angiotech's Senior Corporate Counsel refers to "the details of the escrow *claims*) (emphasis added).)

Furthermore, it is obvious from the actual summaries of its claims that Angiotech has provided that each is a free-standing claim. For example, in its original Notice of Claims, Angiotech sets forth the "summary" of each claim, and each is bound by the claims deadline of April, 2007. (Compl. Ex. C at Ex. A.) It is clear on its face that the claim for "product recalls if necessary after completion of Quality System Investigation activities" (Claim 9) is entirely

separate and unrelated to Claim 2, for "Employee taxes: Taxes and remittances related to Taunton facility employees receiving distributions for options were not properly made on or prior to closing." (*Id.*)  In fact, the claims span more than one division and various different facilities. (*See, e.g., id.* Claim 1 (involving a recall dispute with a Puerto Rico facility); *id.* Claim 2 (involving Taunton facility employee options); *id.* Claims 4 and 5 (involving a water system and unspecified "equipment" in the Wheeling facility, respectively).)

Angiotech's position is that it may freely amend its original claims and add new "contingency" amounts – all without documentation – in perpetuity.  In Angiotech's view, it has no obligations to ever present any documents supporting its claims or to stop raising its claim amounts as long as they add up to $20 million or less.  Contracts will not be construed to lead such absurd results so clearly at odds with the language of the Agreements and the intent of the Parties. *See, e.g., Bank Julius Baer & Co., Ltd. v. Waxfield Ltd.*, 424 F.3d 278, 283 (2d Cir. 2005); citing *World Trade Ctr. Prop., LLC v. Hartford Fire Ins. Co.*, 345 F.3d 154, 184 (2d Cir. 2003).  The Parties agreed by contract to bring finality to such matters as of April, 2007 for a transaction that closed in March of 2006.  That limitation should be enforced by this Court.

## CONCLUSION

In order for Angiotech to be entitled to any of the escrow funds, Angiotech had to provide proper claim notification.  It did not.  It also had to provide documents and other materials to support its claims.  It did not.  It also had to file *all* of its claims in a timely fashion. It did not.  Therefore, there are no claims that can "be subject to indemnification in accordance with [] Article IX [of the Stock Purchase Agreement] notwithstanding [the indemnity's expiration date]." (Compl. Ex. A at § 9.1(b).)

For purposes of this Motion, Angiotech must "show beyond doubt that the plaintiff can provide no set of facts in support of [its] claim which would entitle [it] to relief." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir. 1994). It cannot do so. Accordingly, Angiotech's Motion for Partial Judgment on the Pleadings must be denied.

Date: July 23, 2008                    **ROUNDTABLE HEALTHCARE PARTNERS**

By _____
Jason Mogel
Linda Imes
Spears & Imes LLP
51 Madison Avenue
New York, NY 10010
Tel:    (212) 213-6996
Fax:    (212) 231-0849
LImes@spearsimes.com
JMogel@spearsimes.com

F. Thomas Hecht
Jacob M. Mihm
Amy M. Gardner
Ungaretti & Harris, LLP
3500 Three First National Plaza
Chicago, Illinois 60602
Tel:    (312) 977-4400
Fax:    (312) 977-4405
fthecht@uhlaw.com
jmmihm@uhlaw.com
agardner@uhlaw.com
*Attorneys for Plaintiff*
*RoundTable Healthcare Partners, L.P.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of July 2008 I caused to be served a true and correct copy of RoundTable Healthcare Partners' Opposition to Angiotech Pharmaceuticals (U.S.), Inc.'s Motion for Partial Judgment on the Pleadings upon each of the following via ECF:

Warren J. Rheaume
Malaika M. Eaton
Heller Ehrman LLP
701 Fifth Avenue, Suite 6100
Seattle, Washington 98104-7098
Tel: (206) 447-0900
Fax: (206) 447-0849
warren.rheaume@hellerehrman.com
malaika.eaton@hellerehrman.com

Andrew Levine
Heller Ehrman LLP
Times Square Tower
7 Times Square
New York, NY 10036-6524
Tel: (212) 832-8300
Fax: (212) 763-7600

**Counsel for Defendant Angiotech Pharmaceuticals (U.S.), Inc.**

Jason Mogel

# APPENDIX A

Westlaw.

Slip Copy
Slip Copy, 2007 WL 2859702 (W.D.N.Y.)
**2007 WL 2859702 (W.D.N.Y.)**

Page 1

Southward Investments, LLC v. V-GPO, Inc.
W.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,W.D. New York.
SOUTHWARD INVESTMENTS, LLC, Plaintiff,
v.
V-GPO, INC., Defendant.
No. 06-CV-6540T.

Sept. 26, 2007.

**DECISION and ORDER**

MICHAEL A. TELESCA, United States District
Judge.
*1 Plaintiff Southward Investments, LLC,
("Southward"), brings this action against defendant
V-GPO, Inc., ("V-GPO") claiming that the defend-
ant breached a contract between the parties, and un-
lawfully converted plaintiff's property. Southward
seeks specific performance of the terms of the con-
tract, or, in the alternative, damages for the alleged
breach of contract and conversion of property.

Defendant V-GPO moves for summary judgment in
its favor on grounds that this court lacks subject
matter jurisdiction over the dispute because the
amount in controversy is not in excess of
$75,000.00. Defendant further contends that
plaintiff's cause of action for conversion is un-
timely, and that its breach of contract claim is de-
fective as a matter of law because Southward failed
to perform conditions precedent set forth in the
contract.

For the reasons set forth below, I grant defendant's
motion for summary judgment.

*BACKGROUND*

Plaintiff Southward Investments, LLC, is an invest-
ment company located in Rochester, New York.

Southward is engaged in the business of selling
shell corporations. Morris Diamond ("Diamond") is
the President of Southward. Diamond was person-
ally acquainted with Casimer Jaszewski
("Jaszewski"), the owner of controlling interest in a
company known as Epicure Investments
("Epicure"). Epicure was a publicly-traded shell
corporation.

In 2001, Jaszewski sought the assistance of South-
ward in selling Epicure. Diamond contacted
Douglas Murdock ("Murdock") of Belmont Man-
agement Services to inquire whether Murdock
knew of any potential buyers for a publicly-traded
shell corporation. Murdock indicated that a com-
pany affiliated with Belmont, defendant V-GPO, (a
privately held corporation) was interested in pur-
chasing Epicure as part of a "reverse merger" trans-
action whereby V-GPO would merge with Epicure,
and in doing so, would become a publicly traded
company. A reverse merger transaction is relatively
simple way for a privately-held company to become
a publicly-traded company in that it avoids several
of the administrative, procedural, and regulatory re-
strictions and requirements imposed on private
companies which attempt to become publicly-
traded companies. In a reverse merger transaction,
because a publicly-traded company already exists,
the privately-held company need only merge with
the public company to become a public company it-
self. Typically, once a reverse merger is completed,
the name of the merged company is changed to that
of the former private company, and the principles
of the private company take control of the newly
formed public company.

In 2001, Epicure and V-GPO agreed to enter into a
reverse merger agreement. Pursuant to the parties'
agreements, Jaszewski was to be paid $400,000 for
the company. Southward contends that its compens-
ation for arranging the deal was to be paid in
2,000,000 freely-trading, pre-merger stock from
Epicure. Southward contends that because
Jaszewski was under financial duress at the time, it

© 2008 Thomson Reuters/West. No Claim to Orig, U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2859702 (W.D.N.Y.)
**2007 WL 2859702 (W.D.N.Y.)**

Page 2

agreed to take its commission in the form of stock, and to pay the transactional costs and attorneys fees related to the merger. Thereafter, Southward contends that it agreed to trade its 2,000,000 shares of freely-trading, pre-merger Epicure Stock for 3,000,000 restricted post-merger shares of the newly formed company that emerged from the merger.

*2 Defendant disputes the plaintiff's claims, and contends that Southward never had an agreement with either Jaszewski, Belmont, or V-GPO to receive 2,000,000 shares of pre-merger Epicure stock, nor was there ever an agreement between any of the parties to exchange 2,000,000 shares of pre-merger Epicure Stock for 3,000,000 post merger shares. Rather, defendant contends that Southward and V-GPO entered into a Stock Purchase Agreement whereby Southward agreed to purchase 3,000,000 shares of post-merger V-GPO par value common stock (valued at $.0001 per share) for $2,500,000. Specifically, the Stock Purchase Agreement provided that:

the Purchaser [Southward] hereby agrees to purchase ... [3,000,000 shares of stock] for an aggregate of $2,500,000 U.S. ("Price"), and Purchaser hereby agrees to pay simultaneously with payment of the Price, all fees, costs, and expenses associated with effecting the transactions related to the Merger Agreement dated the date of this Agreement between the Company [V-GPO] and Epicure Investments, Inc., ... including specifically, but not exclusively, the sale of the [3,000,000 shares of stock] to Purchaser. Company [V-GPO] acknowledges and agrees that the Price for the [3,000,000 shares of stock] shall be provided by the resale of certain shares of Epicure Investments, Inc....under the Stock Sale and Escrow Agreement of even date herewith .... " FN1

FN1. The Stock Sale and Escrow Agreement referred to in the Stock Purchase Agreement was actually entered into on December 6, 2001. That agreement was

made between Epicure Investments and Belmont Management Services, a company operated by V-GPO.

V-GPO contends that because Southward never paid for the stock pursuant to the Stock Purchase Agreement, it is not entitled to the $3,000,000 shares of stock. Southward contends that the money that was to be used for the purchase of the stock was to be derived from the sale of Epicure that was sold to Belmont pursuant to the Stock Sale and Escrow Agreement.

### DISCUSSION

#### I. Defendant's Motion for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."When considering a motion for summary judgment, all inferences and ambiguities must be resolved in favor of the party against whom summary judgment is sought. *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54 (2nd Cir.1997). If, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party, a grant of summary judgment is appropriate. *Annis v. County of Westchester,* 136 F.3d 239, 247 (2nd Cir.1998).

#### II. Breach of Contract

"To make out a viable claim for breach of contract a 'complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.' " *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.,* 375 F.3d 168, 177 (2nd Cir.2004) (quoting

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2859702 (W.D.N.Y.)
**2007 WL 2859702 (W.D.N.Y.)**

Page 3

*Harsco Corp. v. Segui,* 91 F.3d 337, 348 (2d Cir.1996).

\*3 In the instant case, there is no dispute that Southward and V-GPO were parties to a Stock Purchase Agreement. It is further undisputed that V-GPO did not deliver 3,000,000 shares of $.0001 par value Common Stock to Southward following completion of the merger between V-GPO and Epicure. Assuming that the plaintiff could prove damages from not receiving the 3,000,000 shares of stock, the remaining questions are whether Southward performed under the contract, and whether V-GPO breached the agreement by not delivering the 3,000,000 shares.

The Stock Purchase Agreement clearly states that Southward "agrees to purchase the shares for an aggregate of $2,500,000 ..." It is uncontested, however, that Southward did not pay any amount for the shares. Accordingly, because Southward failed to fulfill a condition precedent to receiving the shares, (paying the $2,500,000 purchase price), Southward cannot establish a claim for a breach of contract.

Southward, however, claims that the parties never intended that it would have to pay for the shares, and that it was understood that the 3,000,000 post-merger shares were to be received by Southward in exchange for the 2,000,000 pre-merger shares that it claims it was entitled to as compensation for arranging the merger, and paying for the associated transactional costs of the merger. In support of this argument, Southward points to that portion of the Stock Purchase Agreement which states that V-GPO "acknowledges and agrees that [$2.5 million] price for the shares shall be provided by the resale of certain shares of Epicure Investments, Inc.... under the Stock Sale and Escrow Agreement of even date herewith."December 10, 2001 Stock Purchase Agreement at ¶ 1.

Southward's argument, however, is unavailing for several reasons. First, there is no evidence in the record that Southward had any agreement with any party under which it would receive 2,000,000 shares of pre-merger Epicure Stock. Although Plaintiff's Complaint alleges that "[p]rior to December, 2001, plaintiff entered into an agreement with Jaszewski pursuant to which, among other things Jaszewski agreed, in consideration of plaintiff arranging for a reverse merger between Epicure and an operating company, that Jaszewski would contribute the use and/or benefit of 2,000,000 of his shares of Epicure ... to facilitate the merger transaction" (Complaint at ¶ 6), Morris Diamond, Southward's President, admitted under oath that in fact Jaszewski and Southward had *never* entered into any agreement pursuant to which Southward would receive *any* pre-merger Epicure stock. Deposition Testimony of Morris Diamond at p. 133, 140.Accordingly, the allegation of that an agreement existed between Southward and Jaszewski as alleged in the Complaint is false, and cannot serve as support for plaintiff's claim that he was to receive 2,000,000 shares of stock in compensation for his role in the merger, or that he agreed to exchange his 2,000,000 shares of pre-merger stock for 3,000,000 shares of post merger stock. Having not received 2,000,000 shares of stock initially, Southward lacked the ability to exchange that stock for post-merger stock. Similarly, because Southward did not have 2,000,000 shares of stock to be sold, absent some agreement to the contrary, it could not benefit from the sale of 2,000,000 shares of stock to be applied towards the purchase price of the post-merger stock.

\*4 Southward contends, however, that it was to benefit from the resale of stock sold by Jaszewski to Belmont pursuant to the Stock Sale and Escrow Agreement ("SSEA") entered into between Belmont and Jaszewski. The SSEA, however, was the agreement which effectively "sold" Epicure to V-GPO, and provided, generally, that in consideration of Jaszewski's delivery of 2,010,000 shares of Epicure Stock to Belmont, Jaszewski would receive $400,000. Nowhere in that agreement is there any reference to Southward being entitled to receive any stock, or benefit from the sale of Jaszewski's

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2859702 (W.D.N.Y.)
2007 WL 2859702 (W.D.N.Y.)

stock. Accordingly, I find Southward's claim of entitlement to the benefit of proceeds from the resale of Jaszewski's stock to Belmont to be wholly unsuported by the record.

The only evidence in the record suggesting that Southward was entitled to either 2,000,000 shares of pre-merger stock or 3,000,000 of post-merger stock is Diamond's testimony that he had oral understandings with Murdock that Southward would receive 3,000,000 shares of stock. Diamond testified that he had "an understanding" with Murdock that Southward would receive stock as its compensation for being "the go-between" in the merger deal. Deposition Testimony of Morris Diamond at pp. 135-136.Diamond testified that his stock compensation deal was "done orally." *Id.* at 140.However, the Stock Purchase Agreement entered into by Diamond on behalf of Southward states clearly and unequivocally that the written agreement constituted "the entire agreement between the parties pertaining to the subject matter as set forth [therein] and supersede[d] any prior understandings or agreements, oral or written. Accordingly, Southward's claims of oral promises collateral to the contract may not be considered by the court. Because V-GPO has demonstrated that Southward failed to perform a condition precedent under the Stock Purchase Agreement, I find that plaintiff has failed to state a claim for breach of contract.

III. *Conversion and Specific Performance*

For the reasons stated above, I grant defendant's motion for summary judgment with respect to plaintiff's claims for specific performance and conversion. Plaintiff has failed to establish that it is entitled to performance of the Stock Purchase Agreement, and has failed to establish that the defendant has converted its property.

CONCLUSION

For the reasons set forth above, I grant defendant's

motion for summary judgment, and dismiss plaintiff's complaint with prejudice.

ALL OF THE ABOVE IS SO ORDERED.

W.D.N.Y.,2007.
Southward Investments, LLC v. V-GPO, Inc.
Slip Copy, 2007 WL 2859702 (W.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

## Westlaw.

17 Misc.3d 1101(A)                                                                                                    Page 1
17 Misc.3d 1101(A), 851 N.Y.S.2d 57, 2007 WL 2756961 (N.Y.Sup.), 2007 N.Y. Slip Op. 51785(U)
**Unreported Disposition**
17 Misc.3d 1101(A), (N.Y.Sup.)2007 WL 2756961

**C**
Duane Reade, Inc. v. Cardtronics, LP
N.Y.Sup.,2007.
(The decision of the Court is referenced in a table
in the New York Supplement.)
Supreme Court, New York County, New York.
DUANE READE, INC., Plaintiff,
v.
CARDTRONICS, LP, Defendant.
No. 603545/06.

Sept. 21, 2007.

Daniel P. Goldberg, Esq., Kasowitz, Benson,
Torres, & Friedman LLP, New York, for Plaintiffs.
Steven Paradise, Esq., Michael S. Davi, Esq.,
Debbie E. Green, Esq., Zachary Mazin, Esq., Vin-
son & Elkins LLP, New York, for Defendants.
BERNARD J. FRIED, J.
**\*1** This action arises as a result of the Second
Amendment to an ATM Placement Agreement
entered into by plaintiff Duane Reade and defend-
ant Cardtronics as of December 2003 (the Arrange-
ment). Duane Reade originally moved for an Order:
(i) enforcing an exclusive forum selection agree-
ment; and (ii) pursuant to CPLR 6311, enjoining
Cardtronics from pursuing an action it initiated in
the District of Harris County Texas (the Texas Ac-
tion). Cardtronics cross-moved for an Order: (i) dis-
missing this action in favor of the Texas Action; or
(ii) staying this action pending the outcome of that
Texas Action. Cardtronics cross-moved, in the al-
ternative, to dismiss the complaint, pursuant to
CPLR 3211(a)(7), for failure to state a cause of ac-
tion upon which relief can be granted. Duane Reade
cross-cross-moved for an Order, pursuant to CPLR
3212 and 3211(c), granting partial summary judg-
ment as to liability, and a declaration of the mean-
ing of a particular section of the Arrangement.

I have been advised that the Texas Action has been
discontinued by stipulation. Thus, the remaining
motions before me are: (i) Cardtronics' motion to
dismiss the complaint; and (ii) Duane Reade's mo-

tion for partial summary judgment as to liability,
and a declaration of the meaning of applicable lan-
guage in the Arrangement .[FN1]

> FN1. Cardtronics' motion is based solely
> upon interpretation of the contract lan-
> guage at issue, the proofs provided are as
> complete as they would be on an outright
> summary judgment motion under CPLR
> 3212, there are no general pertinent factual
> issues outstanding, and Cardtronics has re-
> sponded to the motion for partial summary
> judgment. I will, thus, treat Cardtronics'
> motion as a cross motion for summary
> judgment.

According to the complaint, on or about July
14,1999, the American Express Travel Related Ser-
vices Company, Inc. (AMEX) and Duane Reade
entered into an "ATM Placement Agreement,"
which provided for the placement of AMEX auto-
mated teller machines (ATMs) in Duane Reade
stores. On or about March 2001, AMEX and Duane
Reade executed an amendment to the ATM Place-
ment Agreement, titled "First Amendment to Li-
censed Space for ATMs Agreement."Subsequently,
on or about August 8, 2003, AMEX sold, trans-
ferred, and assigned the ATM Placement Agree-
ment to Cardtronics.On December 19, 2003,
Cardtronics and Duane Reade executed the Second
Amendment (herein, as defined above, the Arrange-
ment), to the original ATM Placement Agreement,
extending the life of the ATM Placement Agree-
ment through 2014. The Arrangement modified
several provisions of the original ATM Placement
Agreement and added several new ones, including a
provision concerning "Bank Branding" of the
Cardtronics ATMs located in Duane Reade stores.
Both parties have acknowledged at oral argument,
and asserted in their memoranda, that the language
of the Arrangement is unambiguous. Nonetheless,
the following pertinent part of a provision is at the
heart of the instant dispute:

© 2008 Thomson Reuters/West, No Claim to Orig. U.S. Govt. Works.

17 Misc.3d 1101(A)                                                                Page 2
17 Misc.3d 1101(A), 851 N.Y.S.2d 57, 2007 WL 2756961 (N.Y.Sup.), 2007 N.Y. Slip Op. 51785(U)
Unreported Disposition
**17 Misc.3d 1101(A), (N.Y.Sup.)2007 WL 2756961**

Both parties acknowledge that a "Bank Brand-ing" arrangement with a large well known finan-cial institution (a "bank") covering and affecting the ATMs will benefit Duane Reade by increas-ing foot-traffic in the affected store locations. "Bank Branding" means permitting a bank to so mark or brand an ATM such that to any person using that ATM it will appear to be owned or op-erated by that bank, notwithstanding the fact that the ATM continues to be owned, managed and operated by Cardtronics. Additionally, the bank's customers will be able to use any such branded ATM without paying any surcharge. In recogni-tion of these lost surcharge transactions and to preclude any loss of fees payable to Duane Reade hereunder, as of the date any Bank Branding ar-rangement becomes effective, Cardtronics will determine the number of surcharged transactions conducted by said bank's customers during the immediately preceding month at all of the ATMs covered by such arrangement (the "Branding Sur-charge Transactions") and thereafter through the term of this Agreement on a monthly basis will credit Duane Reade with the full amount of the Branding Surcharge Transactions.

*2 ATM Placement Agreement, Second Amend-ment, ¶ 11.

By 2005, the parties had agreed that JP Morgan Chase (Chase) would be the Branding Bank under the Arrangement. Cardtronics began to install or upgrade the ATMs in Duane Reade stores in the first quarter of 2005. In June of 2005, Cardtronics and Duane Reade disagreed as to the amount of fees due under the Arrangement. Specifically, Cardtronics maintained that it was required to make a determination of the Branding Surcharge Transac-tions amount only once, for the month immediately preceding the Arrangement (i.e., February 2005), and pay that amount, each month, for the duration of the ATM Placement Agreement. Duane Reade, meanwhile, maintained that Cardtronics was re-quired to pay for the actual number of Branding Surcharge Transactions in *each* month immediately

preceding payment.

Contracts are to be interpreted from the intention of the parties, as derived from the language of the con-tract, and where the language is plain and unam-biguous, extrinsic circumstances should not be con-sidered to determine the intention of the parties. *Lopez v. Fernandito's Antique,* 305 A.D.2d 218, 219 (1st Dept 2003). This does not mean, of course, that common sense should be disregarded in favor of formalistic literalism; in all events, the essence of the contract should be preserved. *Reiss v. Finan-cial Performance Corp.,* 279 A.D.2d 13, 19 (1st Dept 2000); *see also Aron v. Gillman,* 309 N.Y. 157, 163 (1955).

Here, the Arrangement states that Cardtronics will determine "the number of surcharged transactions" conducted by Chase "customers during the immedi-ately preceding month at all of the ATMs covered by such arrangement."As the very basis of the Ar-rangement is that there would no longer be "surcharged transactions" for Chase customers after the effective date, there is but one interpretation available: that this refers to the month before the ef-fective date of the Arrangement, and not to sub-sequent months in which there are no such "surcharged transactions." Stated more simply, after the effective date, there was, presumably, no longer any such thing as a "surcharged transaction" for Chase customers; the number of surcharged transactions would always, thereafter, be zero.

Moreover, the payment method under the Arrange-ment is that Cardtronics "through the term of this [Arrangement] on a monthly basis will credit Duane Reade with the full amount of the Branding Surcharge Transactions."The "Branding Surcharge Transactions" is defined as "the number of sur-charged transactions conducted by said bank's cus-tomers during the immediately preceding month at all of the ATMs covered by such arrangement."If there are no "surcharged transactions," there can be no "full amount of the Branding Surcharge Trans-actions."Thus, the amount of the payment, by the plain meaning of the Arrangement, is the amount

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

17 Misc.3d 1101(A), 851 N.Y.S.2d 57, 2007 WL 2756961 (N.Y.Sup.), 2007 N.Y. Slip Op. 51785(U)
**Unreported Disposition**
**17 Misc.3d 1101(A), (N.Y.Sup.)2007 WL 2756961**

determined in that one calculation of the number of surcharged transactions in the month immediately preceding the effective date of the Arrangement. No other interpretation gives meaning to the terms, or, indeed, the paragraph as a whole. *Acme Supply Co. v. City of New York*, 39 AD3d 331, 332 (1st Dept 2007) ("[a]n interpretation that gives effect to all the terms of an agreement is preferable to one that ignores terms or accords them an unreasonable interpretation" [citation and internal quotation marks omitted] ).

*3 It is also notable that the calculation was to be of "the number of surcharged transactions conducted by said bank's customers during the immediately preceding month," whereas payment for those lost transactions was to be "on a monthly basis." If both calculation and payment were both to have been on a monthly basis, the Arrangement would have, or should have, so stated. *Two Guys from Harrison-N.Y. v. S.F.R. Realty Assoc.*, 63 N.Y.2d 396, 403 (1984) ("[i]n construing a contract, one of a court's goals is to avoid an interpretation that would leave contractual clauses meaningless" [citations omitted] ). The proper interpretation is one that gives different meanings to "immediately preceding month" and "monthly basis." *HSBC Bank USA v. National Equity Corp.*, 279 A.D.2d 251, 253 (1st Dept 2001) ("the rule is that where two seemingly conflicting contract provisions reasonably can be reconciled, a court is required to do so and to give both effect" [citations and internal quotation marks omitted] ).

Duane Reade's proffered interpretation would either completely obviate the cited language, or, alternatively, call upon the court to read "surcharged transactions" to mean "transactions that would have been surcharged."Again, such an interpretation would render the term "surcharged transactions" meaningless. *See Yoi-Lee Realty Corp. v. 177th Street Realty Assoc.*, 208 A.D.2d 185, 190 (1st Dept 1995) ("contracts should be construed to give force and effect to their provisions and not in a manner so as to render them meaningless" [citations omitted] ); *see also God's Battalion of Prayer Pentecostal*

*Church v. Miele Assoc.*, 6 NY3d 371, 374 (2006) (contracts should be read to give effect to all provisions).

Duane Reade also argues that the language of the Arrangement is prospective, referring to the fact that "the bank's customers *will* be able to use any such branded ATM without paying any surcharge (emphasis added)." Duane Reade concludes that this means that the "recognition of these lost surcharge transactions" must also be prospective. This argument is without merit. There is nothing new or novel about offering a fixed continued payment in exchange for a potential continued payment. If the lost surcharge transactions are prospective, it does not follow that the compensation for those potential losses must be calculated as they arise. For example, nary a lawsuit would ever be resolved if defendants were required to recalculate actual losses of plaintiffs indefinitely into the future. Rather, payment for prospective losses are settled by a pre-calculated payment. Such is the norm, and not the exception. *Compare* Restatement (Second) of Torts: Damages For Past, Present And Prospective Harms § 910 ("[o]ne injured by the tort of another is entitled to recover damages from the other for *all harm, past, present and prospective*, legally caused by the tort" [emphasis added] ).

Finally, the phrase "the full amount of the Branding Surcharge Transactions" is an indication that Cardtronics' interpretation is rational. The use of the phrase "the full amount" is a clear attempt to avoid the payment of partial amounts, or variations in the amounts payable. Thus, the indication is that there may be times when the number of transactions conducted by Chase's customers might be less than (or more than) the number used to determine the Branding Surcharge Transactions amount, The Arrangement, then, attempts to regularize the amount payable, and not to offer month-to-month variations, as suggested by Duane Reade. I have considered Duane Reade's remaining arguments, and find them to be without merit. Duane Reade's motion for summary judgment as to liability is denied.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

17 Misc.3d 1101(A)                                                                    Page 4
17 Misc.3d 1101(A), 851 N.Y.S.2d 57, 2007 WL 2756961 (N.Y.Sup.), 2007 N.Y. Slip Op. 51785(U)
**Unreported Disposition**
17 Misc.3d 1101(A), (N.Y.Sup.)2007 WL 2756961

*4 Cardtronics' motion to dismiss the complaint for failure to state a claim is granted with regard to the first cause of action for breach of contract. With regard to the second cause of action, however, the motion to dismiss is denied. CPLR 3001 states that "[t]he supreme court may render a declaratory judgment ... as to the rights and other legal relations of the parties to a justiciable controversy whether or not further relief is or could be claimed."Ergo, if the claim for declaratory judgment, as presented by Duane Reade, is justiciable, the motion to dismiss for failure to state a claim should be denied. *Barry v. Ready Reference Publ. Co.*, 25 A.D.2d 827, 827 (1st Dept 1966) (principal purpose of declaratory judgment is to provide for "the complete and final settlement of the rights and legal relations of the parties with respect to the matters in controversy"). Here, the parties disagree as to performance and payment obligations under the Arrangement. As a result, the matter is justiciable, and rendering a declaratory judgment would not be superfluous or unnecessary. *Kalisch-Jarcho v. City of New York,* 72 N.Y.2d 727, 731 (1988).

Partial summary judgment should be granted declaring that the meaning of paragraph 11 of the Second Amendment (executed December 19, 2003) to the original ATM Placement Agreement (executed on or about July 14,1999) is that Cardtronics was obligated to determine the number of actual surcharged transactions conducted by JP Morgan Chase customers at all of the ATMs covered by the Second Amendment (which was defined therein as the "Branding Surcharge Transactions") during the month immediately preceding the effective date of the Second Amendment (i.e., February 2005), and pay the amount so determined thereafter through the remaining term of the ATM Placement Agreement, on a monthly basis, to Duane Reade.

Accordingly, it is hereby

**ORDERED** that the motion of defendant Cardtronics, LP for summary judgment dismissing the complaint is granted to the extent that the first cause of action for breach of contract is dismissed, and it is otherwise denied; and it is further

**ORDERED** that the prong of the cross motion of plaintiff Duane Reade seeking partial summary judgment as to liability is denied; and it is further

**ORDERED** that the prong of the cross motion of plaintiff Duane Reade for summary judgment declaring the meaning of paragraph 11 of the Second Amendment (executed December 19, 2003) to the original ATM Placement Agreement (executed on or about July 14,1999), is granted.

Settle judgment.

N.Y.Sup.,2007.
Duane Reade, Inc. v. Cardtronics, LP
17 Misc.3d 1101(A), 851 N.Y.S.2d 57, 2007 WL 2756961 (N.Y.Sup.), 2007 N.Y. Slip Op. 51785(U)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

## Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1203836 (S.D.N.Y.)
**2002 WL 1203836 (S.D.N.Y.)**

Page 1

▷
Rutgerswerke AG and Frendo S.p.A. v. Abex Corp.
S.D.N.Y.,2002.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
RUTGERSWERKE AG and FRENDO S.p.A.,
Plaintiffs,
v.
ABEX CORPORATION, Pneumo Abex Corporation and Whitman Corporation, Defendants.
**No. 93 CIV.2914 JFK.**

June 4, 2002.

Baker & McKenzie, Chicago, IL, Of Counsel:
Richard Franklin, Esq., for the Plaintiffs.
Fognani Guibord Homsy & Roberts, LLP, Chicago,
IL, Of Counsel: John Roberts, Esq., for Defendants
Abex Corporation and Pneumo Abex Corporation.
Butler Rubin Saltarelli & Boyd, Chicago, IL, Of
Counsel: Kirk T. Hartley, Esq., for Defendant
Whitman Corporation.

### OPINION and ORDER

KEENAN, District J.
*1 Before the Court are the following motions: (1)
motion for summary judgement by defendants
Abex Corporation ("Abex"), Pneumo Abex Corporation ("Pneumo Abex"), and Whitman Corporation
("Whitman") (collectively "Defendants"); (2) Defendants' motion for partial summary judgment on
the issue of whether the "dumps" were permanently
closed in 1983; (3) Defendants' motion to strike;
and (4) motion for summary judgment by plaintiffs,
Rütgers AG (formerly known as Rütgerswerke AG
and herein referred to as "Rütgers") and Frendo
S.p.A. ("Frendo") (collectively "Plaintiffs"). The
motions are opposed. The Court has jurisdiction
over this action pursuant to 28 U.S.C. § 1332.[FN1]
The Court heard oral argument on these motions on
May 16, 2002 and thoroughly considered all submissions made in connection with them. For the
reasons stated herein, the Court grants Defendants'

motion for summary judgment, denies Plaintiffs'
motion for summary judgment and denies as moot
all other pending motions.

> FN1. Jurisdiction before this Court is predicated upon diversity of citizenship
> between the parties, see28 U.S.C. §
> 1332(a)(1), as plaintiff Rütgers is a German stock corporation with its principal
> place of business in Germany, plaintiff
> Frendo is an Italian stock corporation with
> its principal place of business in Italy, defendant Abex was a corporation organized
> and existing under the laws of Delaware
> with its principal place of business in New
> York, defendant Pneumo Abex is a corporation organized under the laws of
> Delaware with its principal place of business in New Hampshire, and defendant
> Whitman is a holding corporation organized under the laws of Delaware with its
> principal place of business in Illinois and
> the amount in controversy exceeds the applicable jurisdictional minimum. See Rutgerswerke AG v. Abex Corp., No. 93 Civ.
> 2914, 1995 WL 625701, *1 (S.D.N.Y. Oct.
> 25, 1995).

### Background

This lawsuit involves a dispute over who should
bear financial responsibility for a landfill removal
project at a brake manufacturing plant in Orzinuovi,
Italy, a town located in the northern part of the
country in an area known as the Lombardy Region.
On January 23, 1970, the Mayor of Orzinuovi, upon
consultation with the Hygienic Building Commission, granted authorization to construct the
Orzinuovi plant. See Defs.' 56.1 Statement ¶ 6;
Roberts Aff., ¶ 18; Ex. Q. From April of 1978 till
the end of 1983, plaintiff Rütgers and defendant
Abex, through wholly-owned subsidiaries, participated in a joint venture that owned and operated the
Orzinuovi plant. See id. ¶ 7; Roberts Aff., ¶ 5; Ex.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1203836 (S.D.N.Y.)
2002 WL 1203836 (S.D.N.Y.)

D. During this time period, Hans Bethke, the Rüttgers official responsible for reducing the waste stream at the plant, visited and toured the facility about twice a year. *See id.* ¶¶ 8-9; Roberts Aff. ¶ 5; Ex. D, pp. 21, 34, 43 & 46. This tour included the backyard area of the plant where the underground landfills were located. *See id.* ¶¶ 8-9; Roberts Aff. ¶ 5; Ex, D, pp. 34, 43. At his deposition, Mr. Bethke testified that on these occasions he saw above-ground waste piles, but no underground landfills. *See* Roberts Aff. ¶ 5; Ex. D, pp. 43-45.

On or about September 22, 1980, the Region of Lombardy received a request for authorization to operate a waste disposal facility from Frendo,[FN2] pursuant to Lombardy Regional Law 94/1980. By this request, Frendo sought approval for the closure of two landfills and the opening of another landfill located at the Orzinuovi plant. *See id.* ¶ 6; Ex. E, pp. 41-54; Roberts Aff. ¶ 14; Ex. M. In response to that request, on March 17, 1982, the Lombardy Region sent a notice asking for supplemental documentation. *See* Pls.' Resp. to Defs.' 56.1 ("Pls.' Resp.") ¶ 11; Pls.' Ex, E, ¶¶ 6(c)-(e). Because of the failure to supply the requested information, on November 8, 1982, the Region informed Frendo officials that a denial of authorization was being processed. *See id.* By letter dated May 31, 1983, Frendo withdrew the September 1980 application for authorization to open the other landfill and submitted a request for authorization to temporarily store waste within the Orzinuovi plant. *See* Defs.' 56.1 Statement ¶ 12; Roberts Aff., ¶ 15; Ex. N. In response to this subsequent request, on October 25, 1983, the Lombardy Region rendered Deliberation No. III/32537, a statement officially acknowledging "the closing of the landfill disposal facility located" at the Orzinuovi plant. *Id.* ¶ 13; Roberts Aff. ¶ 13; Ex. L. The Deliberation directed Frendo to submit, within three months, a proposed environmental restoration plan prepared in cooperation with the Provincial Administration of Brescia, the local authority responsible for verifying implementation of the plan. *See id.* Shortly thereafter, on December 21, 1983, the Province of Brescia acknowledged receipt

of the Deliberation confirming the closing of the landfill disposal facility at the plant and requested that Frendo forward documentation illustrating its proposed environmental restoration plan for the site. *See id.* ¶ 14; Roberts Aff. ¶ 16; Ex. O. Following an April 19, 1984 on-site inspection of the Orzinuovi plant, on April 30, 1984, the Province issued an official acknowledgment verifying compliance with the regulatory program. *See id.* ¶ 15; Roberts Aff. ¶ 3; Ex. B, pp. 117-119; Roberts Aff. ¶ 12; Ex. K; Roberts Aff. ¶ 17; Ex. P. On September 8, 1993, the Province of Brescia's Waste Control Office prepared a chronology of events regarding the landfill situation at the Orzinuovi plant. *See* Roberts Aff. ¶ 3, Ex. B, p. 55; Ex. H. This report states that, "after DPR 915/82 went into effect, Frendo permanently closed the landfill as evidenced by deliberation no. 32537 of the Lombardy Region dated October 25, 1983."*Id.* Ex. H, p. 3. Italian officials have never advised Frendo of a deficiency in any of its notifications or approvals. *See* Roberts Aff. ¶ 3, Ex, B, pp. 93-94.

> FN2. "Frendo" hereinafter refers to the entity that owned and operated the Orzinuovi plant at any given time, unless otherwise specified.

*1988 Share Purchase Agreement*

*2 Sometime after the conclusion of the joint venture, on April 28, 1988, defendant Whitman Corporation (then known as IC Industries, Inc.) and defendant Pneumo Abex (then known as PA Holdings Corporation) executed a stock purchase agreement (the "1988 Purchase Agreement"), under which Whitman agreed to sell to Pneumo Abex certain subsidiaries including defendant Abex Corporation ("Abex"), an entity that, in turn, owned 99.99% of the shares of Abex S.p.A., an Italian stock company. *See* First Am. Compl. Ex. C, § 1(a)(ii) & § 3(d); Pls.' 56.1, ¶ 12. At that time Abex S.p.A. owned and operated the Orzinuovi plant. *See id.*

Thereafter, a dispute arose between Whitman and Pneumo Abex concerning certain provisions of the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1203836 (S.D.N.Y.)
2002 WL 1203836 (S.D.N.Y.)

1988 Purchase Agreement. *See* First Am. Compl.; Ex. G, p. 1. To resolve the dispute, on September 23, 1991, Whitman and Pneumo Abex entered into a settlement agreement (the "Settlement Agreement") providing, among other things, that Whitman and Pneumo Abex would amend the 1988 Purchase Agreement by executing a document entitled "Second Amendment to Stock Purchase Agreement dated April 28, 1988" (the "Second Amendment").*See id.;*Ex. G, p. 2. That same day, September 23, 1991, Whitman and Pneumo Abex executed the Second Amendment, which the parties dated August 29, 1988. *See id.;*Ex. H. Section 2 of the Second Amendment amended Section 12(b)(vi) of the 1988 Purchase Agreement to read:

Seller hereby agrees to indemnify Buyer and its affiliates (including the Sold Subsidiaries) against and to hold them harmless from, any loss, liability, claim, damage or expense (including reasonable legal fees and expenses) suffered or incurred by Buyer or its affiliates for or on account of or arising from or in connection with ...

(a) any noncompliance or failure to comply with, violation of, or breach of any Applicable Environmental Law ...;

(b) statutory liability arising out of any releasing, spilling, ... dumping, burying, placing, storing or disposing of any substance classified, defined, identified or designated as hazardous or toxic at any time prior to August 29, 1990, pursuant to Applicable Environmental Law or within the meaning given to the term hazardous or toxic under any Applicable Environmental Law ...; or

...

(d) any investigation, proceeding, claim or allegation relating to any matter indemnifiable under (a) or (b) above.

*Id.*

Section 12(b)(vi), as amended, defines "Applicable Environmental Law" as "any federal, state, local

and foreign statute, code, act, ordinance, regulation, requirement, or administrative rule and any permit, license, authorization, consent, notice, order, writ, subpoena or decree issued pursuant thereto relating to or as applied to pollution control, environmental contamination or protection of the environment, in each case limited to the extent and scope of recovery available at any time on or prior to August 29, 1990 ...."*Id.* ¶ 12(b). Paragraph 3 of the Second Amendment provides: "The parties acknowledge ... that the environmental matters listed on Schedule 12(b)(vi) [thereto] are included within [Whitman's] indemnification obligations under Section 12(b)(vi) as amended."*Id.* ¶ 36.Schedule 12(b)(vi), in turn, lists "Italian Environmental (Frendo)." *Id.* ¶ 37.The term "Italian Environmental (Frendo)" on Schedule 12(b)(vi) includes the landfills at the Orzinuovi plant. *See* Abex/Pneumo Abex Admission No. 56; Whitman Admission No. 40.

### 1989 Share Purchase Agreement

*3 On January 2, 1989, plaintiff Rütgers and defendant Abex entered into a stock purchase agreement (the "1989 Purchase Agreement"), under which a subsidiary of Rütgers, Frendo S.r.l., purchased the capital stock in Abex S.r.l. (formerly Abex S.p.A.), which owned and operated the Orzinuovi plant. *See* First Am. Compl., Ex. A.[FN9] Abex represented and warranted to Purchaser (Frendo S.r.l.) and Parent (Rütgers) under section 3.1.7 of the 1989 Purchase Agreement that the Orzinuovi plant was not being conducted in violation of any applicable law, other than violations that did not have a material and adverse affect on the business or finances of the sold subsidiary, Abex S.r.l.[FN10]*See id.* § 3.1.7 Section 7.3(a) of the agreement provides that, subject to section 7.1, Abex "will indemnify, defend and hold harmless," Rütgers and Frendo S.r.l. with respect to "any and all claims, demands or suits (by any person or entity, including without limitation any Governmental Agency), losses or liabilities ... relating to, resulting from or arising out of any material breach by [Abex] of any of the representations, warranties or

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1203836 (S.D.N.Y.)
**2002 WL 1203836 (S.D.N.Y.)**

Page 4

covenants of [Abex]" contained in the agreement. *Id.* § 7.3(a). Section 7.1(a), in turn, contains a one-year limitation on Rütgers's (and Frendo's) ability to assert a breach of warranty claim and provides that "any claim for an alleged breach of representation or warranty which is not asserted by written notice given as herein provided which describes the basis for such claim with specificity may not be pursued."*Id.* ¶ 7.1(a).[FN5]

> FN3. In May 1989, Frendo S.r.l. merged with Abex S.r.l. and assumed the name Frondo S.p.A., a plaintiff in this action. *See* First Am. Compl. ¶ 12.

> FN4. Section 3.1.7. provides in pertinent part:

> > Compliance with Laws. [T]he business of the Sold Subsidiaries ... is not being conducted, and neither of the Sold Subsidiaries ... is, in violation of any applicable Law, other than violations which do not, and, insofar as reasonably can be foreseen, in the future will not, either individually or in the aggregate, have a material adverse affect on the business, financial condition or results of operations of the Sold Subsidiaries.

> First Am. Compl., Ex. A, § 3.1.7.

> FN5. Section 7.1(a) provides in relevant part:

> > Each of the representations and warranties ... will survive the Closing and remain in full force and effect until the expiration of one year after the Closing Date or, if earlier, January 31, 1990, with the result that any claim for an alleged breach of a representation or warranty which is not asserted by written notice given as herein provided which describes the basis for such claim with specificity may not be pursued.

First Am. Compl., Ex. A, ¶ 7.1(a).

*Plant Expansion Investigation and Discovery of Landfills*

In September 1989, two Rütgers officials, Mr. Bethke and Mr. Bayer, began investigating the possibility of expanding the Orzinuovi facility by building in the area behind the plant. *See* Roberts Aff. ¶ 5; Ex. D, pp. 96-99. During the course of this investigation, on September 28, 1989, these officials allegedly discovered the landfills. *See Id.*Upon discovery, Mr. Bethke immediately questioned Frendo officials regarding the status of the landfills. *See Id.*Ex. D, pp. 103-05. On October 6, 1989, in response to the inquiry regarding the waste situation, Mr. Colli, a Frendo manager, advised Mr. Bethke that the "dump inside the plant" was used "up to the second half of 1983" and that, "we presented on April 17, 1984 the land reclamation project of the interested area and we obtained the approval from 'Provincia' on April 30, 1984."Roberts Aff. ¶ 11; Ex. J.

Shortly before expiration of the one-year limitation period, on October 23, 1989, Plaintiffs notified defendant Abex, in writing, of Plaintiffs' belief that underground landfills at the Orzinuovi plant might expose them to liability, thereby constituting a material breach by Defendants of representations and warranties under the 1989 purchase agreement. *See* Defs.' Supplemental 56.1 Statement, Ex. 1. In the letter, Plaintiffs stated: "While such waste disposal may or may not be partially covered by some official permit, it appears that at least a significant portion of the waste disposal on the Orzinuovi premises is not covered by any license or permit whatsoever."*Id.* The letter also explained: "We are currently in the process of investigating and inspecting the nature and scope of the waste disposal site as well as its legality."*Id.*

*\*4 Plaintiff Frendo first notified Italian authorities about the landfills in an October 2, 1991 letter proposing a landfill removal project as part of a plan to modernize and expand the Orzinuovi plant and to*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1203836 (S.D.N.Y.)
**2002 WL 1203836 (S.D.N.Y.)**

comply with the dictates of an environmental policy recently prepared by Frendo's new management. *See* Roberts Aff., ¶ 9; Ex. H. This letter made no reference to a violation of law as the reason for the project and came more than two years after the indemnity demand asserted against Defendants. All of Frendo's subsequent correspondence with Italian authorities likewise contained no mention of a violation of law as the impetus for the removal project. *See id* Ex. H. On January 23, 1993, the Mayor of Orzinuovi issued an order relating to the removal of the landfills at the Frendo plant. *See* Coccia Decl., Tab R.

### Discussion

### I. Summary Judgment Standards

This Court may grant summary judgment only if the moving party is entitled to judgment as a matter of law because there is no genuine dispute as to any material fact. *See Silver v. City Univ. of New York,* 947 F.2d 1021, 1022 (2d Cir.1991); *Montana v. First Fed. Sav. & Loan Ass'n,* 869 F.2d 100, 103 (2d Cir.1989); *Knight v. U .S. Fire Insur. Co.,* 804 F.2d 9, 11 (2d Cir.1986). The role of the Court on such a motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party."*Knight,* 804 F.2d at 11;*see also First Fed. Sav. & Loan Ass'n,* 869 F.2d at 103 (stating that to resolve a summary judgment motion properly, a court must conclude that there are no genuine issues of material fact, and that all inferences must be drawn in favor of the non-moving party).

The movant bears the initial burden of informing the Court of the basis for its motion and identifying those portions of the "pleadings, depositions, answers to interrogatories, and admissions to file, together with affidavits, if any," that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). If the

movant meets this initial burden, the party opposing the motion must then demonstrate that there exists a genuine dispute as to the material facts. *See id.;Silver,* 947 F.2d at 1022.

The opposing party may not solely rely on its pleadings, on conclusory factual allegations, or on conjecture as to the facts that discovery might disclose. *See Gray v. Darien,* 927 F.2d 69, 74 (2d Cir.1991). Rather, the opposing party must present specific evidence supporting its contention that there is a genuine material issue of fact. *See Celotex Corp.,* 477 U.S. at 324;*Twin Lab. Inc. v. Weider Health & Fitness,* 900 F.2d 566, 568 (2d Cir.1990).

To show such a "genuine dispute," the opposing party must come forward with enough evidence to allow a reasonable jury to return a verdict in its favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U .S. 242, 248 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986); *Cinema North Corp. v. Plaza at Latham Assocs.,* 867 F.2d 135, 138 (2d Cir.1989). If "the party opposing summary judgment propounds a reasonable conflicting interpretation of a material disputed fact," then summary judgment must be denied. *Schering Corp. v. Home Ins. Co.,* 712 F.2d 4, 9-10 (2d Cir.1983). The Court will analyze the summary judgment motions in accordance with these principles.

### II. Plaintiffs' Motion For Summary Judgment

*5 In May 1993, Plaintiffs brought this diversity action asserting contractual indemnification claims against Defendants for the cost of the landfill removal project at the Orzinuovi plant.[FN6]Plaintiffs move for summary judgment on their indemnity claims, arguing that no genuine issues of material fact exist. Specifically, Plaintiffs contend that they deserve summary judgment against Defendants because the remaining material facts in this case have been significantly narrowed as a result of Defendants' alleged failure to defend against claims potentially within the scope of the duty to indemnify.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 6
Not Reported in F.Supp.2d, 2002 WL 1203836 (S.D.N.Y.)
2002 WL 1203836 (S.D.N.Y.)

FN6. Plaintiffs claim damages for the cost of the investigation and remediation of landfills at the Orzinuovi plant in the amount of the U.S. dollar equivalent of approximately DM 3,850,743.52 and Lira 21,268,488,677. *See* Pls.' Notice of Mot. at 3.

Plaintiffs argue that they are relieved of any responsibility of proving actual liability arising from the landfills at the Orzinuovi plant because Defendants breached their duty to defend against the claims made by Italian authorities. Plaintiffs base their argument on a line of New York cases involving breach of the duty to defend in which courts have held that where an indemnitor declines to defend, the indemnitor will be bound by any reasonable settlement reached by the indemnitee. In making this argument, Plaintiffs principally rely upon the following passage in *ELRAC, Inc. v. Cruz*, 699 N.Y.S.2d 647 (N.Y. Civ.Ct. Queens Co.1999):

If, however, the indemnitor is given notice of the claim or proceeding against the indemnitee and declines to defend, then the indemnitor is conclusively bound by any reasonable good faith settlement the indemnitee may make or any litigated judgment that may be rendered against him. Under these circumstances, an indemnitee may recover based on its "potential liability", and need not demonstrate "actual liability" by providing the elements of the underlying claim against it. In other words, if sufficient notice was given, an [indemnitee] will have to show: (1) only "potential liability, to wit: that the indemnitee could have been found liable at the trial of the underlying action; and (2) that the underlying settlement was reasonable and made in good faith.

*Id.* at 649 (internal citations omitted).

In light of *ELRAC*, Plaintiffs maintain that they need establish only that: "(i) they could have been found potentially liable to the Italian Authorities; and (ii) that the underlying settlement with the Italian Authorities was reasonable and made in good

faith."Pls.' Br. at 10. But the *ELRAC* string of cases is inapposite. As Defendants point out, unlike in this case, each of those cases involved a situation in which a third party brought a suit against the indemnitee that plainly fell within the given indemnity provision's coverage, thereby triggering the indemnitor's duty to defend, whereas here no third party ever instituted a lawsuit triggering Defendants' defense obligations. Neither Plaintiffs' October 23, 1989 letter expressing the belief that the landfills might expose them to potential liability, nor the Mayor's January 23, 1993 order triggered any defense obligations under the indemnification provisions because neither situation presented Defendants with anything to defend.[FN7]Contrary to Plaintiffs' assertion, Defendants never declined to defend the claims of Italian authorities for the simple reason that there were no formal claims to defend against, or, at the very least, there was insufficient notice of any such claim.[FN8]*See Atlantic Richfield Co. v. Interstate Oil Transport Co.*, 784 F.2d 106, 113 (2d Cir.1986) ("Notice sufficient to give the indemnitor a meaningful opportunity to defend is the indispensable element to be proven by the party seeking indemnity.... Where notice-which includes a meaningful opportunity to assume the defense-is lacking, a demonstration of actual liability is required."); *Carey Transp. v. Greyhound Co.*, 80 B.R. 646, 652-53 (Bankr.S.D.N.Y.1987) ("Where an indemnitor is subject to an express duty to defend, and where the indemnitee fails to give adequate notice of the claim or makes a settlement without giving the indemnitor reasonable opportunity to participate, the indemnitee cannot recover indemnity for the settlement without proving actual liability."). This is illuminated by the fact that Plaintiffs point to no evidence indicating that they acted in Defendants' stead in pursuing a defense against any claim made by Italian authorities. Quite the contrary, evidence in this case indicates that Plaintiffs tried to create a "violation of law" to create indemnity claims by drafting the cleanup order ultimately issued by the Mayor of Orzinuovi and by failing to contest the order, despite Plaintiffs' knowledge of its invalidity.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1203836 (S.D.N.Y.)
2002 WL 1203836 (S.D.N.Y.)

Page 7

FN7. In the insurance-coverage context, courts have explained the duty to defend concept as follows: "the duty to defend is measured against the allegations of pleadings but the duty to pay is determined by the actual basis for the insured's liability."*Hugo B oss F ashions, I nc. v . F ederal Insur.*, 252 F.3d 608, 627-28 (2d Cir.2001) (quoting *Servidone Constr. Corp. v. Sec. Ins. Co. of Hartford*, 64 N.Y.2d 419, 488 N.Y.S.2d 139, 477 N.E.2d 441, 444 (1985)).

FN8. Plaintiffs' argument for an award of summary judgment in their favor is premised upon a failure to defend theory. But this theory utterly fails against defendant Whitman for the simple reason that the 1988 SPA, as amended, does not contain a duty to defend clause. For this reason alone, then, plaintiff Frendo is not entitled to summary judgment against Defendant Whitman.

*6 Accordingly, the Court denies Plaintiffs' motion for summary judgment against Defendants.

### III. Defendants' Motion For Summary Judgment

Defendants brought a motion for summary judgment, arguing that they are entitled to judgment as a matter of law because the indemnity provisions at issue do not cover the cleanup at the Orzinuovi plant. The question presented by this motion is whether the cost of Plaintiffs' landfill-removal project falls within Defendants' indemnification obligations as defined by the 1988 Purchase Agreement, as amended, and the 1989 Purchase Agreement.

This issue is one of New York law because both contracts specify that they are governed by the laws of New York. *See* First Am. Compl., Ex. A, § 10.9(a); Ex. C, § 75. To establish a breach of contract claim under New York law, a plaintiff must

prove: (1) the existence of a contract between the parties; (2) plaintiff's compliance with the terms of the contract; (3) defendant's breach of the contract; and (4) damages as a result of the breach. *See Prince v. American Airlines, Inc.*, 1999 WL 796178, No. 97 Civ. 7231, at *7 (S.D.N.Y. Oct. 6, 1999); *see also Terwilliger v. Terwilliger*, 206 F.3d 240, 245-46 (2d Cir.2000). To avoid summary judgment, a nonmovant must present specific evidence to support its position that there is a genuine issue of material fact. *See Banca Commerciale Italiana v. Northern Trust Int'l Banking Corp.*, 160 F.3d 90, 93 (2d Cir.1998); *Marks v. New York Univ.*, 61 F.Supp.2d 81, 88-89 (S.D.N.Y.1999).

Defendants contend that Plaintiffs have failed to create a triable issue of material fact to support one of these essential elements-to wit, that Plaintiffs suffered damages as a result of the alleged breach. Given that the indemnity provision under the 1989 Purchase Agreement differs from the indemnity provision under the 1988 Purchase Agreement, as amended, the Court will discuss them separately.

### A. Contractual Indemnification Under 1989 Purchase Agreement

In count 1 of their amended complaint, Plaintiffs assert a claim against defendants Abex and Pneumo Abex ("Defendants") for indemnification under the 1989 Purchase Agreement for losses incurred on account of removing allegedly unlawful landfills at the Orzinuovi plant. *See* First Am. Compl. ¶¶ 7-21.Section 7.3(a) of the 1989 Purchase Agreement obligates Defendants to indemnify Plaintiffs in connection with any loss resulting from a material breach of Defendants' representation of Frendo's compliance with applicable law. *See* First Am. Compl.; Ex. A, § 7.3(a), pp. 39-40; § 3.1.7, pp. 15-16. The introductory phrase of section 7.3 makes this indemnity obligation subject to the procedural limits set forth in section 7.1. *See id.;*Ex. A, § 7.3, p. 39. Pursuant to section 7.1(a), any notice of claim for indemnification must satisfy both a timeliness and a specificity requirement. Section

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1203836 (S.D.N.Y.)
**2002 WL 1203836 (S.D.N.Y.)**

7.1(a), the "survival" provision, provides in relevant part:

*7 Each of the representations and warranties ... will survive the Closing and remain in full force and effect until the expiration of one year after the Closing Date or, if earlier, January 31, 1990, with the result that any claim for an alleged breach of a representation or warranty which is not asserted by written notice given as herein provided which describes the basis for such claim with specificity may not be pursued.

*Id.;* § 7.1(a), p. 38.

By virtue of section 7.1(a), the time period in which Plaintiffs could make an indemnity demand expired on January 31, 1990, the one-year anniversary of the closing date. *See* First Am. Compl. ¶ 9 (alleging that "[t]he purchase and sale provided for in the 1989 Stock Purchase Agreement was closed on or about January 31, 1989 (the "1989 Closing Date")."). Based on section 7.1(a)'s specificity provision, written notice of a claim predicated on the compliance representation should identify specific liability under the law. Defendants argue that Plaintiffs cannot pursue an indemnity claim because they did not give proper notice of their claim within the one-year period allowed for in the 1989 Purchase Agreement. Plaintiffs contend that their October 23, 1989 letter to Defendant Abex-advising of Plaintiffs' belief of a possible breach under the 1989 Purchase Agreement-satisfies section 7.1(a).

Plaintiffs sent the demand letter more than three months prior to expiration of the one-year period. But to fulfill the conditions of section 7.1(a), the October 23, 1989 notice must satisfy the specificity requirement as well. Based on the contractual language, section 7.1(a)'s two requirements go hand-in-hand; thus, a bare assertion of a claim for indemnity within the one-year window is meaningless without accompanying details regarding the basis for the claim. Any other interpretation of section 7.1(a) would eviscerate its specificity clause, a result contrary to the rules of contract construction.

This is so because under New York law, the governing law specified in the 1989 Purchase Agreement, a court must interpret a contract so as to give effect to all of its clauses and to avoid an interpretation that leaves part of a contract meaningless. *See Insurance Co. of North America v. ABB Power Generation, Inc.,* 925 F.Supp. 1053, 1058-59 (S.D.N.Y.1996). Moreover, New York courts apply the canon of strict construction with particular force to indemnity provisions to avoid reading into an agreement a duty not anticipated by the parties. *See TD Waterhouse Investor Srvcs. Inc. v. Integrated Fund Srvcs., Inc.,* No. 01 Civ. 8986, 2002 WL 441123, at *2 (S.D.N.Y. Mar. 21, 2002). With all of this in mind, the Court turns to an analysis of whether Plaintiffs gave proper notice of their claim within the one-year time period as required by section 7.1(a).

The October 23, 1989 letter asserts a right to indemnity on account of a possible breach of the "compliance with law" representation. In that letter, Plaintiffs express, in a general fashion, the opinion that landfills at the Orzinuovi plant might not comply with Italian law: "[w]hile such waste disposal may or may not be partially covered by some official permit, it appears that at least a significant portion of the waste disposal on the Orzinuovi premises is not covered by any license or permit whatsoever."First Am. Compl.; Ex. B. The letter does not indicate the basis for this impression, nor does it specify which Italian law, if any, the existence of the landfills possibly violated. The letter advises that an investigation into the legality of the landfills was still ongoing. *See id.*

*8 For starters, the mere presence of landfills at a manufacturing plant was not *per se* unlawful under Italian law because government officials issued permits authorizing such activity (as was the case here).*See, e.g.,* Roberts Aff. ¶ 17, Ex. P; *see also* Defs.' Ex. 52, pp. 5-6 ("[U]ntil 1976, no specific legislation (whether national or regional) existed in Italy dealing specifically with wastes disposal and/or water pollution."). In that sense, Plaintiffs could

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1203836 (S.D.N.Y.)
**2002 WL 1203836 (S.D.N.Y.)**

not properly make a claim for indemnity simply based upon the discovery of landfills. Plaintiffs' letter intimates as much given the acknowledgments that at least some of the waste disposal might be officially authorized and that the situation called for further investigation. Meanwhile, despite Plaintiffs' implication to the contrary, at this point in their investigation, they had no reason to conclude that landfills at the Orzinuovi plant created any illegality. In fact, on October 6, 1989, in response to Plaintiffs' inquiry regarding the legal status of the landfills, Frendo management advised Plaintiffs that the "dump inside the plant" was used "up to the second half of 1983" and that, "we presented on April 17, 1984 the land reclamation project of the interested area and we obtained the approval from 'Provincia' on April 30, 1984."Defs.' 56.1 ¶ 19; Ex. J. In light of this, when Plaintiffs made their indemnity demand they had information indicating *official approval* of the waste disposal at the Orzinuovi plant.

Moreover, Plaintiffs engaged in a questionable course of conduct after making their indemnity demand. This behavior included ignoring Abex's requests for more information regarding the basis for Plaintiffs' claim. For instance, after receipt of the October 23rd demand, Abex responded on October 31, 1989 by requesting proof to support Plaintiffs' claim and asking for access to Frendo employees with knowledge of the relevant facts. *See* Defs.' 56.1 ¶ 62; Tab 2. That October 31 letter notified Plaintiffs of the lack of specificity in their notice: "the letter of October 23, 1989 does not give us enough facts to conclude one way or the other whether there was a material breach of any representations, warranties or covenants under the Stock Purchase Agreement or whether there is a duty to indemnify."*Id.* On at least two separate occasions, Abex requested more specific information concerning the basis for Plaintiffs'indemnity demand, each time giving Plaintiffs an opportunity to specify their claim within the one-year limitation period. *See, e.g.,* Defs.' 56.1 ¶¶ 63-64; Tabs 3 & 4. These numerous requests, however, went unheeded.[FN9]

Plaintiffs also neglected to conduct a timely inquiry into the permit history of landfills at the plant, a seemingly obvious step in an investigation of this type. In this regard, Plaintiffs' representative who was primarily responsible for gathering facts concerning the landfills and for dealing with Italian authorities with respect to the landfill situation testified that he made no attempt to ascertain any information regarding permit authorization for the landfills, a telling admission. *See* Roberts Aff. ¶ 3; Ex. B, pp. 89-90. Additionally, the record reflects that Plaintiffs waited almost one and one-half years after the October 23rd indemnity demand to retain Italian counsel to analyze Italian environmental requirements as they relate to potential claims against Abex with respect to the Orzinuovi plant. *See* Defs.' 56.1 ¶ 81; Tab 8. This factor implies that as of October 23, 1989 Plaintiffs knew of no legal ground on which to base their claim for indemnity, which explains (but hardly absolves) the failure to specify potential liability under the law in their notice of claim. Furthermore, Plaintiffs waited nearly two years after giving notice to Defendants before informing Italian authorities, on October 2, 1991, of the presence of landfills at the Orzinuovi plant. *See* Defs.' Exs., Tab 16. Their October 2nd notification mentions nothing about a violation of law as the reason for Plaintiffs' proposed landfill removal project, even though Plaintiffs took care to draft the letter in such a way as to avoid damaging "our litigation in the United States."*See* Defs. Exs., Tab 12, Despite this goal, at no time during their discussions with Italian authorities did Plaintiffs state that the reason for their proposed removal project was due to concerns about the legality of the landfills.

> FN9. Plaintiffs sent Abex a letter on November 23, 1989, but this communication failed to illuminate the basis for Plaintiffs' claim with respect to the landfills, as Plaintiffs' own position reflects: "The December 21, 1989 letter responds to plaintiffs' November 23, 1989 letter, which deals exclusively with matters other than the Orzinuovi Dumps. These letters are

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 10

Not Reported in F.Supp.2d, 2002 WL 1203836 (S.D.N.Y.)

2002 WL 1203836 (S.D.N.Y.)

completely irrelevant to matters in controversy in this litigation."Pls.' Resp. to Defs.' Suppl. 56 .1 ¶ 63.

*9 Moreover, Plaintiffs' improper conduct included a covert campaign to generate grounds for their indemnity demands against Defendants. Despite Defendants' request that the parties work together in dealing with government officials, Plaintiffs pursued a campaign of secrecy and concealment regarding their dealings with Italian authorities. *See* Defs. Supplemental 56.1 ¶ 91, Tab 12. For example, during one of Plaintiffs' private meetings with the Mayor of Orzinuovi about the landfills, Plaintiffs' representative asked the Mayor whether "it is possible to have from him a mandatory request to proceed" with Plaintiffs' already proposed remediation project. *See id.* ¶ 100, Tab 26. Plaintiffs' campaign also involved coaxing the Mayor to issue the January 23, 1993 order requiring plaintiff Frendo to undertake a landfill cleanup project, an order that Plaintiffs' counsel secretly drafted and requested. *See id.* ¶ 109, Tabs 56, 57. In addition to this, after informing Plaintiffs that the order was invalid and without legal effect, Plaintiffs' lawyer then stated, "I assume these developments should not be disclosed to Abex."Roberts Aff. ¶ 20, Ex. S. In pressing their indemnity rights here, Plaintiffs make much of this order, classifying it as a "claim" asserted against them by Italian authorities. But given the dubious pedigree of the order, this so-called "claim" is little more than a claim of Plaintiffs' own creation.

The Court concludes that Plaintiffs' October 23rd indemnity demand fails to specifically particularize the basis for their claim as required by section 7.1(a). Because of Plaintiffs' lack of compliance with the notice of claim requirements set forth in section 7.1(a), namely, the failure to identify specific liability under the law on account of the landfills, they cannot pursue a claim for indemnification under the 1989 Purchase Agreement. Therefore, the Court grants defendants Abex and Pneumo Abex summary judgment as to count I of Plaintiffs'

amended complaint.

B. Contractual Indemnification Under 1988 Purchase Agreement

In count II of their amended complaint, plaintiff Frendo ("Plaintiff") asserts a claim against defendant Whitman ("Defendant") for indemnification under the 1988 Purchase Agreement for losses associated with the landfill removal project at the Orzinuovi plant. *See* First Am. Compl. ¶¶ 30-41.Whitman represented and warranted under section 5(i) of the 1988 Purchase Agreement that the Orzinuovi plant was not being conducted in violation of any applicable law, other than violations that did not have a material and adverse effect on the business or finances of Frendo. *See id.* § 5(i). Section 12(b)(i) obligated Defendant to indemnify the buyer in connection with any loss resulting from a breach of any representation provided by Defendant in section 5. *See id.* § 12(b)(i). Section 12(b)(i)'s broad indemnification provision expressly excludes environmental matters, for which indemnification provisions are set forth separately in section 12(b)(vi).*See id.*Section 12(b)(vi) of the 1988 Purchase Agreement, as amended by section 2 of the Second Amendment, obligates Defendant to indemnify the buyer from any liability incurred by the buyer on account of: (a) any noncompliance with any Applicable Environmental Law; (b) statutory liability arising out of any dumping of a substance classified as hazardous or toxic under any Applicable Environmental Law; or (d) any investigation, proceeding, claim or allegation relating to any matter indemnifiable under (a) or (b).*See id.;*Ex. H, § 2. Based on this contractual provision, to obtain indemnity, Plaintiff must prove not only the Orzinuovi plant operator's non-compliance with applicable law or statutory liability because of the landfills, but must also establish that Plaintiff suffered losses because of the non-compliance or because of a claim or allegation of non-compliance. The Court rejects the notion that the Mayor's January 23rd order meets this requirement. Plaintiffs, however, also argue that under Italian law, the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1203836 (S.D.N.Y.)
2002 WL 1203836 (S.D.N.Y.)

Orzinuovi plant operator had an affirmative duty to remove the landfills regardless of a governmental directive to do so. Because of this, the Court will analyze the Italian regulations that Plaintiffs claim Frendo, as plant operator, was out of compliance with as of the closing dates of the 1988 Purchase Agreement and the 1989 Purchase Agreement.

1.Time Frame of Landfill Usage

*10 Before analyzing whether the landfills violated any of the Italian regulations cited by Plaintiffs, the Court will consider an issue raised by Defendants in their motion for partial summary judgment, namely, the time frame in which Frendo utilized landfills at the Orzinuovi plant, insofar as this issue impacts the violation of law analysis.

In their amended complaint, Plaintiffs allege that landfill usage at the plant occurred from approximately 1971 to approximately 1986. *See* First Am. Compl. ¶ 13. Defendants argue that the evidence in this case fails to support this allegation for a variety of reasons. First, Defendants argue that because plaintiff Frendo's predecessor company represented in written submissions to Italian regulatory authorities that landfills located at the Orzinuovi plant were permanently closed in 1983 and reclaimed in 1984, the doctrine of regulatory estoppel precludes Plaintiffs from asserting a position contrary to this representation, namely, that landfills at the Orzinuovi plant were used until 1986. *See* First Am. Compl., count 1, ¶ 13. Defendants cite *Tozzi v. Long Island Railroad Co.,* 651 N.Y.S.2d 270, 274-75 (N.Y.Sup.1996), as support for the availability of regulatory estoppel. In *Tozzi,* the court relied upon principles underlying the doctrine of judicial estoppel to conclude that, in an appropriate situation, a court may invoke the concept of regulatory estoppel "to estop a party in a litigation from making a factual assertion contrary to a factual assertion made in the course of an administrative proceeding."*Id.* at 275.But application of this theory is not appropriate where, as here, the initial factual representations were not made during the course of

a formal regulatory proceeding. *See id.*The *Tozzi* court declined to apply regulatory estoppel in that case because: "[i]n the instant action, the subject endorsement was adopted in the State of New York by a single letter request setting forth the proposed amendment. No hearings were conducted. No regulatory proceedings of any nature were conducted requiring the insurer's presence. The insurer did not submit a sworn written statement or make any factual representations under oath."*Id.* Like in *Tozzi,* the factual assertions at issue here were not made in the course of an administrative proceeding, nor were they made under oath. Based on the reasoning in *Tozzi,* in particular, that absent a prior regulatory proceeding analogous to a judicial prosecution of an action, utilizing the concept of regulatory estoppel against a litigant is improper, the Court declines to apply regulatory estoppel in this case.

According to evidence in this case, in October 1983, regulatory authorities issued a statement officially acknowledging the closure of the landfill disposal facility at the Orzinuovi plant. Moreover, after conducting an on-site inspection of the plant in April 1984, regulatory officials acknowledged Frendo's compliance with the program for reclamation of the site. Defendants argue that this official confirmation of closure, among other things, conclusively establishes that Frendo ceased on-site usage of landfills in 1983, or, at the very least, as of April 1984 when regulators conducted the on-site inspection.

*11 In support of their allegation of post-inspection dumping, Plaintiffs hope to rely upon the testimony of two Frendo plant employees, Messrs. Pizzamiglio and Vianelli, at least one of whom has sworn that landfills at the Orzinuovi plant were used as late as 1986. These statements, however, are gravely suspect. Specifically, Defendants argue that Plaintiffs cannot use any testimony from these witnesses to prove post-inspection dumping because Plaintiffs deliberately destroyed prior sworn affidavits by the same two men. *See* Defs.' 56.1 Statement ¶ 47. Back in 1992, Plaintiffs began

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1203836 (S.D.N.Y.)
**2002 WL 1203836 (S.D.N.Y.)**

compiling evidence regarding the history of the landfills in order to convince Defendants to pay the "maximum amount" toward the cleanup costs. *See* Roberts Aff. ¶ 23; Ex. V. To do so, Plaintiffs enlisted Mr. Colli, the Orzinuovi plant manager and a Managing Director of plaintiff Frendo, to obtain the affidavits of Messrs. Pizzamiglio and Vianelli. At his deposition, Mr. Colli testified that after obtaining these sworn statements he deliberately destroyed them sometime after June 1992. *See* Roberts Aff. ¶ 3; Ex. B, p. 111. He also testified that Messrs. Pizzamiglio and Vianelli signed the affidavits, but: "Before sending the affidavits, I was in contact with our lawyers, and I said, 'If we go this way, we are going to sign that we did something illegal. I want to be sure that our people are not going to have a problem of that." ' *Id.* at 110;*see id.* ("Because the people signed the paper, Pizzamiglio and Vianelli, but we didn't deliver to anybody these papers."). Later in the deposition, Mr. Colli was asked whether he provided a copy of those affidavits to anyone else, to which he responded in the negative. *See id.* at 112.

In the course of discovery, Plaintiffs produced copies of unsigned affidavits, one each from Messrs. Pizzamiglio and Vianelli, stating that landfill usage at the Orzinuovi plant occurred between 1974 and 1982. *See* Defs.' 56.1 Statement ¶ 49; Roberts Aff. ¶ 26; Ex. Y. Defendants point out that the information contained in these unsigned affidavits therefore contradicts Plaintiffs' allegations of post-inspection use of landfills at the Orzinuovi plant. Notwithstanding the contents of the unsigned affidavits, Plaintiffs have elicited testimony from Mr. Vianelli to the effect that dumping of small amounts of scrap material at the plant occurred as late as 1986. *See id.;*Roberts Aff. Ex. W, pp. 110-11.

In response, Plaintiffs now explain that their counsel prepared draft affidavits of Messrs. Pizzamiglio and Vianelli sometime in late 1992 (specifically, sometime between November of 1992 and December 17, 1992) as part of settlement negotiations with Whitman and Abex. *See* Pls.' Resp. to Defs.'

56.1 ¶ 43; Hackett Decl. ¶¶ 4-6. In particular, Plaintiffs submit the declaration of David P. Hackett, Esq. (the lead counsel for Rütgers and Frendo in connection with these negotiations), which states that sometime after November of 1992, he prepared draft affidavits of Messrs. Pizzamiglio and Vianelli, and, on December 17, 1992, he sent the drafts to these two gentlemen as well as Mr. Marcoaldi, Plaintiffs' environmental expert, for their review. *See* Hackett Decl. ¶¶ 3-6. Mr. Hackett then swears that, on December 18, 1992, Mr. Colli returned to him the unsigned affidavits that Hackett had prepared for Messrs. Pizzamiglio and Vianelli and that these are the unsigned affidavits produced to Defendants during the discovery phase of this case. *See id.* ¶ 6.

*12 Even still, a *July 10, 1992* communication between Plaintiffs' lawyers (which included Mr. Hackett) seems to establish their knowledge of some form of affidavit from both Messrs. Pizzamiglio and Vianelli to the effect that landfill usage at the Orzinuovi plant ceased in 1982. This July 10, 1992 facsimile message, addressed to Mr. Hackett, among others, states:

At the meeting of July 1st, 1992, in Frankfurt (attending Mr. Büttner, Mr. Streit, Mr. Colli and Mr. Marcoaldi), Mr. Büttner stressed that the wording used in the affidavits of Messrs. Pizzamiglio and Vianelli should be further discussed with you. *The present wording,* in fact, contains no specific indication as to the location of the waste disposals after 1982 (see my fax of July 1st, 1992). This conflicts with the audit prepared by PAR eighteen months ago (presently held by Whitman) where the location of the waste disposals after 1982 is indicated. Mr. Büttner is concerned that Whitman could point out the contradiction."

Defs.' Exs., Tab 39 (emphasis supplied).

This message no doubt could refer to other affidavits of Messrs. Pizzamiglio and Vianelli, perhaps the *signed* affidavits entrusted to Mr. Colli. One thing is certain, though, this fax communication

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1203836 (S.D.N.Y.)
**2002 WL 1203836 (S.D.N.Y.)**

highlights Plaintiffs' deep concern with avoiding "conflicts" and "contradictions."

Based on these circumstances, Defendants ask the Court to exclude any testimony from Messrs. Pizzamiglio and Vianelli contradictory to the two unsigned affidavits produced during discovery. Defendants rely on the spoliation of evidence theory (also referred to as "spoilation") to support their position. This doctrine refers to a party's intentional or negligent destruction of evidence that impairs another party's ability to prove or defend a civil action. *See West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 778 (2d Cir.1999) ("Spoilation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."). When a party's intentional conduct causes the destruction of evidence, a district court has considerable discretion to impose a wide range of sanctions for purposes of leveling the evidentiary playing field and punishing the improper conduct. *See Shamis v. Ambassador Factors Corp.,* 34 F.Supp.2d 879, 888 (S.D.N.Y.1999) ("It is well settled that the Court has the ... power to sanction a party that destroys relevant and discoverable evidence [based on, among other things,] a court's inherent power to regulate litigation, preserve and protect the integrity of the proceedings before it, and sanction parties for abusive practices."). Such sanctions include ordering dismissal of the culpable party's suit, granting summary judgment in favor of the prejudiced party, precluding the culpable party from giving testimony regarding the destroyed evidence, or giving an adverse inference instruction to the jury against the culpable party. *See Trigon Insur. Co. v. United States,* 204 F.R.D. 277, 285 (E.D.Va.2001).

*13 In considering whether to impose sanctions for spoliation of evidence, a court must initially determine whether the party against whom sanctions are sought had an obligation to preserve evidence. *See Indemnity Insur. Co. of North Amer. v. Liebert Corp.,* No. 96 Civ. 6675, 1998 WL 363834, at *3 (S.D.N.Y. June 29, 1998). The duty to preserve

evidence arises even prior to the filing of a complaint "where a party is on notice that litigation is likely to be commenced."*Id.* at *3. In such a situation, the party is obligated to preserve "what it knows, or reasonably should know, will be relevant in the action."*Turner v. Hudson Transit Lines, Inc.,* 142 F.R.D. 68, 72 (S.D.N.Y.1991); *see also Kudatzky v. Galbreath Co.,* No. 96 Civ. 2693, 1997 WL 598586 (S.D.N.Y. Sept. 23, 1997) ("The threshold question with respect to imposing sanctions for document spoilation based on the court's inherent powers is whether the party knew or should known that the destroyed evidence was relevant to pending, imminent or reasonably foreseeable litigation."(internal quotation marks omitted)).

Here, Plaintiffs had notice that litigation could likely commence with respect to the waste disposal situation. For example, Plaintiffs specifically obtained the affidavits in response to advice from their lawyers that information regarding the timing of the waste disposal was important to resolving claims between the parties. *See* Roberts Aff. ¶ 3; Ex. B, pp. 108-09. Moreover, Plaintiffs now argue that these affidavits are immune from allegations of spoliation based on the confidentiality of compromise negotiations under Federal Rule of Evidence 408 because they were prepared in the course of settlement discussions. Rule 408 forbids the admission of statements made during settlement talks to prove liability or the lack of liability.[FN10]The Rule, however, provides no support for Plaintiffs' deliberate destruction of this evidence. That is so because the Court finds that the affidavits constitute otherwise discoverable evidence, explicitly made admissible by the terms of Rule 408, since, from all indications, they contained only historical factual information otherwise discoverable as deposition testimony. *See*Fed.R.Evid. 408 ("This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations.").

FN10.Rule 408 provides, in pertinent part:

Evidence of (1) furnishing or offering or

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1203836 (S.D.N.Y.)
2002 WL 1203836 (S.D.N.Y.)

promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible.

Fed.R.Evid. 408.

In light of this, Plaintiffs reliance on *Kleen Laundry & Dry Cleaning Services, Inc. v. Total Waste Management Corp.,* 817 F.Supp. 225, 229 (D.N.H.1993), is misplaced, for that case involved a situation where the court disallowed an affidavit that incorporated statements made during settlement negotiations. Unlike in *Kleen Laundry,* the affidavits here included statements of historical facts pertinent to this lawsuit. As such, these affidavits were "otherwise discoverable" and thus were not subject to exclusion under Rule 408. The Court therefore concludes that Plaintiffs deliberately destroyed the affidavits after the obligation to preserve them arose and after Plaintiffs had clear notice of this obligation.

*14 Once a court determines that a party had a duty to preserve evidence, the court must then consider: (1) the degree of fault of the party who destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) the appropriate sanction. *See Indemnity Insur.,* 1998 WL 363834, at *3. The evidence before the Court provides a sufficient basis for finding that Plaintiffs intentionally destroyed the affidavits to prevent their use in future litigation. For one thing, Plaintiffs and their counsel apparently were concerned that the contents of similar affidavits would undermine Plaintiffs' position on issues important in this case. Moreover, the destruction of this evidence was not accidental or inadvertent. Quite the contrary, Mr. Colli, a high-ranking official of plaintiff Frendo, admitted that he purposely destroyed the affidavits sometime after

June 1992, apparently after deciding that the contents of the affidavits might establish that Frendo employees engaged in illegal activities with respect to waste disposal. *See* Roberts Aff. ¶ 3; Ex. B, p. 110. The Court rejects Plaintiffs' argument that the record does not establish that Mr. Colli acted within the scope of his employment at the time that he destroyed the affidavits. In this respect, Mr. Colli collected the affidavits on behalf of his employer and then contacted Plaintiffs' lawyers, whom he referred to as "our lawyers," allegedly to discuss whether the affidavits suggested that Frendo employees had acted wrongfully. It was after this conversation that Mr. Colli apparently destroyed the evidence.

Based on the foregoing, the Court finds Plaintiffs highly culpable for the destruction of this evidence. The Court also finds that Defendants are significantly prejudiced by the loss of this evidence because now Defendants cannot use these prior sworn statements as admissions regarding the time period of landfill usage, nor can Defendants use the statements to impeach the new and contradictory testimony given by Messrs. Pizzamiglio and Vianelli. Moreover, although Defendants deposed these two gentlemen, they provided only sketchy testimony regarding the contents of the destroyed affidavits. Also, Defendants have provided inferential evidence (the unsigned affidavits) as to the possible contents of the missing materials, which indicates that such materials would have been harmful to Plaintiffs' case. *See Skeete v. McKinsey & Co ., Inc.,* No. 91 Civ. 8093, 1993 WL 256659, at *7 (S.D.N.Y. July 7, 1993).

Pursuant to the spoliation doctrine, Defendants ask the Court to sanction Plaintiffs by precluding them from giving testimony from Messrs. Pizzamiglio and Vianelli contradictory to their two unsigned affidavits. Given the record in this case, such a sanction is appropriate. Mindful of the serious nature of this sanction, the Court nonetheless finds such a penalty fitting given the deliberate destruction of evidence and Plaintiffs' overall bad behavior in

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1203836 (S.D.N.Y.)
**2002 WL 1203836 (S.D.N.Y.)**

their pursuit of indemnification.

*15 Besides the deposition testimony from these two gentlemen that dumping of small amounts of scrap material at the Orzinuovi plant occurred as late as 1986, Plaintiffs offer virtually nothing else to suggest post-inspection landfill usage. Regarding this issue, Plaintiffs' environmental expert, Mr. Marcoaldi, identifies other things that allegedly establish post-inspection usage, including: (1) "pieces of production specific to the period '78/'79 were found during excavation;" (2) accounting documents dated 1976 found during the removal project that "in principle should be kept for ten years;" (3) some worker (whom the report fails to name) remembers that excavations were made in the backyard area of the plant; and (4) "one purchase order and relevant invoice confirm use of bulldozer and excavator in that area at [the] beginning of January 1988."Pls.' Exs., Tab V, tbl. 3.2.

These items cannot support a finding of post-inspection landfill usage insofar as a conclusion predicated on them would amount to mere guesswork or conjecture. Not every issue of fact or conflicting inference presents a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986) ( "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."(internal citations omitted)). The evidence here is not significantly probative on the issue of post-inspection landfill usage so as to create a genuine issue of material fact requiring denial of summary judgment.

Therefore, in terms of the violation of law analysis, this Court will proceed on the basis of no post-inspection landfill usage, *i.e.,* that no on-site dumping occurred after regulators confirmed closure of the landfills at the Orzinuovi plant in April of 1984.

2.Alleged Violations of Italian Law

Each side offers the opinion of a foreign legal expert concerning issues of Italian law relevant to the case. With respect to their violation of law contentions, Plaintiffs submit the report of their Italian law expert, Gianfranco Amendola. In his report, Professor Amendola renders an opinion on the extent to which the landfills at the Orzinuvi plant violated Italian law as of the closing dates of the 1988 Purchase Agreement and the 1989 Purchase Agreement. Professor Amendola concludes that these landfills may have been out of compliance with the following Italian regulations: (1) Articles 216 and 217 of the Consolidated Health Act of July 27, 1934; (2) Articles 674, 440, 452 and 635 of the Italian Penal Code ("Penal Code"); (3) Lombardy Regional Law no. 94 of June 7, 1980 ("LRL"); and (4) DPR no. 915 of September 10, 1982 ("DPR"). In response, Defendants offer the opinion of their Italian legal expert, Gian Luigi Tosato. Professor Tosato's report concludes that the Orzinuovi plant did not, at any time, violate the Italian regulations cited by Plaintiffs with respect to the landfills located at that facility.

a.Determinations of Italian Law

*16 Federal Rule of Civil Procedure 44.1 controls determinations of foreign law in federal court. Rule 44.1 gives a district court wide latitude in resolving issues of foreign law: "The court in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law."Fed.R.Civ.P. 44.1. Because of this latitude, a court may reject even uncontradicted expert testimony and reach its own decisions on the basis of independent examination of foreign legal authorities. *See Curtis v. Beatrice Foods Co.,* 481 F.Supp. 1275, 1285 (S.D.N.Y.), *aff'd,* 633 F.2d 203 (2d Cir.1980). Moreover, disagreement among legal experts on content, applicability, or interpretation of foreign law, as here, does not create genuine issues of material fact for summary judgment purposes.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1203836 (S.D.N.Y.)
**2002 WL 1203836 (S.D.N.Y.)**

Page 16

*See Banco de Credito Indus., S.A. v. Tesoreria General,* 990 F.2d 827, 838 (5th Cir.1993); *see also Bassis v. Universal Line, S.A.,* 436 F.2d 64, 68 (2d Cir.1970); *Kashfi v. Phibro–Salomon, Inc.,* 628 F.Supp. 727, 737 (S.D.N.Y.1986).

Each side submitted a report by an expert in Italian environmental law to support its position and the parties provided the Court with English translations of relevant Italian law. Based on the foregoing guidelines, the Court intends to determine whether the landfills violated applicable Italian law as of the closing dates of the agreements by consulting the expert opinions and by conducting independent analysis of Italian regulations and authorities.

b.Consolidated Health Act of July 27, 1934

First, Professor Amendola concludes that the presence of landfills at the Orzinuovi plant violated articles 216 and 217 of the Consolidated Health Act of July 27, 1934 ("CHA"), which, although passed during the Fascist era, is apparently still in effect. Article 216 classifies manufacturing facilities into two categories, *i.e.,* the first category and the second category. *See* Declaration of Massimo Coccia ("Coccia Decl."), Tab 12 (English translation of article 216). For purposes of this dispute, the experts agree that manufacturing plants that use or produce asbestos, like the Orzinuovi plant, fall within the first category. *See* Pls.' Ex. U, Amendola Rpt., p. 9; Pls.' Ex. W, Tosato Rpt., p. 6. Article 216 imposes two requirements on an operator of a manufacturing plant within the first category, namely, a notice requirement and a location requirement. Under article 216's notice requirement, plant officials must give written notice to the Mayor prior to the commencement of operations at the facility. *See* Coccia Decl., Tab 12. With respect to this requirement, on January 23, 1970, based upon an application filed by Frendo officials, the Mayor of Orzinuovi granted authority to construct and operate the Orzinuovi plant. *See* Roberts Aff. ¶ 18; Ex. Q. In light of this, the Court finds that this application satisfies the notice requirement under article 216 of the CHA.

*17 Article 216's location requirement provides that a manufacturing facility must be located in the countryside and removed from any housing, or, if located in an inhabited area, the facility must not create a public health risk. *See* Coccia Decl., Tab 12. With regard to this requirement, the Court observes that, given the evidence in this case, including pictures of the Orzinuovi plant, the facility appears to be situated in an uninhabited area, which means that article 216 imposes no further obligation on the operator of this facility. *See, e.g.,* Pls.' Summary Judgmt. Br., Ex. A. Moreover, Plaintiffs fail to point to evidence that suggests otherwise. But even assuming that the Orzinuovi plant is located within an inhabited area, the facility was not out of compliance with the CHA. This is true on account of the pronouncement in the Mayor's January 23, 1993 order, issued pursuant to the CHA, stating that the Orzinuovi plant posed no public health risk.FN11Other factors lend support to this conclusion, including the opinion of Plaintiffs' own environmental consultant, who advised Plaintiffs' lawyers that any pollution caused by the landfills appeared to be contained within the plant and that the conditions in the surrounding area were acceptable. *See* Defs.' Ex. 52, p. 5.

> FN11. For this reason, article 217 of the CHA was not violated either, since the Mayor has authority to act under this article only when operation of a given facility creates a specific danger for public health. *See* Pls.' Ex. W, Tosato Rpt., p. 7.

Based on the foregoing, the Court finds that operation of the Orzinuovi plant was not in violation of the CHA during the relevant time periods. Apart from this, and assuming *arguendo* that the Orzinuovi plant was in violation of the CHA, the Court notes that any such non-compliance would not have had a material and adverse affect on Frendo's business (finances or operations), and thus, under the terms of the 1989 Purchase Agreement, no breach of warranty would have occurred.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1203836 (S.D.N.Y.)
2002 WL 1203836 (S.D.N.Y.)

This is so given that operating a facility in violation of the CHA carries a maximum fine of only $250. *See* Coccia Decl., Tab 12 ("Any offence is subject to a penalty ranging from [$25 to $250]"); *see also* Pls.' Ex. W, Tosato Rpt., p. 6. In fact, Plaintiffs' own Italian lawyers opined as much in a May 1991 memorandum regarding the legality of the landfills, advising: "the negligible amount of sanctions provided in that article [of the CHA], as well as the fact that the obligation to notify is practically never observed by Italian enterprises (without any reaction by the authorities) make the risks deriving from this violation quite low."Defs.' Ex. 52, p. 13. Furthermore, based on its language, the 1988 Purchase Agreement limits recovery for any alleged violation of applicable environmental law to the extent available under the given statutory provision-*i.e.*, $25 to $250 in the case of a CHA violation. *See* First Am. Compl.; Ex. H, § 12(b).

Based on the record in this case, the Court concludes that operation of the Orzinuovi plant was not in violation of the CHA at the time of the closings. In any event, given that the sanction for a violation of this statute carries only a fine ranging from $25 to $250, the Court notes that such a violation would not have constituted a material adverse situation as required under the 1989 Purchase Agreement.

c.Italian Penal Code Violations

*1. Article 674*

*18 Next, Professor Amendola concludes that the presence of the landfills at the Orzinuovi plant violated article 674 of the Italian Penal Code. Article 674, entitled "Dangerous Throwing of Things," punishes "whoever throws or pours in a place of public transit or in a private place of public or of other persons' use things that may offend, dirty or annoy other people."Coccia Decl., Tab 16 (English translation of article 674); *see also* Pls.' Ex. W, Tosato Rpt., p. 10. Because article 674, by its terms, applies only if the so-called "dangerous throwing" occurred in a place of public passage

(which was not so here), this penal provision is inapposite. Interestingly, Plaintiffs' own Italian lawyers reached a similar conclusion back in May of 1991 in advising that; "it does not seem that any violation of article 674 may be alleged. This article applies only if the deteriorating substance or matter is poured or thrown in a place of public thoroughfare or in a private place used jointly and the PAR report indicated pollution effects only within the Frendo area."Defs.' Ex. 52, p. 15. Even Professor Amendola tacitly admits as much in his expert report, opining: "the broad wording of [article 674] as to the places where it applies makes the provision applicable to almost any place, *except for those places where there is exclusive use by the party disposing of the waste.*" Pls.' Ex. U, Amendola Rpt., p. 12 (emphasis supplied). The situation in this case presents the quintessential exception because the landfills were located in the backyard area of the Orzinuovi plant far removed from the public. Notwithstanding this, without any citation of legal authority, Professor Amendola advances the position that: "the crime is committed not only when the offence, the dirtying or the nuisance results from direct throwing or discharging, but also when such effect occurs indirectly, *e.g.* due to the place where the waste was disposed of, as in the case of contamination of underground aquifers."*Id.* at 12.The Professor fails to cite any evidence indicating that contamination of the water supply occurred here. Besides a lack of legal and factual support, his argument fails in light of the conclusion in the PAR report [FN12] that "the water quality is acceptable" and on account of the September 8, 1993 statement by the Province in its official chronology that the analyses done on September 7, 1992 by the Local Health Units show no contamination of the water inside the Orzinuovi plant. *See* Pls.' Ex. W, Tosato Rpt., p. 9.

> FN12. The "PAR report" refers to the report prepared by PAR Srl, the consulting firm hired by Rütgers to conduct environmental inspections at the Orzinuovi plant. *See* Defs.' Ex. 52, p. 3.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1203836 (S.D.N.Y.)
**2002 WL 1203836 (S.D.N.Y.)**

Based on the record in this case, the Court concludes that Frendo was not in violation of article 674 of the Italian Penal Code during the relevant time periods.[FN13]

> FN13. The maximum punishment for violation of article 674 is one month imprisonment or a $235 fine. *See* Pls.' Ex. W, Tosato Rpt., p. 10. The Court therefore makes the same observation with respect to article 674 as it did with respect to article 216 of the CHA, namely, that any violation of either article would not have had a material and adverse affect on Frendo's business (finances or operations), and thus, under the terms of the 1989 Purchase Agreement, no breach of warranty would have resulted.

### 2. Articles 440 and 452

Professor Amendola also concludes that the presence of landfills at the Orzinuovi plant violated articles 440 and 452 of the Penal Code as a result of the contamination of the aquifers. Article 440, read in conjunction with article 452, relates to the negligent "adulteration or counterfeiting of edibles" and "punishes whomever corrupts water or food designated for consumption in a way that is dangerous for public health."Pls.' Ex. W, Tosato Rpt., p. 11; *see also* Coccia Decl., Tabs 17, 18 (English translations of articles 440 and 452). For these provisions to apply here, Plaintiffs must prove that because of the Orzinuovi landfills an adulteration of water designated for drinking occurred to such a degree as to be dangerous for public health. *See* Pls.' Ex. W, Tosato Rpt., p. 11. Professor Amendola, however, fails to provide any factual basis to support his conclusion. As discussed in connection with Plaintiffs' article 674 claim, the record reflects that no contamination of drinking water was shown to have occurred as a result of the landfills. *See* Roberts Aff. ¶ 3, Ex. B, p. 152. Trying to dodge this deficiency, Professor Amendola cites a Court of Cassation decision (Criminal Division, Decision no. 968, Oct. 24, 1991) for the proposition that adulteration of

water, pursuant to articles 440 and 452, occurs based on the mere danger of adulteration, even if no actual damage occurs. *See* Pls.' Ex. U, Amendola Rpt., p. 12. Professor Amendola has misconstrued that decision, as it held that with respect to the crime of adulteration of water, the government need not prove actual damages, provided that there is adequate evidence to establish an actual adulteration of drinkable water and a danger to public health. *See* Pls.' Ex. W, Tosato Rpt., p. 11.

**\*19** Accordingly, based on the record in this case, the Court concludes that Frendo did not violate article 440 or 452 of the Penal Code.

### 3. Article 635

In his report, Professor Amendola further concludes that the presence of landfills at the Orzinuovi plant violated article 635 of the Penal Code (which makes it a crime to seriously damage property) due to contamination of the aquifers. Professor Amendola points out that in construing this article, a Court of Cassation decision advised that: "the pollution of deep aquifers constituting public water resources available to anyone through the use of wells constitutes the crime of serious damaging of property in view of the public designation of the water,"*See* Pls.' Ex. U, Amendola Rpt ., p. 13. From this quotation, it seems clear that for article 635 to apply in the public water-supply context, proof of pollution must exist. Because article 635 requires proof of contamination of water (*i.e.,* "deep aquifers"), which is not present in this case, the Court concludes that Frendo did not violate article 635 of the Penal Code based on the evidence in this case.

### d.Lombardy Regional Law

In 1980, the Lombardy Region enacted Regional Law no. 94 of June 7, 1980 (the "LRL") to provide a regulatory scheme for waste disposal within the Region. *See* Pls.' Ex. U, Amendola Rpt., p. 13; Pls.' Ex. W, Tosato Rpt., p. 12. Professor Amendola alleges that waste disposal procedures at the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1203836 (S.D.N.Y.)
**2002 WL 1203836 (S.D.N.Y.)**

Orzinuovi plant conflicted with provisions of the LRL as of its entry into force and all times thereafter. *See* Pls.' Ex. U, Amendola Rpt., p. 13. In making his argument, the Professor cobbles together a compendium of duties for waste producers by selectively picking provisions of the LRL and charges that the Orzinuovi plant operator did not adequately meet these obligations. *See id.* at 13-14.He summarizes the obligations as follows: "whomever had disposed in the past of industrial waste by dumping it (or burying it), was under a duty to notify the Region and to indicate the location of the closed dumps. If the person disposing of the waste was managing a waste disposal facility, it was obliged to apply for authorization to continue its activity, subject to the use of appropriate facilities and the adoption of all necessary precautions."*Id.* at 14.His report then lists various reasons why Frendo's actions failed to properly comply with the LRL. *See id.* at 15-18.

The fatal flaw in the Professor's argument, however, is that on April 30, 1984, regulatory authorities formally recognized the cessation of landfill usage at the Orzinuovi plant and Frendo's compliance with the LRL. As discussed earlier, on October 1, 1980, regional officials received formal notification, pursuant to the LRL, from Frendo regarding waste disposal activities at the plant. After an April 19, 1984 on-site inspection of the plant, on April 30, 1984, the Province issued a decree verifying compliance with the LRL regulatory scheme.

*20 Hobbled by this (*i.e.,* the official confirmation of compliance with the LRL as of April 30, 1984), Professor Amendola (and Plaintiffs' environmental expert, Mr. Marcoaldi) challenges that edict by nitpicking the notification approach taken by Frendo and by charging that Frendo failed to disclose all of the landfills in the notification reports filed in accordance with the LRL. The fact remains that the Italian regulators charged with enforcement of the LRL had the opportunity-and availed themselves of it-to explore the bases for and quality of Frendo's reporting with respect to waste disposal activities at

the plant by conducting an on-site inspection. This Court therefore refuses to belatedly second-guess the determinations of a foreign agency exercising its regulatory function. Accordingly, the Court finds that Frendo was in full compliance with the LRL as of April 30, 1984, the date on which the Region issued its official pronouncement. Moreover, because of the lack of a material issue of fact as to post-inspection dumping, the Court concludes that the Orzinuovi plant operator was in full compliance with the LRL as of the closing dates of the 1988 Purchase Agreement and the 1989 Purchase Agreement.

e. (Presidential Decree) no. 915 of September 10, 1982

The DPR (Presidential Decree) no. 915 of September 10, 1982 (the "DPR") represents the first national statute governing, among other things, toxic and dangerous waste disposal in Italy. *See* Pls, Ex. U, Amendola Rpt., p. 18; Pls.' Ex. W, Tosato Rpt., p. 17. The DPR requires producers of special waste, including toxic and dangerous waste, to obtain authorization for the operation of any landfill. *See* Pls. Ex. U, Amendola Rpt., p. 18. Professor Amendola argues that by virtue of the DPR, Frendo had a statutory obligation to remove landfills closed prior to the effective date of the statute. This construction of the DPR, however, conflicts with case law construing the statute and with the prohibition against retroactive rules. *See* Pls.' Ex. W, Tosato Rpt., pp. 18-21.

Based on the language of the statute and the *ex post facto* principle, this regulatory scheme imposes no retroactive obligations with respect to landfills that ceased operation prior to the effective date of the DPR. *See id.* at 18.The DPR was approved on September 10, 1982, but according to Italian authorities, this statute only became effective on September 13, 1984, the publication date of the resolution called for under the DPR. *See id.* at 23 ("It is clear that until September 13, 1984, date of publication of the resolution named by Article 4, all the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1203836 (S.D.N.Y.)
**2002 WL 1203836 (S.D.N.Y.)**

Page 20

administrative and penal rules on the disposal of toxic and dangerous waste were consequently not applicable (quoting Pretura Bassano del Grappa, decision of Nov. 15, 1985)). What is more, the Province of Brescia's official chronology confirms that at the time the DPR went into effect, Frendo had permanently closed the landfills. *See* Roberts Aff. ¶ 3, Ex. H, p. 3. Additionally, back in May of 1991, Plaintiffs counsel, in connection with the DPR, concluded that: "compliance with this law depends upon the actual behavior of Frendo after April 1984, i.e. after the inspection of the site made by the province of Brescia as a consequence of Frendo's decision to abandon their application for authorization."Defs.' Exs., Tab 52.

**\*21** Consequently, because the evidence in this case indicates that Frendo permanently closed the landfills at the Orzinuivi site by April 1984, prior to the DPR's effective date, September 13, 1984, the Court concludes that Frendo was not in violation of the DPR as of the closing date of either the 1988 Purchase Agreement or the 1989 Purchase Agreement, given the lack of evidence of post-inspection dumping.

Based on the foregoing, the Court finds as a matter of law that Plaintiff cannot establish Frendo's non-compliance with applicable environmental law or statutory liability on account of the landfills as of the closing date of the 1988 Purchase Agreement (or as of the closing date of the 1989 Purchase Agreement), nor can Plaintiff establish that it suffered losses because of any non-compliance or because of a claim or allegation of non-compliance. Consequently, the Court grants defendant Whitman summary judgment as to count II of Plaintiffs' amended complaint.

### Conclusion

For the reasons set forth above, the Court grants Defendants' motion for summary judgment and denies Plaintiffs' motion for summary judgment. The Court denies as moot all other pending mo-

tions. The Court orders this case closed and directs the Clerk of Court to remove it from the Court's active docket.

SO ORDERED.

S.D.N.Y.,2002.
Rutgerswerke AG and Frendo S.p.A. v. Abex Corp.
Not Reported in F.Supp.2d, 2002 WL 1203836 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

12 Misc.3d 1191(A)
12 Misc.3d 1191(A), 824 N.Y.S.2d 770, 2006 WL 2193047 (N.Y.Sup.), 2006 N.Y. Slip Op. 51524(U)
**Unreported Disposition**
**12 Misc.3d 1191(A), (N.Y.Sup.)2006 WL 2193047**

Page 1

Spiritis v. Village Of Hempstead Community De-
velopment Agency
N.Y.Sup.,2006.
(The decision of the Court is referenced in a table
in the New York Supplement.)
    Supreme Court, Nassau County, New York.
            Glen L. SPIRITIS, Plaintiff,
                        v.
    VILLAGE OF HEMPSTEAD COMMUNITY DE-
        VELOPMENT AGENCY, Defendant.
                No. 13129-04.

                July 28, 2006.

The Law Office of Steven Cohn, P.C., Carle Place,
counsel for plaintiff.
Ryan, Brennan & Donnelly, LLP, Floral Park,
counsel for defendant.LEONARD B. AUSTIN, J.

### ORDER

*1 Plaintiff moves pursuant to CPLR 3212 for sum-
mary judgment on the first, second, third and fourth
causes of action of the amended verified complaint.

### BACKGROUND

Plaintiff previously moved for summary judgment
on his third cause of action. By decision and order
dated August 16, 2005, the motion was denied. At
that time, Plaintiff had not yet been deposed. Ac-
cordingly, this Court gave Defendant the opportun-
ity to conduct further discovery. This Court further
determined that, in any event, Plaintiff could not re-
cover on the theory of *quantum meruit.* In the in-
terest of efficiency and completeness, this Court in-
corporates herein its order dated August 16, 2005.

In the amended verified complaint, Plaintiff alleges
five causes of action. He now seeks summary judg-
ment on four of them. In the first cause of action,
Plaintiff seeks damages of $441,193 for accumu-
lated vacation days, sick days, personal days and

compensatory and bonus time. Such sum is sought
in accordance with the Village of Hempstead and
Defendant's policy upon termination of employ-
ment. In the second cause of action, Plaintiff seeks
damages of $286,000 for unused vacation, sick,
personal, birthday and accrued compensatory time
pursuant to his Consulting Agreement. On this mo-
tion, Plaintiff has apparently recalculated his al-
leged accrued benefits. He now seeks damages of
$437,902.29, on both the first and second causes of
action. In the third and fourth causes of action, re-
spectively, Plaintiff seeks $81,000 for services
rendered, and reimbursement for attorneys fees and
court costs, pursuant to the Consulting Agreement.

### DISCUSSION

Summary judgment is the procedural equivalent of
a trial. *Capelin Assoc. Inc. v. Globe Mfg. Corp.,* 34
N.Y.2d 338 (1974). It is a drastic remedy that will
only be granted when the proponent establishes that
there are no triable issues of fact. *Alvarez v. Pro-
spect Hosp.,* 68 N.Y.2d 320 (1986). On a motion
for summary judgment the court should refrain
from making credibility determinations. *Capelin
Assoc. Inc. v. Globe Mfg. Corp., supra.*

#### A. *First Cause of Action*

Plaintiff has submitted Defendant's resolution dated
December 18, 1990 which became effective
November 5, 1990. Pursuant to that resolution, his
permanent appointment as Commissioner of Com-
munity Development, and his entitlement to
20-paid vacation days per year, were authorized.
Plaintiff has also submitted a Resolution Establish-
ing Personnel Policies of Defendant dated April 1,
2003 ("2003 Resolution"). Pursuant to the 2003
Resolution, vacation days, sick days and personal
days for Defendant's "Executive Staff" are estab-
lished. Payment for accrued vacation time and sick
leave upon termination is authorized thereunder.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

12 Misc.3d 1191(A)                                                                                        Page 2
12 Misc.3d 1191(A), 824 N.Y.S.2d 770, 2006 WL 2193047 (N.Y.Sup.), 2006 N.Y. Slip Op. 51524(U)
Unreported Disposition
12 Misc.3d 1191(A), (N.Y.Sup.)2006 WL 2193047

Plaintiff has also submitted the minutes of Defendant's meetings in 1998, 1999, 2001, and 2002, authorizing Plaintiff to "carryover vacation days." In addition Plaintiff has submitted a summary of his hours as prepared by Defendant's comptroller, Gwen Willis. The summary shows alleged "accumulated earned days" and "used days." The legal basis for the first cause of action is "Village and CDA policy" (Amended complaint, ¶¶ 6,7).

*2 In general, a public employee whose employment has terminated may not recover the monetary value of unused vacation and sick time in the absence of statutory or contractual authority. *Garrigan v. Incorporated Village of Malverne,* 12 AD3d 400 (2nd Dept.2004); *Kerlikowske v. City of Buffalo,* 305 A.D.2d 997 (4th Dept.2003); and *Grishman v. City of New York,* 183 A.D.2d 464 (1st Dept.), *lv. app. den.*80 N.Y.2d 760 (1992).General Municipal Law § 92 authorizes the governing board of a municipality to grant, by local law, ordinance or resolution, vacation and sick leaves, as well as to provide for cash payment of the monetary value of accumulated and unused vacation time.

Here, the 2003 Resolution by Defendant's Board expressly provided, that upon termination of the Commissioner, as a member of the executive staff, Plaintiff was entitled to payment for accrued vacation, and sick leave up to 165 days. Under these circumstances, the Court deems the complaint to include the 2003 Resolution as the legal basis for Plaintiff's first cause of action. As a result, Plaintiff has presented a *prima facie* case of liability of Defendant on Plaintiff's first cause of action for accumulated vacation and sick leave days before his resignation.

In opposition, Defendant has failed to present any evidence whatsoever, by a person with knowledge of the facts (CPLR 3212[b] ), on the specific issue of the authority, or lack thereof, for Plaintiff's claim for accumulated vacation and sick days. Under these circumstances, Plaintiff is entitled to summary judgment on the issue of liability on his first cause of action for some accumulated days before

his resignation.

However there are large gaps in Plaintiff's evidence in terms of the number of days he actually accumulated. No proof has been submitted demonstrating that Plaintiff was authorized to carry over vacation days back from 1990 through 1997. No proof has been presented to demonstrate that the same number of sick leave and personal days approved in 2003 were in effect in 1990 and thereafter. The 2003 Resolution does not provide for the accrual of personal days. No explanation of the 20.5 days listed as "Bonus" on the summary is provided. Overall, numerous triable issues of fact are presented as to how Plaintiff accumulated the claimed 448 days for which he seeks payment. Therefore, summary judgment on the issue of damages on the first cause of action must be denied.

*B. Second Cause of Action*

The second cause of action is based upon the following provision of the Consulting Agreement:

**5. Unused Vacation, Sick and Personal Days.**Upon the execution of this Agreement CONSULTANT shall be paid for any and all prior unused vacation, sick, personal, birthday days and accrued compensatory time based upon his prior salary except for 30 days of vacation time which shall be paid to CONSULTANT upon termination of this Agreement.

The Consulting Agreement, dated January 20, 2004. The record contains a resolution of Defendant, dated January 6, 2004, wherein Defendant authorized its Chairman to execute an "employment agreement" the Consulting Agreement with Plaintiff. The Consulting Agreement provides that Defendant wanted "to engage the services of the CONSULTANT [Plaintiff] to perform consulting services for the CDA as a Project Manager for the North Main Street Urban Renewal, Hempstead, New York as an employee of the CDA."

*3 Plaintiff alleges that he performed the required

© 2008 Thomson Reuters/West, No Claim to Orig. U.S. Govt. Works.

12 Misc.3d 1191(A)                                                                                                    Page 3
12 Misc.3d 1191(A), 824 N.Y.S.2d 770, 2006 WL 2193047 (N.Y.Sup.), 2006 N.Y. Slip Op. 51524(U)
Unreported Disposition
12 Misc.3d 1191(A), (N.Y.Sup.)2006 WL 2193047

services as the Project Manager from February 1, 2004, until he resigned on September 20, 2004, and that he has received no payments under the Consulting Agreement. There is evidence in the record that funding for the North Street Urban Renewal Project came from a private source, namely RB Hempstead. Plaintiff has presented a *prima facie* case of Defendant's liability for breach of its obligation pursuant to the Consulting Agreement to pay for "unused vacation, sick, personal, birthday days and accrued compensatory time."

In opposition, Defendant raises a number of arguments. First, it claims that the Consulting Agreement is void *ab initio* because it is subject to competitive bidding requirements and HUD regulations as a result of federal funding. Defendant's present Commissioner, Claude Gooding, avers that payments required under the Consulting Agreement "would have to be made out of the grant moneys received from the United States Government."

Contracts for professional services requiring specialized skill and expertise are exempt from statutory competitive bidding requirements. *Zack Assoc., Inc. v. Setauket Fire Dist.*, 12 AD3d 439 (2nd Dept.2004); and *Giustino v. County of Nassau.* 306 A.D.2d 376 (2nd Dept.2003). Plaintiff's responsibilities included review of and input into such diverse matters for the North Street Urban Renewal Project as a blight study, the site plan, appraisals of buildings in the site plan area and portions of the environmental statement. In addition, Plaintiff attended meetings of the Village of Hempstead Planning Board and Defendant's Board and helped prepare Defendant's budget for the fiscal year 2004/2005. Review of the deposition transcripts of Michael Abrahams, the former Deputy Commissioner, Richard Birdoff, a principal of the developer, Charles Robinson, the former Village Attorney, and Gwen Willis, Defendant's Comptroller, make it clear that the services performed by Plaintiff required such specialized knowledge and experience as to render the Consulting Agreement exempt from federal and local competitive bidding

statutes.

Furthermore, although questions remain as to whether federal funds were the source of the funding for the Consulting Agreement, it appears that, in any event, HUD regulations would not be applicable. No evidence has been presented by Defendant that the services provided by Plaintiff were available from any other source 24 (CFR 85,36[d][4] ). Indeed, the record, as a whole, establishes the uniqueness of Plaintiff's services based upon his experience and familiarity with the North Street Urban Renewal Project and Defendant's needs.

Defendant further challenges the calculation and use by Plaintiff of "comp time" to preserve his vacation and sick days. The documentary basis for the accumulation of "comp time" is the CSEA contract in effect from June 1, 1998-May 31, 2003, as provided in the 2003 Resolution. As the CSEA contract does not prohibit the use of "comp time" to preserve vacation days and sick days, this objection is rejected.

*4 Defendant's argument that Plaintiff was not an employee, but a "consultant" is also unfounded. A written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms. *Norma Reynolds Realty Inc. v. Edelman*, 29 AD3d 969 (2nd Dept.2006). See also, *Matter of Matco-Norca Inc. v. Matz,* 22 AD3d 495 (2nd Dept.2005). The Consulting Agreement plainly states in the "Whereas" paragraph that Plaintiff was to be engaged as "an employee of the CDA," and the resolution authorizing Defendant to execute the Consulting Agreement referred to it as an "employment agreement."

Defendant has failed to raise a triable issue of fact as to its liability for breach of the Consulting Agreement. Accordingly, summary judgment on the issue of Defendant's liability on the second cause of action must be granted.

However, many of the same questions of fact regarding the accumulation of vacation days, sick

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

12 Misc.3d 1191(A)
12 Misc.3d 1191(A), 824 N.Y.S.2d 770, 2006 WL 2193047 (N.Y.Sup.), 2006 N.Y. Slip Op. 51524(U)
**Unreported Disposition**
12 Misc.3d 1191(A), (N.Y.Sup.)2006 WL 2193047

days, and personal days, that exist concerning the first cause of action, are present with respect to the second cause of action. In addition, the Court notes that there is no evidence to support the accumulation or use of "comp time" prior to June 1, 1998, which would exclude approximately 11 of the days noted on Plaintiff's summary of accrued time. Based on the foregoing, summary judgment on the issue of damages on the second cause of action must be denied.

### C. Third Cause of Action

In his third cause of action, Plaintiff alleges that he is due $81,193.75 for services performed pursuant to the Consulting Agreement. His evidence consists of typewritten pages, with brief descriptions the work performed and a notation of minutes or hours spent on such work. The Consulting Agreement provides for Plaintiff to be compensated at the rate of $275 per hour, with a 20-hour bi-weekly maximum. Plaintiff was required to submit bi-weekly time sheets "setting forth the amount of hours worked and the extent of the work performed."

Defendant insists that Plaintiff failed to comply with the Consulting Agreement in that his time sheets were not submitted on a bi-weekly basis and they were not properly itemized. Defendant further insists that there are "serious factual issues as to the accuracy and reasonableness of Spiritis' time sheets and that Plaintiff's alleged "time sheets" reflect unreasonable amounts of time with extremely vague descriptions of the work allegedly performed.

A contractual duty ordinarily will not be construed as a condition precedent absent clear language showing that the parties intended to make it a condition. *Uniguard Security Ins. Co. Inc. v. North River Ins. Co.,* 79 N.Y.2d 576, 581 (1992); and *Roan/Meyers Assoc. L.P. v. CT Holdings Inc.,* 26 AD3d 295 (1st Dept.2006). No such clear language is present in this case. The Consulting Agreement does not expressly condition payment upon the submission of the bi-weekly time sheets. There is no

clear language showing an intent to make the required submission of time sheets a condition precedent to payment. Accordingly, to the extent that Defendant argues the failure to comply with a condition precedent, the argument must be rejected.

*5 In contrast, the accuracy of the time sheets is a triable issue of fact. As Robert Francis, the Commissioner during the term of the Consulting Agreement, points out, Plaintiff did not report to him or anyone else at Defendant (Francis affidavit, par. 5). As much of the information regarding Plaintiff's time sheets is peculiarly within Plaintiff's knowledge, Defendant should be allowed to cross-examine Plaintiff as to those time sheets; especially Plaintiff's notation of 8 and 10 hour days on a number of occasions. See gen'lly, *Jered Contracting Corp v. New York City Transit Auth.,* 22 N.Y.2d 187 (1968); and *Procter & Gamble Distributing Co. v. Lawrence American Field Warehousing Corp.,* 16 N.Y.2d 344, 362 (1965). Although there is no issue of fraud involved, Defendant certainly suggests that there are errors in Plaintiff's calculations.

Thus, Plaintiff is entitled to summary judgment on the issue of liability on his third cause of action, with the issue of damages referred to trial.

### D. Fourth Cause of Action

Finally, the Consulting Agreement expressly provides that in the event of litigation arising out of performance thereunder, "the parties agree to reimburse the prevailing party's reasonable attorney's fees court, court costs, and all other expenses." As Plaintiff has established Defendant's liability on the first three causes of action, Plaintiff is the prevailing party. Consequently, Plaintiff is entitled to summary judgment on the issue of liability on the fourth cause of action for attorney's fees, court costs, and other expenses. The amount and reasonableness of such fees and costs remain to be established at trial. *Arent, Fox, Kinter Plotkin & Kahn PLLC v. Lurzer GmbH,* 297 A.D.2d 590 (1st Dept.,

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

12 Misc.3d 1191(A)
12 Misc.3d 1191(A), 824 N.Y.S.2d 770, 2006 WL 2193047 (N.Y.Sup.), 2006 N.Y. Slip Op. 51524(U)
**Unreported Disposition**
**12 Misc.3d 1191(A), (N.Y.Sup.)2006 WL 2193047**

2002).

Accordingly, it is,

**ORDERED,** that Plaintiff's motion for summary judgment on its first, second, third, and fourth causes of action in the amended verified complaint is **granted** on the issue of liability only; and it is further,

**ORDERED,** that the trial of this matter, as previously scheduled shall proceed on the assessment of damages consistent herewith.

This constitutes the decision and Order of the Court.

N.Y.Sup.,2006.
Spiritis v. Village Of Hempstead Community Development Agency
12 Misc.3d 1191(A), 824 N.Y.S.2d 770, 2006 WL 2193047 (N.Y.Sup.), 2006 N.Y. Slip Op. 51524(U)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.