**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ROUNDTABLE HEALTHCARE PARTNERS, L.P., a Delaware Limited Partnership, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 08 CV 02968 (MGC) |
| ANGIOTECH PHARMACEUTICALS (U.S.), INC., a Washington Corporation, | ) ) ) | |
| Defendant. | ) ) | |

**ROUNDTABLE'S MEMORANDUM IN SUPPORT OF MOTION
FOR PARTIAL JUDGMENT ON THE PLEADINGS
PURSUANT TO FED. R. CIV. P. 12(C)**

This Motion for Partial Judgment on the Pleadings presents two questions for the Court's consideration: (1) can Angiotech Pharmaceuticals (U.S.), Inc. ("Angiotech") prevail on its claims for funds added nearly a year after the close of the claims period; and (2) can Angiotech prevail on its claims for indemnification, when it is undisputed that Angiotech failed to comply with the indemnification claims procedures set forth in the parties' Escrow Agreement and Stock Purchase Agreement (together, the "Agreements"). The answer to both of these questions is "no." The Court should therefore grant Count I of RoundTable Healthcare Partners, L.P.'s ("RoundTable") Complaint (the "Complaint" or "Compl.") as it pertains to Angiotech's failure to comply with the terms of the Agreements, grant Count II of the Complaint in full, dismiss with prejudice Count I of Angiotech's Counterclaims (the "Counterclaims" or "Ans. and

Counterclaims") and enter an order directing the release of the remaining escrow funds and accumulated interest to RoundTable.[1]

## FACTUAL BACKGROUND

**Relevant Provisions of the Stock Purchase Agreement and the Escrow Agreement**

On January 31, 2006, RoundTable entered into a stock purchase agreement (the "Stock Purchase Agreement") with Angiotech pursuant to which Angiotech acquired all of the outstanding equity interests in American Medical Instruments Holdings, Inc. ("AMI") for approximately $785 million. (Compl. ¶ 2 and Ex. A; Ans. and Counterclaims Ans. to ¶ 2.)[2] In connection with the closing of the transaction contemplated by the Stock Purchase Agreement, Angiotech and RoundTable (collectively, the "Parties"), along with LaSalle Bank, N.A. ("LaSalle Bank"), as Escrow Agent, executed an Escrow Agreement (the "Escrow Agreement"). (Compl. ¶ 3 and Ex. B; Ans. and Counterclaims Ans. to ¶ 3.)  Both Parties are sophisticated entities and were represented by counsel.  (Compl. Exs. A and B.)

RoundTable and the other equityholders of AMI agreed to indemnify Angiotech for *specific*, *identifiable* losses incurred for "any breach of or inaccuracy in (i) any representation or warranty made by [RoundTable]." (Compl. Ex. A, Article III.)  The indemnification was time limited and not to be used simply to pass on the costs of operations.

Pursuant to the terms of the Escrow Agreement, Angiotech deposited $20 million of the purchase price with LaSalle Bank to provide reimbursement for claims made by Angiotech meeting certain terms and conditions. (Compl. ¶ 2 and Ex. B; Ans. and Counterclaims Ans. to ¶

---

[1] The Court has before it Angiotech's fully briefed Motion for Partial Judgment on the Pleadings.  Not only should the Court deny that motion for the reasons set forth in RoundTable's Opposition (Docket No. 21) but, for the reasons set forth herein, the Court should grant judgment on the pleadings for RoundTable.

[2] The Court may consider documents attached to the complaint as an exhibit or incorporated in it by reference when evaluating a motion for partial judgment on the pleadings. *Brass v. American Film Tech., Inc.,* 987 F.2d 142, 150 (2d Cir. 1993).

3.)  If Angiotech's claims fail to satisfy the time limitations and procedural requirements set forth in the Agreements, the $20 million in sale proceeds are to be released to RoundTable.  (Compl. Ex. B at § 4.A.)

RoundTable's liability for any alleged breaches, if any, was limited by the Parties to the $20 million in escrow funds.  (Compl. ¶ 4 and Ex. A at § 9.)  The Agreements set forth specific procedures by which Angiotech must make claims against the escrow.  (Compl. Ex. A at § 9.5.) The procedures were structured to enable the Parties to make informed decisions about claims and to facilitate resolution of any post-closing disputes.[3]

Specifically, the Agreements set forth the following mandatory claims procedures.  If those procedures are not followed, the escrow account is not simply up for grabs – the sale proceeds will be released to RoundTable pursuant to the terms of the Agreements.  (Compl. Ex. B at § 4.A.)  In order for Angiotech to prevent the release of the escrow funds to RoundTable, Angiotech must meet all of the following:

- Angiotech "shall notify" RoundTable "within ten days of becoming aware of . . . any Damages that [Angiotech] shall have determined to have given or is reasonably likely to give rise to a claim for indemnification." (Compl. Ex. A at § 9.5.)

- Angiotech must provide adequate notice of its claims.  (*Id*. at § 9.1(a)(i).)

- Angiotech "shall provide" to RoundTable "all information and documentation necessary to support and verify, any Damages that [Angiotech] shall have determined to have given or is reasonably likely to give rise to a claim for indemnification."  (*Id*. at § 9.5.)

- Angiotech shall give to RoundTable "access to all books and records in the possession or under control of [Angiotech] which [RoundTable] reasonably determines to be related to such claims."  (*Id*.)

- If RoundTable disputes any claim asserted by Angiotech, Angiotech is obligated to respond to RoundTable within fifteen (15) days of its receipt

---

[3] Angiotech, prior to entering into the Agreements, was provided with all of the operational documents of AMI and given access to all facilities for due diligence.

of the notice of objection and to work with RoundTable in good faith to attempt to resolve the dispute. (*Id.*)

**Angiotech Failed To Follow The Claims Procedures, Yet Has Prevented The Release Of The Escrow Funds To RoundTable**

On April 4, 2007, one week before the expiration of the representations and warranties, Angiotech submitted to the Escrow Agent a one-page Escrow Claims Notice identifying 11 separate claims which, when totaled, requested the entire $20 million in the escrow account. (Compl. ¶ 16 and Ex. C.)  As a result, LaSalle Bank cannot release the funds to RoundTable until issues involving Angiotech's claims are resolved.  The claim descriptions provided little or no detail.  (*See* Compl. Ex. C.)  For example, Claim 9 was for $1.5 million for "Potential Product Recalls."  (Compl. Exs. C and N at Claim 9.)  The entire description offered for this claim is "Cost of product recalls if necessary after completion of Quality System Investigation activities" and an identification of the divisions from which these "potential product recalls" might possibly arise.  (*Id.*)  Nothing beyond these one sentence descriptions was provided for Claim 9 or any of the other Claims.  (Compl. Exs. C and N at Claim 9.)  On the other hand, RoundTable timely issued a Notice of Objection to the Notice of Claims.  (Compl. ¶ 17 and Ex. D.)  Simultaneously, RoundTable demanded that Angiotech comply with its obligations under the Agreements to provide documents supporting the claims and give RoundTable access to Angiotech's books and records in order to assess the claims.  (Compl. Ex. D.)

The Stock Purchase Agreement provides that Angiotech, after tendering a claim for indemnification, must provide "*as soon as practicable thereafter all information and documentation necessary to support and verify*" the submitted claim(s).  (Compl. ¶ 19 and Ex. A at § 9.5(a) (emphasis added).)  Section 9.5(a) also requires that RoundTable "shall be given access to all books and records in the possession or under control" of Angiotech which

RoundTable reasonably determines to be related to such claims.  (Compl. Exs. A at § 9.5(a), and Ex. B at § 3(a) (setting forth claims procedures contained within the Escrow Agreement).)  These requirements enable RoundTable to assess claims entered against it.

RoundTable repeatedly requested such materials but they have *never* been provided.  Nor has RoundTable been granted access to Angiotech's books and records.  (*See, e.g.,* Compl. ¶¶ 25-32, 35, 39, 48 and Exs. E - K, P; *see also* Ans. and Counterclaims Ans. to ¶¶ 26, 28, 29, 32, 35, 39 (offering numerous excuses not permitted by the Agreements, but ultimately conceding that "Angiotech has not provided copies of supporting documentation to RoundTable regarding Angiotech's claim[s] to the escrow funds."))

On February 21, 2008 (following the commencement of litigation in state court in Chicago, Illinois by LaSalle Bank) Angiotech abandoned roughly one-third of its claims and agreed to release $6,512,319 in funds from the escrow account to RoundTable based upon its "revised estimate." (Compl. at ¶¶ 35, 36 and Ex. N.)  Angiotech eventually executed a Joint Letter of Direction allowing the release of the $6,512,319 to RoundTable.  (Compl. ¶ 35 and Ex. O.)

## Angiotech Attempted To Increase Its Claim Demands After The Close Of The Claims Period

On February 21, 2008, Angiotech also attempted to improperly increase the amounts it seeks for two of the eleven claims by $2,164,371 and to add a wholly new component – an additional 20% "contingency" of $2,202,274 for two of the claims, a component nowhere authorized by the Agreements.  (Compl. ¶ 35, 36-39; *see also id.* Ex. P.)  In fact, the Agreements specifically prohibit Angiotech from obtaining indemnification for speculative damages.  (Compl. Ex. A at § 9.2 (barring recovery for "punitive, speculative or consequential damages unless such damages are incurred or paid by an Indemnified Party pursuant to a Third Party

5

Claim").)  In addition to being unsubstantiated, these additions were submitted almost a year after the claims period expired in April of 2007 and are therefore time-barred.  Section 9.1(b) of the Stock Purchase Agreement provides that "no claim for indemnification, reimbursement or other remedy" may be brought after the claims expiration date.  (Compl. Ex. A at § 9.1(b).)  The added damages and wholly new contingency claims clearly fall within the reach of "indemnifications, reimbursement or other remedy."  (*Id.*)  Accordingly, RoundTable advised Angiotech that the Agreements did not permit Angiotech to increase its damages after the close of the claims period or to withhold a "contingency reserve."  (Compl. Ex. P.)  RoundTable demanded that Angiotech agree to release an additional $4,366,645.  (Compl. ¶ 38 and Ex. P; Ans. and Counterclaims Ans. to ¶ 38.)  Angiotech refused.  (Compl. ¶ 38; Ans. and Counterclaims Ans. to ¶ 38.)

**Procedural Background**

On March 21, 2008, RoundTable filed its Complaint alleging in Count I that Angiotech breached the Agreements by wrongfully claiming entitlement to the escrow funds, both because Angiotech had not complied with the conditions precedent necessary for recovery, and because Angiotech made improper claims against the escrow.  (Compl. ¶¶ 43-51.) In Count II, RoundTable alleged that Angiotech breached the Agreements by attempting to improperly adjust the claim amounts and claim a 20% "contingency" for two of the claims.  RoundTable also alleged one Count related to tax refunds not raised in this Motion.  RoundTable seeks compensatory damages, declaratory relief, attorney's fees and costs, along with pre-judgment and post-judgment interest as provided by law.  (Compl. ¶ 6.)  Angiotech counterclaimed on April 17, 2008, alleging it had "performed or substantially performed all material obligations of the contract" and claiming in Count I that RoundTable had breached the parties' agreements by

not agreeing to Angiotech's requested accommodations related to its obligations to provide documentation and support for its claims. (Ans. and Counterclaim at ¶¶ 159-166.) Angiotech also made claims related to the suit filed by LaSalle Bank in Chicago, state tax refunds, and an office lease. (*Id.* at ¶¶ 167-182.) None of those claims – or the underlying dispute regarding the representations and warranties – are at issue in this Motion.

## ARGUMENT

I.  **ANGIOTECH CANNOT INCREASE ITS CLAIM AMOUNTS AND CREATE A "CONTINGENCY" CATEGORY AFTER THE CLOSE OF THE CLAIMS PERIOD.**

The claims period was finite. Angiotech, therefore, cannot increase individual claim amounts after the claims period was closed. To hold otherwise would transform the agreed-upon closed claims period into an open-ended claims period. The Agreements do not contemplate such a result, and the purpose of the sunset provisions in the Agreements would be frustrated absent strict enforcement. Angiotech's effort to increase its Damages for certain claims totaling $4,366,645, therefore, must fail.

### A.    Angiotech May Not Increase The Amounts Of Its Claims After The Close Of The Claims Period.

Section 9.1(b) of the Stock Purchase Agreement provides:    "No claim for indemnification, reimbursement or other remedy . . . may be brought with respect to breaches of representations and warranties after the applicable [claims] expiration date set forth in 9.1(a)(i)." (Compl. Ex. A at § 9.1(b).)

Under the Agreements, the claims period closed on April 14, 2007. Over ten months after the close of the claims period, Angiotech attempted to bypass the close of the claims period and the Agreements themselves by increasing its claim amounts. Both of the Agreements make clear that the Notice of Claim must include a specific dollar amount reflecting the amount sought

for each claim. *See, e.g.,* Compl. Ex. B at Ex. B (the sample "Escrow Claim Notice"); Compl.

Ex. B at § 3(a).  In other words, nowhere is there a provision permitting Angiotech to claim one

amount in the Claims Notice, and then change its mind to increase individual claim amounts

after the claims deadline.[4]  In fact, the Escrow Agreement specifically contemplates that claims

paid from the Escrow Account will be the same as or some portion of the amounts claimed in the

Claims Notice – not *more* than the amounts claimed in the Claims Notice.   The Escrow

Agreement provides that disbursements will be made in:

> (i)  the amount of Damages sought in any Escrow Claim Notice [if
> not timely objected to by the Seller Representative] . . .
> (ii)  the amount set forth in a Joint Letter of Direction. . .
> (iii) the amount of the Damages, *or portion thereof,* sought in any
> Escrow Claim Notice directed to be so paid to Buyer in any written
> notice delivered by the Seller Representative . . .or
> (iv)  the amount of any Damages*, or portion thereof,* sought in any
> Escrow Claim Notice that is directed to be paid in a final, non-
> appealable order of a court having jurisdiction over the asserted
> claim. . . .

(Compl. Ex. B at § 3(d) (emphasis added).)

Thus, there is no provision for Angiotech to raise its claim amounts after the close of the

claims period.[5]

---

[4] Nor is there a provision of the Agreements which would permit Angiotech to refuse to provide documentary support for its claims while it spends 16 months trying to come up with such support.

[5] The disingenuousness of the claims is obvious when considering that the transferred entities manufacture medical devices and therefore have an ongoing obligation to the public and the Food and Drug Administration to handle threats to patient safety in a responsible and swift manner.  In the 17 months since the transaction closed, even if any of the medical devices were on the shelves at this point, Angiotech has not initiated or announced a recall, nor has it reported any of these supposed $20 million in issues to its shareholders or the Securities and Exchange Commission, as evidenced by a search of recalls on the FDA website (which shows none for any of the entities in question since before the transaction) or a review of Angiotech's SEC filings on the SEC website.  The Court may take judicial notice of information on the FDA and SEC's websites, www.fda.gov and www.sec.gov, respectively.  *See, e.g., Ligon v. Doherty*, 208 F.Supp.2d 384, 386 n.1 (E.D.N.Y. 2002) (taking judicial notice of information on the website of the New York State Department of Correctional Services); *Phillips v. City of New York*, 453 F. Supp. 2d 690, 738 n.36 (S.D.N.Y. 2006) (taking judicial notice of publication on website of the City's Administration for Children's Services).

**B.     Angiotech May Not Increase Claim Amounts By Withholding A "Contingency Reserve."**

In its February 21, 2008 letter, Angiotech withheld a 20% "contingency" in the amount of $2,164,371 for Claims 6 and 7.  (Compl. Ex. N.)  The Agreements contain no provision which would permit Angiotech to unilaterally increase its claim amounts by tacking on a "contingency reserve to account for unanticipated cost increases."  (*Id.*)  Indeed, the Agreements specifically bar recovery for such speculative claims.  (Compl. Ex. A at § 9.2.)  The reason for a claims period – rather than the Escrow Account existing in perpetuity as an ATM for Angiotech to draw on at its leisure – was to allow the Escrow Account and the sale to come to an end at a definite point in time.   Again, nothing in either of the Agreements allows Angiotech to add a 20% "contingency reserve" at any point, and certainly not after the end of the claims period.   For example, the Stock Purchase Agreement makes clear that the "Damages" reimbursable from the Escrow Account are defined as:

> Any and all losses, liabilities, Actions, assessments, costs, penalties, fines, judgments, deficiencies, diminution of value, expenses (including costs of investigation, defense and settlement and reasonable attorneys' and accountants' fees), or damages of any kind or nature whatsoever, including lost profits, lost revenues and loss of business, whether or not involving a Third-Party Claim, but *excluding punitive, speculative or consequential damages unless such damages are incurred or paid by an Indemnified Party pursuant to a Third Party Claim.* . . .

(Compl. Ex. A at § 9.2 (emphasis added).)

Therefore, these "contingency" amounts and claims for increased damages must fail.  The Parties agreed by contract to bring finality to such matters as of April, 2007 for a transaction that closed in March of 2006.  That limitation should be enforced by this Court.  The Escrow Agent should be ordered to release to RoundTable $4,366,645 and a *pro rata* share of interest in

recognition of the fact that, under the clear terms of the Agreements, Angiotech cannot sustain its late-filed and "contingency" claims.

## II.    ANGIOTECH HAS FORFEITED ITS RIGHT TO SEEK THE REMAINING SALES PROCEEDS BEING HELD IN ESCROW BY FAILING TO FULFILL THE CONDITIONS PRECEDENT TO ITS RIGHT TO RECOVERY.

Angiotech has waived its right to seek indemnification for RoundTable's purported contractual breaches by electing not to comply with the procedures enumerated in the Agreements for making such claims. Angiotech agreed that it would forfeit its ability to seek the remaining sales proceeds being held in escrow, *i.e.*, the $20 million in escrow, and the escrow funds would be released to RoundTable on April 14, 2007, *unless* prior to and after that date Angiotech took precise measures preserving its ability to pursue such claims. This is not a unique arrangement. To the contrary, the conditions agreed upon present a classic scenario where two parties bargain for finality of their relationship by contracting that the relationship will end *unless* one of the parties takes precise measures to continue the relationship.

Neither the precise conditions under which Angiotech could properly block LaSalle Bank from releasing the remaining sales proceeds to RoundTable (thereby preserving its ability to pursue its claims), nor the actions Angiotech actually took to block LaSalle Bank from releasing the funds, are in dispute. The fact that the parties' relationship has continued beyond the dates by which Angiotech agreed to walk away or properly submit claims against the remaining sales proceeds should not be confused as evidence that Angiotech has complied with the Agreements – it simply reflects LaSalle Bank's understandable proclivity not to act as an arbiter and expose itself to liability after being served with Angiotech's purported "Notice of Escrow Claim."

**A.** **Angiotech Improperly Blocked LaSalle Bank From Releasing The Remaining Sales Proceeds By Failing To Comply With The Claims Procedures.**

It is uncontested that Angiotech has failed to perform the contractual obligations set forth in the Agreements. The contractual obligations are neither insubstantial nor advisory; they go to the heart of how the parties intended to resolve disputes regarding representations and warranties, *if any*, without extended litigation. If the remaining sales proceeds were not released to RoundTable by LaSalle Bank through Angiotech's inaction (*i.e.* by not filing an escrow claims notice in the manner agreed-upon by the parties), it was expected that proofs of Angiotech's escrow claims would be readily available and, at a minimum, good faith bargaining would ensue. The reason these proof and disclosure provisions are so important is clear – RoundTable bargained for, and Angiotech agreed, that Angiotech could not block RoundTable's receipt of the remaining sales proceeds after April 14, 2007, based upon unsubstantiated claims of a speculative and contingent nature. Notwithstanding the exchange of these promises, Angiotech has done just that, thereby circumventing the temporal aspect of RoundTable's potential indemnification obligations.

1.    Angiotech Failed to Describe The Nature of Its Claims.

Section 9.5 of the Stock Purchase Agreement required Angiotech to provide to RoundTable "all information and documentation necessary to support and verify[] any Damages . . . determined to have given or . . . reasonably likely to give rise to a claim for indemnification." (Compl. Ex. A at §9.5.) Similarly, in Section 3 of the Escrow Agreement, Angiotech agreed that it "shall deliver a notice in substantially the form of Exhibit B attached hereto (an "*Escrow Claim Notice*"). (Compl. Ex. B. at §3.) In turn, Exhibit B to the Escrow Agreement required Angiotech to provide a description of the claims.

Claim 6 is one example of Angiotech's failure to provide meaningful claims descriptions. There, Angiotech originally sought $6,005,000 for "Quality System Investigation and Remediation" at its SSC and InterV divisions. (Compl. Ex. C at Ex. A.) The following is the entirety of the explanation provided: "Quality system procedures, practices, records and equipment require compliance with applicable regulatory requirements." (*Id.*) The notice does not tell RoundTable what the "quality systems" problems were, where the problems existed, what was done to correct the problems, which statutes or regulations were implicated by the quality problems, or how the $6 million was spent.[6]

Similarly, Angiotech sought $7,776,000 for: "Wheeling Equipment: upgrade of equipment to be validatable and validation of equipment and processes in the Wheeling facility." (Compl. Ex. C at Ex. A, Claim 7.) There is no other description of any kind whatsoever: no identification of the equipment involved, no description of the phrase "upgrade of equipment to be validatable." (*Id.*) There is no description of why this item required over $7.7 million.[7]

Remarkably, Claim 9 is for "*Potential* Product Recalls." The entirety of the description is: "Cost of product recalls, *if necessary,* after completion of Quality System investigation activities" (emphasis added). (Compl. Ex. C at Ex. A.) For this Angiotech seeks $1.5 million without any effort to define what products, what facilities or the nature and rationale of the potential recalls. This is, of course, because there have been no recalls.[8]

---

[6] In fact, as discussed in Section I above, on February 21, 2008 Angiotech unilaterally attempted to increase the claim amount to $8,188,871 and to add an additional $1,633,674 "Contingency" of 20% of the new claim amount. (Compl. Ex. N.)

[7] Then, on February 21, 2008, as discussed in Section I above, Angiotech decreased the claim amount to $2,543,000 and again unilaterally added an additional $568,800 as a 20% "Contingency." (Compl. Ex. N.)

[8] *See* n. 5, *supra.*

These examples alone total in excess of $13 million and are all characterized by an almost total lack of detail, lack of documentary proof, and lack of access to knowledgeable personnel – all of which are required by the Agreements Angiotech entered into.

2.    Angiotech Failed To Provide Supporting Documentation and To Provide RoundTable Access to Relevant Claims Information.

The Agreements require, without qualification, that upon giving a Notice of Claim for indemnification, Angiotech must:  (1) affirmatively provide supporting documentation for *all* submitted claims; (2) provide *all* documentation requested by RoundTable that RoundTable reasonably believes is relevant to any of the submitted claims; and (3) provide access to Angiotech's books and records, if requested.  Angiotech concedes that it has met none of these requirements.  (*See, i.e.,* Ans. and Counterclaims Ans. to ¶¶ 26, 28, 29, 32, 35, 39 (offering numerous excuses not permitted by the Agreements, but ultimately conceding that "Angiotech has not provided copies of supporting documentation to RoundTable regarding Angiotech's claim[s] to the escrow funds.")  Angiotech's failure to comply with these conditions precedent – either by choice or because of the speculative and contingent nature of Angiotech's claims – is fatal to all of its claims for indemnification.

3.    Angiotech Failed to Attempt Resolution of the Disputes in Good Faith.

Section 3(b) of the Escrow Agreement requires that, upon RoundTable's submission of a Notice of Objection, Angiotech is obligated to "attempt to resolve in good faith any dispute regarding any claim with respect to which a Notice of Objection has been delivered within 15 days after delivery of such Notice of Objection."  (Compl. Ex. B at §3(b).)  This, too, is a condition precedent Angiotech failed to satisfy.  On April 16, 2007, RoundTable submitted a timely Notice of Objection.  (Compl. Ex. D.)  The same day, it requested documentation from Angiotech to support the claims.  (Compl. Ex. E.)  Angiotech wrote back on April 24, 2007,

promising that it was "working to gather all documents relevant to the claims set out in our Notice of Claims for Indemnification and we will provide these to you in due course." (Compl. Ex. F.)  That was the only correspondence RoundTable received from Angiotech during the 15 day period.  Sixteen months after that promise, "due course" has never arrived.

> **B.    Angiotech Must Comply With The Agreements' Claims Procedures To Preserve Its Ability To Pursue Indemnity Claims Against The Remaining Sales Proceeds.**

Under New York law, courts look to the language of the contract to determine whether a provision is a condition precedent or a material term of a contract.  Where conditions precedent or material terms are clearly and unambiguously set forth in a contract, they are enforceable obligations.  A party's failure to comply denies to it the benefits of the contract.  Angiotech was free to ignore its contractual duties, but in so doing it forfeited any claim under the Agreements – including any claim to the escrow funds.  *See* FARNSWORTH ON CONTRACTS (THIRD) § 8.3.

For example, New York cases which analyze the closely analogous situation of an insurer/insured consistently hold that a policyholder's failure to satisfy conditions precedent to obtaining coverage are barred from recovery.  *See e.g., Admiral Indem. Co. v. Pancas Restaurant, Inc.*, 2005 WL 2764255, at *3 (S.C. N.Y.) ( N.Y. App. Div. October 3, 2005) (as a matter of law, a policyholder's failure to provide its insurer with notice of a claim "as soon as practicable" as required in the insurance policy precluded policyholder from recovering under the policy); *Argo Corp. v. Greater New York Mut. Ins. Co.*, 827 N.E.2d 762, 763 (N.Y. App. Div. 2005) (same); *Bhattacharyya v. Quincy Mut. Fire Ins. Co.*, 2004 WL 2913895, at *5-6 (N.Y. App. Div. 2004) (as a matter of law, policyholder's failure to cooperate with insurer by providing requested documents to enable the insurer to discover the facts surrounding the loss, as required in the insurance policy, precluded policyholder from recovering); *see also CVC Claims Litig.*

14

*LLC v. Citicorp Venture Capital Ltd.*, 2006 WL 1379596, at \*4 (S.D.N.Y. May 18, 2006) (breach of contract claim was dismissed on the pleadings because "plaintiff has failed to allege, even generally, that the conditions precedent were performed or occurred").

New York courts have consistently held that a party's failure to fulfill conditions precedent bar that party's right to obtain the benefits of a contract, *i.e.*, a party's noncompliance with conditions precedent is fatal to all of its claims. *See e.g.*, *Navilia v. Windsor Wolf Rd. Properties, Co.*, 249 A.D.2d 658 (N.Y. App. Div. 1998); *Charles Hyman, Inc. v. Olsen Industr., Inc.*, 227 A.D.2d 270 (N.Y. App. Div. 1996); *Grin v. 345 East 56th Street Owners, Inc.*, 212 A.D.2d 504 (N.Y. App. Div. 1995); *Hicks v. Bush*, 180 N.E.2d 425 (N.Y. 1962).

The approach of the court in *Southward Investments LLC v. V-GPO, Inc.*, Case No. 06-6540T, 2007 WL 2859702, at \*3 (W.D.N.Y. Sept. 26, 2007) is instructive. The *Southward* Court rejected a breach of contract action to enforce a 3 million share stock sale, finding that the payment of $2,500,000 was a condition precedent to receiving stock under the stock purchase agreement. The court inferred the condition precedent from the use of the word "agrees" in the contract: "the Purchaser [Southward] *agrees* to purchase…[3,000,000 shares of stock] for an aggregate of $2,500,000…" *Id.* Notably, the clause relied upon by the court was not part of any enumerated "Conditions" section of the agreement. It didn't matter because the *language* of the stock purchase agreement clearly created a condition precedent.

Likewise, here, the language of the Agreements unambiguously creates conditions precedent to claiming the remaining sales proceeds requiring that Angiotech: (1) "shall provide" RoundTable with documents supporting its claim (Compl. Ex. A at § 9.5(a)); (2) "shall give" RoundTable access to books and records (*Id.*); and (3) following RoundTable's written objection

to Angiotech's claim, RoundTable and Angiotech shall "agree to attempt to resolve in good faith any dispute…" (Compl. Ex. B at § 3(b)).  These terms are mandatory and unequivocal.

These obligations to provide proof may also be construed as material terms of the Agreement – as distinct from conditions precedent.  The result, however, is absolutely the same: Angiotech is free to disregard such material terms, but it then cannot recover from the escrow fund.  If Angiotech had taken no action prior to the expiration of the representations and warranties, Angiotech would concede that it had "forfeited" the opportunity to pursue claims against the remaining sales proceeds and those proceeds would have been released to RoundTable.  Angiotech, therefore, cannot diminish the importance of the conditions precedent, nor escape the consequences of its actions, or inactions, as the case may be.  By doing so, Angiotech forfeits any right to other benefits of the Agreement, including any claim on the escrow.  *See Mowers v. Paul Revere Life Ins. Co.*, 27 F. Supp. 2d 135 (N.D.N.Y. 1998), relevant portion upheld, 204 F.3d 372 (2d Cir. 2000); *Cabe v. Aetna Cas. & Surety Co.*, 544 N.Y. S. 2d 862 (1st Dept. 1989) (" . . . Plaintiffs' continued failure, without explanation or excuse, to provide the requested information, constituted a material breach of the policy, precluding recovery by the Plaintiff.")

### C.    Angiotech Forfeited Its Ability To Seek Indemnity From The Remaining Sales Proceeds Held In Escrow.

Forfeiting its ability to proceed with claims against the remaining sales proceeds for noncompliance should come as no surprise to Angiotech.  Indeed, if Angiotech had not submitted its purported Notice of Escrow Claims in April 2007, LaSalle Bank would have released the escrow funds to RoundTable that month.  Therefore, it is legally and factually disingenuous for Angiotech to suggest that it is unfair or unexpected that its admitted failure to comply with the claims procedures should result in a different fate.

Finally, it is important to note that this is not a case of an unsophisticated party without the benefit of counsel being preyed upon by a large corporation and facing no option but to consent to unfavorable terms. Both parties here are sophisticated, both were represented by counsel, and both took part in an arms' length negotiation over several months. The outcome of those negotiations was the Agreements, the terms of which Angiotech has violated.

Angiotech has failed to comply with the conditions precedent either by choice or due to its inability to properly submit its claims because they were, as Angiotech acknowledges, unknown, speculative and/or contingent in nature when Angiotech submitted the claims. The reason Angiotech finds itself in these circumstances is irrelevant: the two parties *contracted away any other potential remedy for Angiotech's conduct short of forfeiture*. Section 9.8 of the Stock Purchase Agreement states that following the closing, the remedies "are exclusive and in lieu of any and all rights and all other rights and remedies which the parties may have under this Agreement or otherwise against each other … with respect to any breach of any representation or warranty or any failure to perform any covenant or agreement set forth in this Agreement…." (Compl. Ex. A at §9.8.) Angiotech cannot now claim ignorance, or that it should excused by the Court from the ramifications of the very outcome Angiotech agreed upon – forfeiture of Angiotech's rights against the escrow fund.

In any event, Angiotech should not be rewarded for its breaches of contract by being allowed to proceed with its claims unscathed. To that end, at a minimum, Angiotech should be barred from offering further proofs in support of its escrow claims beyond those contained in its Notice of Escrow Claim.

## CONCLUSION

WHEREFORE, based on the foregoing, RoundTable respectfully requests that this Court

enter an order:

1. Granting the relief requested in Count I of RoundTable's Complaint, dismissing with prejudice Count I of Angiotech's Counterclaims, and entering such further and other relief as the Court deems just and appropriate; or

2. Entering an order barring Angiotech from offering further proofs in support of its escrow claims beyond those contained in Angiotech's Notice of Escrow Claim, and entering such further and other relief as the Court deems just and appropriate; or

3. Granting the relief requested in Count II of RoundTable's Complaint, dismissing with prejudice Count I of Angiotech's Counterclaims to the extent it seeks relief common to Count II of RoundTable's Complaint, and entering such further and other relief as the Court deems just and appropriate.


Dated:  August 14, 2008                              Respectfully submitted,


                                                     /s/ Amy M. Gardner
Jason Mogel                                          F. Thomas Hecht
Linda Imes                                           Jacob M. Mihm
Spears & Imes LLP                                    Amy M. Gardner
51 Madison Avenue                                    Ungaretti & Harris, LLP
New York, NY  10010                                  3500 Three First National Plaza
Tel:  (212) 213-6996                                 Chicago, Illinois  60602
Fax:  (212) 231-0849                                 Tel:    (312) 977-4400
LImes@spearsimes.com                                 Fax:    (312) 977-4405
JMogel@spearsimes.com                                fthecht@uhlaw.com
                                                     jmmihm@uhlaw.com
                                                     agardner@uhlaw.com

                                                     *Attorneys for Plaintiff RoundTable Healthcare
                                                        Partners, L.P.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 14th day of August 2008 I caused to be served a true and correct copy of RoundTable Healthcare Partners' Memorandum in Support of Motion for Partial Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c) upon each of the following via ECF and upon New York counsel via hand-delivery:

Warren J. Rheaume
Malaika M. Eaton
Heller Ehrman LLP
701 Fifth Avenue, Suite 6100
Seattle, Washington 98104-7098
Tel: (206) 447-0900
Fax: (206) 447-0849
warren.rheaume@hellerehrman.com
malaika.eaton@hellerehrman.com

Sara K. Pildis
Heller Ehrman LLP
Times Square Tower
7 Times Square
New York, NY 10036-6524
Tel: (212) 832-8300
Fax: (212) 763-7600
sara.pildis@hellerehrman.com

**Counsel for Defendant Angiotech Pharmaceuticals (U.S.), Inc.**

/s/ Amy M. Gardner
Amy M. Gardner

# APPENDIX A

**Westlaw.**

Slip Copy                                                                                                          Page 1
Slip Copy, 9 Misc.3d 1121(A), 2005 WL 2764255 (N.Y.Sup.), 2005 N.Y. Slip Op. 51721(U)
**Unreported Disposition**

**C**
Admiral Indem. Co. v. Pancas Restaurant, Inc.
N.Y.Sup.,2005.
NOTE: THIS OPINION WILL NOT BE PUB-
LISHED IN A PRINTED VOLUME. THE DIS-
POSITION WILL APPEAR IN A REPORTER TA-
BLE.
Supreme Court, New York County, New York.
ADMIRAL INDEMNITY COMPANY, Plaintiff,
v.
PANCAS RESTAURANT, INC., 47 West 55th
Street Restaurant, Inc., d/b/a Giovanni Ristorante,
Public Service Mutual Insurance Company, Os-
waldo Bendenzu and Yuli Lopez, Defendants.
**No. 602950/04.**

Oct. 3, 2005.

CHARLES EDWARD RAMOS, J.
*1 In motion sequence 001, plaintiff Admiral In-
demnity Company ("Admiral") moves, pursuant to
CPLR 3212, for summary judgement on its com-
plaint in an underlying personal injury action. De-
fendants, Pancas Restaurant, Inc., ("Pancas") and
Public Service Mutual Insurance Company
("PSM") cross move for summary judgement dis-
missing the complaint, also pursuant to 3212.

Defendant, Giovanni Ristaurante ("Giovanni") op-
erates a restaurant located in a building at 47-49
West 55th Street in New York, New York. Gio-
vanni leases the restaurant premises from the owner
of the building, defendant Pancas.

Plaintiff Admiral issued a General Liability policy
FN1 to Giovanni. Pursuant to an "Additional In-
sured Endorsement", the policy, as required by the
terms of Giovanni's lease with building owner Pan-
cas, names Pancas as an additional insured. The
Admiral policy contains in its pertinent parts a
"Conditions" section which requires that the in-
sured notify "as soon as practicable of an occur-
rence which may result in a claim."FN2The Condi-
tions section further provides that when "[Admiral]

insurance is excess, [they] will have no duty under
Coverage [ ... ] to defend the insured against any
'suit' if any other insurer has a duty to defend the
insured against that 'suit'."FN3

FN1. Policy # 21-3-1366-31-02

FN2. Admiral policy, Section I-Coverages,
§ 7 Conditions.

FN3.*Id.*

Pancas also procured its own separate liability
policy from the defendant PSM.FN4 Pancas's PSM
policy provides primary coverage to Pancas for,
among other things, lawsuits arising out of bodily
injury occurring within the subject premises.

FN4. Policy # 00-74-304783.

On October 20, 2002, while both the Admiral and
PSM liability policies were in effect, the defendant
and underlying plaintiff, Oswalso Bendenzu,
slipped and fell on a staircase within the above-
described premises during the course of his em-
ployment as a dishwasher for Giovanni. He sus-
tained injuries as a consequence of this accident.

In a December 2, 2002, letter from an attorney re-
tained by Bendenzu, Bendenzu advised that he
would be asserting a claim against Pancas to recov-
er for injuries he had sustained in the course of his
employment. This letter instructed Pancas to notify
its liability insurer for the claim. Plaintiff claims
that Pancas did not notify Admiral of Bendenzu's
claim in December 2002.

On January 2, 2003, Bendenzu commenced an ac-
tion against Pancas in the Supreme Court of Bronx
County for which the Summons and Complaint
were served on Pancas on January 23,
3003.FN5Bendenzu alleged in his complaint that
his injuries are the result of defective conditions of
the premises due to Pancas's negligent maintenance
and ownership of the premises. In February, 2003,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                      Page 2
Slip Copy, 9 Misc.3d 1121(A), 2005 WL 2764255 (N.Y.Sup.), 2005 N.Y. Slip Op. 51721(U)
**Unreported Disposition**

Pancas tendered the action exclusively to its own liability insurer, defendant PSM. PSM thereafter assigned counsel to represent Pancas in the Bendenzu lawsuit without reservation of rights.

> FN5. Bendenzu did not sue his employer, Giovanni, since any such action would be barred by the exclusive provisions of the Workers Compensation Law.

In July, 2003, Admiral claims they were placed on notice of the Bendenzu lawsuit. Admiral acknowledged the action in a letter dated August 11, 2003. Admiral states that it commenced its investigation thereafter into the matter.

*2 On September 15, 2003 the Bendenzu Summons and Complaint were furnished to Admiral. Admiral disclaimed coverage in a letter to Pancas dated November 4, 2003, on the basis of its violation of the Admiral policy's Notice Conditions. In a letter dated May 17, 2004, Admiral rescinded its disclaimer and retained defense counsel to share in and partly assume control of Pancas's defense with PSM in the Bendenzu suit.

Admiral argues that it is not obligated to defend or indemnify Pancas in the underlying personal injury action. Admiral claims that PSM, as Pancas's own general liability insurer, breached the Notice Conditions of the Admiral policy by unconditionally and without any reservation of rights assuming Pancas's defense exclusively at the outset of the underlying litigation. Admiral claims that PSM failed to notify Admiral of the injury or/and suit in a timely manner and controlled Pancas's defense as a primary insurer thereby forfeiting its rights to challenge the nature of the coverage or to disclaim coverage thereunder.

Pancas and PSM oppose plaintiff's motion for summary judgement. Defendants claim that Pancas's delay in providing notice to Admiral creates an issue of fact as to the viability of Admiral's late notice defense.

Additionally, Pancas and PSM file a cross motion for summary judgment on the ground that Admiral is precluded from disclaiming coverage to Pancas because Admiral allegedly unreasonably delayed disclaiming coverage based on a late notice. Defendants also argue that Admiral ultimately rescinded its disclaimer of coverage and has resumed Pancas's defense in the underlying action without reservation.

"[I]n order to obtain summary judgment, movant must establish its defense or cause of action sufficiently to warrant a court's directing judgment in its favor as a matter of law."*Gilbert Frank Corp. v. Federal Ins. Co.,* 70 N.Y.2d 966, 967 (1988). In order to defeat the motion, the defending party must establish the existence of a factual issue requiring trial, through production of admissible evidence. *Id,* at 967.

Pancas's contract, as an additional insured under the Admiral policy, requires it to notify Admiral "as soon as practicable" of an occurrence, claim, or suit pursuant to the policy's coverage section (Condition; section I-coverage; 2 a; 2b). While the issue of whether the insured has given timely notice of occurrence is generally a question of fact:

New York courts have held that it may be determined as a matter of law when (1) the facts bearing on the delay in providing notice are not in dispute and (2) the insured has not offered valid excuse for the delay.

*Village of Endicott, N.Y. v. Insurance Co. of North America,* 908 F Supp 115, 122 (NDNY 1995).[FN6]

> FN6. This decision was vacated in part on reconsideration, 914 F Supp 36 (NDNY 1996). The court held that it erred in declaring that Insurance of America, the defendant in the subject motion for summary judgment, has a duty to defend plaintiff, the Village in that it failed to meet a condition precedent to coverage. Therefore, the court should not have been granted partial

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                Page 3
Slip Copy, 9 Misc.3d 1121(A), 2005 WL 2764255 (N.Y.Sup.), 2005 N.Y. Slip Op. 51721(U)
Unreported Disposition

summary judgement on that issue.

The undisputed evidence establishes that on October 20, 2002 while both the Admiral and PSM liability policies were in effect, the defendant and underlying plaintiff, Bendenzu, sustained an injury during the course of his employment for Giovanni. While Pancas, became aware of the incident in December 2002, it was not until 9 months later, on July 30, 2003 that Admiral was placed on notice for the first time of the 2002 occurrence and lawsuit. Therefore, the facts regarding the delay are not in dispute. Rather, the issue is whether the delay is reasonable.

*3 In *Holmes v. Morgan Guar. and Trust Co. of New York,* the court held that a ten months delay by owner and general contractor of premises, additional insured under a subcontractor's liability policy, in providing notice to subcontractor's insurer of accident and subsequent suit was not reasonable.*Holmes v. Morgan Guar. and Trust Co. of New York,* 223 A.D.2d 441, (1st Dep't 1996). The court stated that the delay violated the policy condition that notice be given "as soon as practicable" and eliminated any duty of insurer to defend them against the lawsuit. *Id.*

Pancas has not offered a valid reason for the delay. New York recognizes the insured's reasonable belief in its non-liability as a valid excuse for a policyholder's untimely notice. *White v. City of New York,* 81 N.Y.2d 955, 957 (1993). Nevertheless, when no credible evidence supports a proffered excuse, a notice will be held untimely as matter of law. *Hartford Fire Ins. Co. v. Masternak,* 55 A.D.2d 472, 474 (4th Dep't.1977).

Defendant Pancas argues that given the allegation that Bendenzu's injury occurred as a result of a defective stairway, which Giovanni was contractually obligated to maintain and repair, Pancas had a good-faith belief that it would not be held liable. However, Pancas, as the owner of the building within which the injury occurred should have been aware of his liability with regards to the occurrence which is specifically alleged in the Bendenzu Summons and Complaint. Additionally, Pancas, as an additional insured, agreed to all of Admiral policy's terms, conditions, limitations and exceptions that existed with respect to the original insured. Therefore, Pancas has an independent contractual obligation for which Pancas should have been put on notice by virtue of being an additional insured on the Admiral policy liability.

Under New York law, an insured's satisfaction of the notice of conditions in a policy insurance, absent valid reason for delay, is a mandatory condition precedent to the insured's right of coverage under the policy. *New York v. Luslow's Sanitary Landfill, Inc.,* 50 F Supp 2d 135, 138 (NDNY 1999). Where an insured breaches the policy notice conditions, it is deemed as a matter of law, to have forfeited its rights under the policy, thus absolving the insurer of any coverage obligations, whether it be the primary or excess insurer, which would otherwise have existed. *Aetna Cas. & Sur. Co. v. Lanza,* 70 Ad2d 508, (1st Dep't.1979). Pancas failed to notify Admiral of the subject occurrence, claim and suit in a timely manner and as a result, breached the conditions stipulated in the Admiral policy. Pancas's breach of insurance contract forfeits its rights of coverage under the Admiral policy.Admiral is not estopped from disclaiming liability. In light of the circumstances, investigation, and delay of notice of occurrence and lawsuit, Admiral's disclaimer was provided as soon as reasonably possible. Pursuant to § 3420(d):

*4 If under a liability policy delivered or issued for delivery in this state, an insurer shall disclaim liability or deny coverage for [ ... ] any other type of accident occurring within this state, it shall give written notice *as soon as is reasonably possible* of such disclaimer of liability or denial of coverage to the insured and the injured person or any other claimant.

It is well established that where an insurance policy would otherwise cover a particular occurrence, but for an exclusion in the policy, an insurance carrier

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                 Page 4
Slip Copy, 9 Misc.3d 1121(A), 2005 WL 2764255 (N.Y.Sup.), 2005 N.Y. Slip Op. 51721(U)
**Unreported Disposition**

will be precluded from disclaiming coverage when it has unreasonably delayed in issuing its disclaimer. *American Ref-Fuel Co. of Hempstead v. Employers Ins. Co. Of Wasau,* 265 A.D.2d 49, (2nd Dep't.2000).

Under New York law, an insurer's statutory obligation to give written notice of disclaimer of coverage "as soon as reasonably possible" pursuant to § 3420(d) varies a great deal according to the specific circumstances surrounding the disclaimer. Nevertheless, timeliness is generally measured from the time that the insurer has sufficient information to disclaim liability in good faith. *AJ McNulty & Co., Inc. v. Lloyds of London,* 306 A.D.2d 211, 212 (1st Dep't.2003). Admiral was obligated pursuant to New York Insurance Law to notify Pancas and PSM as soon as reasonably possible of its disclaimer upon the predicated exclusion. However, Admiral was not put on notice of the 2002 occurrence until July 2003 and did not receive the Bendenzu pleadings until September 2003.

In the case of *Public Service Mutual Insurance Company v Harlen Housing Associates,* the court held that a "disclaimer is based on concrete evidence" in order to avoid "piecemeal disclaimer".*Public Serv. Mut. Ins. Co. v. Harlen Hous Assocs.,* 7 AD3d 421, 440 (1st Dep't.2004). While Admiral cited Pancas's breach of policy conditions as grounds for its liability disclaimer, namely late notification of the occurrence, claim, and lawsuit, Admiral could not come to this determination without an investigation of the Bendenzu accident, the legal events following thereafter and all potential grounds for disclaimers. Under these circumstances, the Court finds Admiral's delay in issuing the disclaimer from September to July reasonable.

Pancas and PSM argue in their cross motion for summary judgement that Admiral is equitably estopped from disclaiming a primary coverage obligation to Pancas because Admiral rescinded its disclaimer and provided defense and indemnity to Pancas. However, estoppel applies only "where [an

insurer] undertakes the defense of the case without reserving its rights, 'in reliance on which the insured suffers the detriment of losing the right to control its own defense" '. *Brooklyn Hosp. Ctr. v. Centennial Ins Co.,* 258 A.D.2d 491 (2d Dep't 1999).

Admiral's rescission letter states in pertinent parts: "We hereby rescind our November 4, 2003 coverage disclaimer. We will share in the defense of this claim on its merits with Magna Carta Insurance Company [PSM]." Admiral did not reserve its rights. While primary coverage by Admiral is not dependent upon the condition that PSM share in the obligation to defend Pancas, as argued by Admiral, the rescission following Pancas's defense does not prejudice Pancas. PSM did not lose complete control of the defense. As the aforementioned letter provides, PSM was able to share in Pancas's defense and Admiral only assumed part of the defense of the claim in conjunction with PSM. Therefore, the estoppel doctrine does not apply to Admiral; Admiral can disclaim their primary coverage obligation after having rescinded their original disclaimer.

**\*5** Accordingly, it is

ORDERED that Admiral's motion for summary judgment (mot.Seq.001) is granted and that Admiral is not obligated to defend or indemnify Pancas in the underlying personal injury action; and it is further

ORDERED that defendants', PSN and Pancas, cross motion for summary judgment is denied; Admiral effectively disclaimed coverage of Pancas in the underlying personal injury action; and it is further

ORDERED that the Clerk is directed to enter judgment accordingly.

N.Y.Sup.,2005.
Admiral Indem. Co. v. Pancas Restaurant, Inc.
Slip Copy, 9 Misc.3d 1121(A), 2005 WL 2764255 (N.Y.Sup.), 2005 N.Y. Slip Op. 51721(U)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                Page 5
Slip Copy, 9 Misc.3d 1121(A), 2005 WL 2764255 (N.Y.Sup.), 2005 N.Y. Slip Op. 51721(U)
**Unreported Disposition**


END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

5 Misc.3d 1029(A), 799 N.Y.S.2d 158 (Table), 2004 WL 2913895 (N.Y.Sup.), 2004 N.Y. Slip Op. 51607(U)

**Unreported Disposition**

Motions, Pleadings and Filings

(The decision of the Court is referenced in a table in the New York Supplement.)

Supreme Court, Queens County, New York.
Pronab BHATTACHARYYA and Gargi Bhattacharyya, Plaintiffs,
v.
QUINCY MUTUAL FIRE INSURANCE COMPANY, Defendant.
No. 21398/03.
Dec. 15, 2004.

Anthony L. Mascolo, Esq. Kew Gardens, attorney for plaintiffs.

Feldman, Rudy, Kirby & Farquharson, P.C., by Doreen J. Spagnuolo, Esq., Westbury, attorneys for defendant.

ARNOLD N. PRICE, J.

*1 Plaintiffs Pronab Bhattacharrya and Gargi Bhattacharyya commenced this action on September 9, 2003, and allege that on September 14, 2002 they left their home at 2 P.M. and returned at 7 P.M., at which time they discovered that the front door and the door to their apartment had been broken into, that their home had been burglarized and that the apartment was in disarray. Plaintiffs called the police shortly after returning home. The police report states that $20,000.00 in cash, jewelry worth $50,000.00, and clothing worth $5,000.00 had been stolen; that a computer, fax machine and official records had been destroyed; that three Rolex watches and one Tourneau watch was stolen as well as a Canon AE 1 camera; a Sony video camera; sterling silver utensils, powder box and photo frame; old passports and bank statements; and that most of the furniture and equipment had been destroyed. The police listed the total value of the watches and household items as $25,000.00. Neither the plaintiffs nor the police took any photographs. Plaintiffs submitted a statement to the insurer dated October 16, 2002 and a claim dated November 23, 2002, which included a detailed list of the items that they assert were stolen or damaged. Plaintiffs claimed that their leather living room sofa, love seat and recliner had deep slashes and cuts, that there was a large crack in the middle of the dining room table and that dining chairs were broken. In addition to the items set forth in the police report, plaintiffs reported as stolen a sterling silver cutlery set; a china closet; three oriental rugs worth $9,800.00; four oil paintings worth $5,900.00; a Sony DVD player with upright speakers; a desk computer; a laptop computer; 15 Indian silk brocade sarees worth $8,000.00; 12 Indian silk pants suits worth $4,000.00; seven pure wool men's suits worth $3,000.00; a fax machine; a color printer; a powder box and photo frames. The plaintiffs also submitted an additional list of stolen items to the police. The list of stolen items provided to the police and the list of stolen items provided to the insurer are not identical.

On October 8, 2002, Quincy Mutual contacted Donald Bucalo, an independent claims adjuster, to investigate the plaintiffs' claim. The claims adjuster spoke to the insureds on October 11 and 14, 2002 and he visited them at their home on October 16, 2002. Mr. Bucalo states in his affidavit that the plaintiffs told him that most of their furniture had been destroyed, that they had discarded the damaged furniture, and moved the furniture, rugs and paintings from the upstairs apartment into their apartment, as they no longer had an upstairs tenant. Mr. Bucalo stated that he inspected the upstairs apartment and that based on his inspection of the wall to wall carpeting, there was little evidence of impressions from furniture being there, and that although plaintiffs showed him an area on a wall where a rectangular painting had been stolen, it seemed that from the discoloration on the wall, the oval that was hanging there had been there for a long time.

*2 Richard McMullen was also hired by Quincy Mutual to investigate plaintiffs' claims. He states in an affidavit that the plaintiffs claimed that they placed the damaged furniture in front of their house with the regular garbage pickup, and that Mr. Bhattacharyya claimed to have given the sanitation men some money to cart away the furniture. Mr. McMullen states that he questioned the sanitation men assigned to plaintiffs' block at the time of the loss, and that he learned that trash was picked up every Wednesday and Saturday, and only five large pieces of bulk trash would be picked up on Saturdays. Mr. McMullen states that the sanitation men did not recall picking up discarded furniture from plaintiffs' house and that they did not accept any money from the insureds.

Quincy Mutual's property claims examiner determined that it was necessary to conduct an Examination Under Oath of the insureds, and counsel was engaged for this purpose. The subject homeowners' policy requires the insured to send the insured, within 60 days after the insurer's request, a signed, sworn proof of loss. The policy also sets forth in detail the information and evidence which the insured is required to include in the proof of loss statement. Counsel for Quincy Mutual, in a letter dated November 26, 2002, demanded that the insureds provide a completed signed and notarized Sworn Statement of Proof of Loss, within 60 days from the receipt of the letter. This letter was sent by certified mail, return receipt requested and was returned to the law firm, with a notation that it was "refused." On December 14, 2002 plaintiffs were personally served with a letter from the insurer dated December 10, 2002, demanding that they provide the insurer with a completed signed and notarized Sworn Statement of Proof of Loss along with proof of loss, and appear for an Examination Under Oath. The 60-day period thus expired on February 15, 2003. The December 10, 2002 letter advised the insureds that they were to produce at the examinations the original receipts for the allegedly damaged and stolen property, proof of purchase of those items, photographs of the claimed items, copies of their monthly bank statements and credit card statements for the period of September 1, 2001 up to and including December 31, 2002, the local usage dialing records for telephones in the insured premises for the period of July 1, 2002 and up to and including November 1, 2002 and any other documents that relate to the alleged loss, to their ownership of the stolen items and their insurance.

Pronab Bhattacharyya appeared for an Examination Under Oath, which was conducted on February 27, 2003. Gargi Bhattacharyya appeared for an Examination Under Oath which was conducted on March 6 and 21, 2003. Plaintiffs' counsel was present at both these examinations. Quincy Mutual's counsel, in letters dated March 14, March 23 and April 2, 2003, advised plaintiffs that they were obligated under the policy of insurance to return executed copies of the Examination Under Oath, and to provide the previously requested documents. Plaintiffs' counsel in a letter dated May 2, 2003 provided the insurer with authorizations for three bank accounts, receipts of purchases made to replace allegedly stolen items, and stated that the sworn statement of proof of loss would be forwarded shortly. The insurer's counsel in a letter dated June 4, 2003 stated that the insureds had failed to produce their executed Examinations Under Oath transcripts and all of the information and documentation called for at their respective Examinations Under Oath and set forth a list of 24 documents and information the insureds were required to provide to the insurer, and stated that the failure to produce the documents would be deemed a breach of the policy's cooperation clause and would result in a denial of the claim. Plaintiffs' counsel provided Quincy Mutual with a Sworn Statement of Proof of Loss, dated June 23, 2003, along with a letter dated June 20, 2003, which Quincy Mutual's counsel received on July 3, 2003. The insureds also provided executed transcripts of the Examinations under Oath and responses to some questions, as well as some of the documents and authorizations that had previously been requested. Counsel for Quincy Mutual, in a letter dated July 8, 2003, informed the insureds' counsel that it had received the transcripts and that it was rejecting and returning the sworn statements of proof of loss as untimely. The insurer's counsel also stated that certain responses provided by plaintiffs' counsel were improper, as they were not set forth in an affidavit sworn to by the insureds, that other responses were inadequate, and that the insureds were required to produce the requested documents. Counsel stated that the insureds' obligations under the policy's cooperation clause could not be fulfilled until they completed the Examinations Under Oath, which included returning all documents and information called for therein. Counsel stated that the insureds would be given one further opportunity to comply with their policy and produce all of the documents and information demanded at the Examinations Under Oath, within 10 days of receipt of the demand, and the failure to comply would constitute a material breach of the cooperation clause of the insurance policy, and would result in a denial of the claim.

*3 Plaintiffs' counsel in a letter dated September 4, 2003 stated that his client would commence an action for breach of contract, based upon the return of the statement of proof of loss, and the failure to pay the claim. Counsel asserted that the insureds had provided all of the documents requested by the insurer. Plaintiffs commenced the within action prior to any determination by the insurer to deny the claim.

Plaintiffs' motion for leave to amend the complaint is denied. Although CPLR 3025 provides that leave to amend a pleading shall be freely granted, leave to amend should not be granted "upon the mere request of a party without a proper basis" ( Morgan v. Prospect Park Assocs. Holdings, 251 A.D.2d 306 [1998]; see Citarelli v. American Ins. Co., 282 A.D.2d 494 [2001] ). Rather, it is incumbent upon the movant to make "some evidentiary showing that the claim can be supported" ( Morgan v. Prospect Park Assocs. Holdings, supra, at 306, citing Cushman & Wakefield v. John David, Inc., 25 A.D.2d 133, 135 [1996]; see Joyce v. McKenna Assocs., 2 AD3d 592, 594 [2003]; Monteiro v. R.D. Werner Co., 301 A.D.2d 636, 637 [2003] ). In determining whether to grant leave, a court must examine the underlying merit of the proposed claims, since to do otherwise would be wasteful of judicial resources ( see Scavo v. Allstate Ins. Co., 238 A.D.2d 571, 572 [1997] McKiernan v. McKiernan, 207 A.D.2d 825 [1997] ). Here, the only affidavit submitted in support of the plaintiffs' motion is from their attorney, who clearly lacks personal knowledge of the underlying facts ( see Frost v. Monter, 202 A.D.2d 632, 633 [1994]; Mathiesen v. Mead, 168 A.D.2d 736, 737 [1990] ). The affidavit submitted by plaintiff Pronab Bhattacharyya is in opposition to defendant's cross motion to dismiss the complaint and does not set forth any factual basis for the proposed causes of action. Although the proposed amended complaint is verified by the plaintiffs, it is devoid of facts. In addition, plaintiffs have failed to proffer any explanation for the delay in seeking this amendment ( Morgan v. Prospect Park Associates Holdings, L.P., supra ). Plaintiffs' assertion in their reply papers that the delay was caused by defendant's failure to pay the claim is clearly insufficient.

The court further finds that plaintiffs' proposed second cause of action to recover damages for the intentional infliction of emotional distress arising out of the defendant's failure to pay plaintiffs' claim under the insurance policy is meritless. The contract of insurance does not create a relationship out of which "springs a duty to the plaintiff separate and apart from the contractual obligation" ( Warhoftig v. Allstate Ins. Co., 199 A.D.2d 258, 259 [1993] ). Plaintiffs' proposed allegations are insufficient to give rise to a separate and distinct duty owed by defendant apart from the relationship as insurer/insured ( see Fischer v. Maloney, 43 N.Y.2d 553, 557 [1978]; Luciano v. Handcock, 78 A.D.2d 943, 944 [1980] ). To the extent that plaintiffs' proposed second cause of action sounds in bad faith, this claim also lacks merit, as plaintiffs failed to allege and cannot demonstrate the existence of any duty extraneous to the contract that was violated by the defendant, giving rise to an actionable tort ( see New York Univ. v. Continental Ins. Co., 87 N.Y.2d 308 [1995]; Rocanova v. Equitable Life Assur. Socy., 83 N.Y.2d 603, 615 [1994]; Saidai v. Sec. Ins. Co., 9 AD3d 420, 421 [2004]; Scavo v. Allstate Ins. Co., supra ).

*4 As regards the proposed third cause of action, "[i]t is well established that an insured may not recover the expenses incurred in bringing an affirmative action against an insurer to settle its rights under the policy [of insurance]" ( New York Univ. v. Continental Ins. Co., supra, at 324; see also Mighty Midgets v. Centennial Ins. Co., 47 N.Y.2d 12, 21 [1979]; Gold v. Nationwide Mut. Ins. Co., 273 A.D.2d 354, 354-355 [2000]; Cunningham v. Security Mut. Ins. Co., 260 A.D.2d 983, 983-985 [1999]; Chase Manhattan Bank v. Each Individual Underwriter Bound to Lloyd's Policy No. 790/004A89005, 258 A.D.2d 1 [1999]; Mazzuoccolo v. Cinelli, 245 A.D.2d 245 [1997] ). Plaintiffs, therefore, may not amend the complaint in order to add a third cause of action to recover attorney's fees arising from the insurer's alleged breach of contract.

Finally, neither the astronomical amount of damages sought in the proposed causes of action, nor the mere use of the words willful and malicious transforms either of the proposed claims into one for punitive damages. In any event, plaintiffs may not seek to recover punitive damages for a breach of contract ( see Rocanova v. Equitable Life Assur. Socy., supra, at 613; see also New York Univ. v. Continental Ins. Co., supra; Sweazey v. Merchants Mut. Ins. Co., 169 A.D.2d 43 [1991], lv dismissed 78 N.Y.2d 1072 [1991] ). Plaintiffs, thus, are not entitled to amend the complaint in order to assert a cause of action for the tort of intentional infliction of emotional distress, or for bad faith or for punitive

damages.

Turning now to defendant's cross motion for summary judgment dismissing the complaint, it is well settled that an insured's failure to submit a sworn proof of loss within 60 days after receiving a demand to do so by its insurer, accompanied by blank proof of loss forms, provides a complete defense to an action for payment on an insurance policy ( see Insurance Law § 3407; _Marino Constr. Corp. v. INA Underwriters Ins. Co.,_ 69 N.Y.2d 798, 800 [1987]; _Igbara Realty Corp. v. New York Prop. Ins. Underwriting Assn.,_ 63 N.Y.2d 201, 216 [1984] ). Defendant hand delivered the proof of loss letter and forms to the plaintiffs on December 14, 2003. The insurer acknowledged receiving plaintiffs' proof of loss dated June 23, 2003, by mail on July 3, 2003, some five months beyond the 60-day period established by defendant's December 14, 2003 demand. In opposition to defendant's cross motion, plaintiffs merely assert that they did not timely provide the proof of loss statement, as it took some time to assemble. The proof of loss statement was clearly untimely, and plaintiffs have not presented a triable issue of fact as to their failure to meet the 60-day deadline. As regards plaintiffs' claim of waiver, it is settled law that "[e]vidence of communications or settlement negotiations between an insured and its insurer either before or after expiration of a limitations period contained in a policy is not, without more, sufficient to prove waiver or estoppel" ( _Frank Corp. v. Federal Ins. Co.,_ 70 N.Y.2d 966, 968 [1988]; see _Midway Paris Beauty Schools v. Travelers Ins. Co.,_ 204 A.D.2d 521 [1994]; _Warhoftig v. Allstate Ins. Co., supra_ ). "Waiver is an intentional relinquishment of a known right and should not be lightly presumed"

**\*5** ( _Frank Corp. v. Federal Ins. Co., supra,_ at 968; see _Blitman Constr. Corp. v. Insurance Co.,_ 66 N.Y.2d 820 [1985] ). Plaintiffs have offered no evidence from which a clear manifestation of intent by the defendant to relinquish the protection of the contractual limitations period could be reasonably inferred. Nor do the facts show that defendant, by its conduct, otherwise lulled the plaintiff into sleeping on its rights under the insurance contract ( _Cibao Corp. v. Royal Indem. Co.,_ 205 A.D.2d 658, 658-659 [1994] ). Defendant, therefore, is entitled to summary judgment on its first affirmative defense as plaintiffs failed to submit a sworn proof of loss within 60 days after receiving a demand to do so by defendant.

Defendant also seeks to dismiss the complaint on the grounds asserted in the second through fifth affirmative defenses, namely that plaintiffs failed to cooperate with the insurer's investigation of their claim, in violation of the insurance policy. Insurance policies "almost universally require, as a condition precedent to performance of the promise to indemnify, that the insured cooperate with the insurer in the investigation of the loss. The failure of an insured to do so is a material breach of the contract and a defense to a suit on the policy" ( _Dyno-Bite, Inc. v. Travelers Companies,_ 80 A.D.2d 471, 473 [1981], appeal dismissed 54 N.Y.2d 1027 [1982]; see also _Lentini Brothers Moving & Storage Company v. New York Property Insurance Underwriting Association,_ 76 A.D.2d 759, 761 [1980], affirmed 53 N.Y.2d 835 [1981] ). Insurers are entitled to promptly obtain all of the facts material to their rights to enable them to decide upon their obligations and, to protect them against false claims. The "failure to comply with the provision of an insurance policy requiring the insured to submit to an examination under oath and provide other relevant information is a material breach of the policy, precluding recovery of the policy proceeds ... (as) an insurance company is entitled to obtain information promptly while the information is still fresh" ( _Argento v. Aetna Casualty & Surety Company,_ 184 A.D.2d 487 [1992]; see also _Somerstein Caterers of Lawrence, Inc. v. Insurance Company of State of Pennsylvania,_ 262 A.D.2d 252 [1999]; _Pizzirusso v. Allstate Insurance Company,_ 143 A.D.2d 340 [1988], appeal dismissed 73 N.Y.2d 808 [1988]; _Cabe v. Aetna Casualty & Surety Company,_ 153 A.D.2d 653 [1989]; _Maurice v. Allstate Insurance Company,_ 173 A.D.2d 793 [1991] ). Moreover, the "right to examine under the cooperation clause of the insurance policy ... is much broader than the right of discovery under the CPLR. By its terms, the insured promises to render full and prompt assistance to discover the facts surrounding the loss and anything less results in a breach of contract" ( _Dyno-Bite, Inc. v. Travelers Companies, supra,_ at 474). The insurer's burden of proving willfulness has been termed "a heavy one" ( _Levy v. Chubb Ins.,_ 240 A.D.2d 336, 337 [1997]; see _Ausch v. St. Paul Fire & Mar. Ins. Co.,_ 125 A.D.2d 43, 45-46 [1987], lv denied 70 N.Y.2d 610 [1987] ) and requires a showing that the insured's attitude " 'was one of willful and avowed obstruction" ' ( _Baghaloo-White v. Allstate Ins. Co.,_ 270 A.D.2d 296 [2000], quoting _Physicians' Reciprocal Insurers v. Keller,_ 243 A.D.2d 547 [1997] ) involving a "pattern of noncooperation for which no reasonable excuse [is] offered" ( _Argento v. Aetna Cas. & Sur. Co.,_ 184 A.D.2d 487, 488

[1992]; *see also Ingarra v. General Accident/PG Ins. Co., 273 A.D.2d 766, 767-768 [2000] ).*

***6** Here, although the plaintiffs submitted to the examinations under oath, they failed to supply the information and documents requested at the examinations, despite the insurer's requests of June 4, 2003, and July 8, 2003. These documents include plaintiffs' local usage detail statements from the telephone service provider; mortgage statements for the period of September 1, 2001 through December 31, 2002; car lease statements; checking account statements as regards the purchase of an oil painting for $2,000.00, in 1999, which was alleged to have been paid for by check; the Macy's credit card statement for the period of September 1, 2001 through December 31, 2002; business tax returns for the period of 2001 and 2002; and credit card statements for the furniture the plaintiffs claimed to have purchased for the second floor apartment, which was alleged to have been moved into plaintiffs' apartment following the burglary. Plaintiffs also failed to exhibit the allegedly damaged property to the insurer.

Despite plaintiffs' claim to have provided the insurer with all requested documents, it is clear that they have failed to provide the insurer with the requested documents, although they were given ample opportunity to do so. Plaintiffs' present submission of copies of their 2000 and 2001 federal income tax returns, which were previously provided at the Examination Under Oath, is insufficient to raise an issue of fact as to whether plaintiffs cooperated with the insurer. The wilful refusal by the plaintiffs to produce appropriate records, including credit card records pertaining to the purchase of items claimed to have been stolen or destroyed, certain tax records, mortgage records, business tax returns, car lease statements, and telephone local usage detail statements, where, as here, the circumstances of the claim may reasonably appear suspicious, defeats the right of the insurer to obtain relevant information to enable it to decide upon its obligations under the policy and to protect against false claims. The court, therefore, finds that plaintiffs' continued failure, without reasonable explanation or excuse, to provide the requested information, constitutes a material breach of the policy precluding recovery by the plaintiffs ( *Johnson v. Allstate Ins. Co., 197 A.D.2d 672 [1993]; Evans v. International Ins. Co., 168 A.D.2d 374 [1990]; Cabe v. Aetna Casualty & Surety Co., 153 A.D.2d 653 [1989]; see also Argento v. Aetna Cas. & Sur. Co., supra; Pizzirusso v. Allstate Ins. Co., 143 A.D.2d 340 [1988], appeal dismissed 73 N.Y.2d 808 [1988]; Averbuch v. Home Ins. Co., 114 A.D.2d 827 [1985] ).*

In view of the foregoing, plaintiffs' motion for leave to amend the complaint is denied in its entirety, and defendant's cross motion to dismiss the complaint is granted, as plaintiffs breached their contractual duty to timely provide the insurer with sworn proof of loss, and breached their duty to cooperate with the insurer's investigation of the claim.

N.Y.Sup.,2004.
Bhattacharyya v. Quincy Mut. Fire Ins. Co.
5 Misc.3d 1029(A), 799 N.Y.S.2d 158 (Table), 2004 WL 2913895 (N.Y.Sup.), 2004 N.Y. Slip Op. 51607(U)
Unreported Disposition

Motions, Pleadings and Filings (Back to top)

• 0021398/2003 (Docket) (May. 27, 2004)
END OF DOCUMENT

Adobe Reader is required to view PDF images.


(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d                                                Page 1
Not Reported in F.Supp.2d, 2006 WL 1379596 (S.D.N.Y.)

**H**
CVC Claims Litigation LLC v. Citicorp Venture
Capital Ltd.
S.D.N.Y.,2006.
Only the Westlaw citation is currently available.
      United States District Court,S.D. New York.
      CVC CLAIMS LITIGATION LLC, Plaintiff,
                          v.
CITICORP VENTURE CAPITAL LTD.; Citicorp
Mezzanine III, L.P.; Saleem Muqaddam; Joseph M.
Silvestri; and John Mowbray O'Mara Defendants.
             **No. 03 Civ. 7936(DAB).**

                  May 18, 2006.

             *MEMORANDUM & ORDER*

BATTS, J.
*1 Plaintiff CVC Claims Litigation LLC ("CVC
Claims") brings this action against Defendants
Citicorp Venture Capital Ltd. ("Citicorp Venture")
and Citicorp Mezzanine III, L.P. ("Citicorp
Mezzanine") for breach of contract, breach of fidu-
ciary duty, and aiding and abetting a breach of fidu-
ciary duty. Against Individual Defendants Saleem
Muqaddam, Joseph M. Silvestri, and John Mow-
bray O'Mara, Plaintiff claims breach of fiduciary
duty and aiding and abetting a breach of fiduciary
duty.

Defendants have moved to dismiss all claims
against Defendants Citicorp Venture, Muqaddam,
Silvestri and O'Mara. Defendants have moved to
dismiss the claims of breach of fiduciary duty and
aiding and abetting a breach of fiduciary duty
against Citicorp Mezzanine. Defendants assert as
grounds for dismissal Rules 12(b)(6), 8(a) and 9 of
the Federal Rules of Civil Procedure. For the reas-
ons that follow, Defendants' Motion to Dismiss is
GRANTED.

                 I. BACKGROUND

The following facts, taken from Plaintiff's Com-
plaint and documents incorporated by reference in-
to the Complaint, are assumed to be true for the
purposes of this Motion.

Plaintiff CVC Claims is a Delaware limited liability
company with its principal place of business in
New York. CVC Claims was created solely for the
purpose of acting as a creditor's litigation trust pur-
suant to a confirmed Chapter 11 plan in a bank-
ruptcy case, *In Re Glenoit Corporation*,
(Bankr.D.Del.), involving Glenoit Corporation
("Glenoit"), a garment manufacturing company.
The need for the litigation trust arose from agree-
ments concerning funding of a pre-packaged plan
of reorganization for debtor Glenoit. The benefi-
ciaries of Plaintiff CVC Claims are Glenoit Corpor-
ation's institutional bondholders ("Bondholders")
and Glenoit's primary secured lender, a banking
syndicate ("Banking Syndicate") led by Banque
National de Paris. (Com pl.¶¶ 9-11.)

Defendant Citicorp Venture is a Delaware corpora-
tion with its principal place of business in New
York. Citicorp Venture finances leveraged buyouts
and maintains controlling equity interests in various
portfolio companies. (Id.¶ 12.)

Defendant Citicorp Mezzanine is a Delaware cor-
poration with its principal place of business in New
York. Citicorp Mezzanine is a corporate affiliate of
Citicorp Venture. Defendants Citicorp Venture and
Citicorp Mezzanine are indirect subsidiaries of
Citicorp.[FN1](Id.¶ 13.)

          FN1. Plaintiff refers to both Defendants
          Citicorp Venture and Citicorp Mezzanine
          as "CVC" in its Complaint. However, it
          has alleged separate claims against each
          subsidiary.

Defendant Muqaddam served as a Vice President of
Citicorp Venture from 1989 and was Citicorp Ven-
ture's senior representative on Glenoit's Board of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1379596 (S.D.N.Y.)

Directors. Defendant Silvestri was employed by Citicorp Venture from 1990 and served as a Vice President of Citicorp Venture from 1995. Silvestri also served as a Citicorp Venture designee on Glenoit's Board of Directors. Defendant O'Mara served on Glenoit's Board of Directors. O'Mara "maintained a consulting relationship" with Citicorp Venture and kept an office in Citicorp Venture's place of business. (Id.¶¶ 14-16.)

**\*2** In December, 1995, Citicorp Venture purchased Glenoit in a leveraged recapitalization, in order to conduct an industry-wide "roll up" of certain garment and fabric manufacturing companies. (Id.¶¶ 19-20.) Subsequently, in light of its financial condition, Glenoit began making arrangements to file a voluntary petition for bankruptcy, which included entering into agreements with CVC, Glenoit's primary secured lender, and Glenoit's Bondholders. (Id.¶ 25.)

On June 30, 2000, Citicorp Mezzanine issued a Commitment Letter to Glenoit stating that it would provide a senior subordinated loan to Glenoit in the amount of $15,000,000.00. (Id.¶ 29.)

Also on June 30, 2000, Citicorp Venture issued a Commitment Letter to Glenoit, stating that it would provide approximately $16,000,000.00 in equity financing in exchange for substantially all of the equity in the reorganized company. (Compl.¶¶ 25, 26.) The Commitment Letter provided, in part:

> This letter confirms the commitment of Citicorp Venture Capital, Ltd .... to provide or cause others to provide up to $16,150,000 of preferred and common equity financing ... to Glenoit Corporation on terms and conditions [that] are reasonably acceptable to [Glenoit] and [Citicorp Venture] subject to the conditions set forth herein.

(Id.¶ 27.) The five conditions precedent were: (1) approval of the Tender Offer and the Plan by the Company's board of directors; (2) tender of Subordinated Notes in the Tender Offer of the holders of at least 95% of the aggregate principal amount of

the outstanding Notes and associated consent, or consent by the holders of 67% of the holders of the aggregated principal amount of the outstanding Notes, representing at least 50% in number of the holders by the close of business on August 3, 2002, provided that the satisfaction of this condition does not preclude CVC from approving the plan; (3) the receipt of $15,000,000.00 by Glenoit of subordinated debt from Citicorp Mezzanine on the terms and conditions of the Commitment Letter of Citicorp Mezzanine; (4) the receipt of all available proceeds of a commitment from Glenoit's existing bank group; and (5) that CVC's common equity ownership of Glenoit or Glenoit's parent company, after taking into account any participations by other persons in the Financing pursuant to the Plan, but disregarding any warrant issued to Mezzanine immediately following consummation of the Financing, shall not be less than 90%. (Id. at Ex. 1 ¶ 2(a)-(e).) The condition at issue here is the completion of a debt financing by which Citicorp Mezzanine would provide Glenoit with $15,000,000.00 in "senior subordinated debt." (Id. Ex. 1 ¶ 2(c).)

On July 25, 2000, both Citicorp Venture and Citicorp Mezzanine issued letters to Glenoit confirming the commitments expressed in their respective Commitment Letters of June 30, 2000.

On August 8, 2000, Glenoit entered into bankruptcy by filing a petition for relief pursuant to Chapter 11, Title 11, United States Code, in the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court"). (Id. ¶ 32.) Pursuant to efforts to solicit its creditors to accept a proposed prepackaged plan of reorganization, Glenoit made certain "first day" motions to the Bankruptcy Court. One such motion requested, in part, an Order authorizing "(I) Payment Or Satisfaction Of Pre-Petition Unsecured Claims And Other Ordinary Course Obligations."By this motion, Glenoit sought and obtained authority to pay in full the undisputed, unsecured pre-petition claims of its unsecured creditors. (Id.¶ 35.)

**\*3** In reliance upon CVC's commitments, Glenoit

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2006 WL 1379596 (S.D.N.Y.)

was able to obtain an agreement from the Banking Syndicate to provide $15,000,000.00 in debtor-in-possession ("DIP") financing, and an agreement from Glenoit's Bondholders to accept a distribution of approximately $16,000,000.00.

Glenoit filed a prepackaged plan of reorganization simultaneously with its bankruptcy petition. (Id.¶ 37.) Glenoit took these actions in reliance upon CVC's commitments to fund the pre-packaged plan of reorganization. (Id.¶ 36.) The Bankruptcy Court approved the Banking Syndicate's $15,000,000.00 DIP and granted Glenoit's motion, authorizing Glenoit to pay out $15,000,000.00-$20,000,000 .00 in unsecured trade and other claims. Glenoit then made payments of millions of dollars in pre-petition unsecured trade and other claims. (Id.¶ 38.)

In October, 2000, Plaintiff alleges that "CVC" advised Glenoit that it would not provide the equity financing or any funds discussed in the June 30, 2000 Commitment Letters. (Id.¶ 39.) Plaintiff defines "CVC" as Citicorp Venture and Citicorp Mezzanine collectively. (Id.¶ 2.) "CVC" had, upon information and belief, decided to abandon its plan of an industry "roll up" of garment manufacturers. (Id.¶ 40.) Although Glenoit managed to confirm its prepackaged plan, the plan resulted in no distribution to Glenoit, a *de minimus* distribution to Glenoit's bondholders, and no distribution to Glenoit's other unsecured creditors with the exception of Glenoit's trade creditors, who had been paid off earlier. (Id.¶ 41.) Additionally, the Banking Syndicate, who had to fund operations during the bankruptcy to preserve the debtors' going concern value, was damaged by at least $20,000,000.00 due to losses suffered as a result of a collateral shortfall following the sale of certain of the debtors' assets. (Id.¶ 42.)

Plaintiff, established for the benefit of the Banking Syndicate and the Bondholders, has brought this action against Defendants.

## II. DISCUSSION

Defendants have moved to dismiss the Second, Third and Fourth Claims for Relief for failure to state a claim pursuant to Fed.R.Civ.P. 8(a), 9(c) and 12(b)(6).[FN2]

> FN2. Defendants concede that Plaintiff has stated a proper claim for breach of contract in its First Claim for Relief. (Defs.' Reply at 2 .)

### A. Legal Standard

In deciding a motion to dismiss for failure to state a claim, the Court "must accept the allegations contained therein as true and draw all reasonable inferences therefrom in favor of the plaintiff."*Gryl ex rel. Shire Pharms. Group PLC v. Shire Pharms.,* 298 F.3d 136, 140 (2d Cir.2002). The Court's task "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."*Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000) (*quotingRyder Energy Distribution Corp. v. Merrill Lynch Commodities Inc.,* 748 F.2d 774, 779 (2d Cir.1984)). Thus, the Court should dismiss the complaint for failure to state a claim only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*ICOM Holding, Inc. v. MCI Worldcom, Inc.,* 238 F.3d 219, 221 (2d Cir.2001).

*4 For purposes of a motion to dismiss, a complaint is deemed to include "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference ... as well as public disclosure documents required by law to be, and that have been, filed with the SEC, ... and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the lawsuit."*Rothman v. Gregor,* 220 F.3d 81, 88-89 (2d Cir.2000) (citations omitted).

### B. Breach of Contract Claim Against Citicorp Venture

Defendants state that dismissal of the Second Claim

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1379596 (S.D.N.Y.)

Page 4

for Relief is warranted because Plaintiff has failed to state a claim for breach of contract by Citicorp Venture.

Citicorp Venture's commitment under its Commitment Letter to Glenoit was subject to the satisfaction of five conditions precedent, set out previously. (Compl. at Ex. 1.) According to Defendants, Plaintiff's Complaint insufficiently alleges a breach of contract claim because it states that one of the conditions precedent, namely that Glenoit must receive the proceeds of the commitment from Citicorp Mezzanine, and thus did not and could not plead the occurrence of all conditions precedent. (Defs.' Mem. Law at 12.)

To state a claim for breach of contract in New York,[FN3] a plaintiff must allege the following elements: (1) the existence of a contract; (2) performance of the contract by one party; (3) breach by the other party; and (3) damages as a result of the breach. *See First Investors Corp. v. Liberty Mut. Ins. Corp.,* 152 F.3d 162, 168 (2d Cir.1998).Rule 9 of the Federal Rules of Civil Procedure provides that "In pleading the performance or occurrence of conditions precedent, it is sufficient to aver generally that all conditions precedent have been performed or have occurred. A denial of performance or occurrence shall be made specifically and with particularity."*See also Internet Law Library, Inc. v. Southridge Capital Management, LLC,* 223 F.Supp.2d 474, 490 (S.D.N.Y.2002). However, if the condition precedent could not be fulfilled because the defendant prevented or hindered its occurrence, defendant must still perform. *See Lindenbaum v. Royco Prop. Corp.* 164 A.D.2d 254, 260 (1st Dept.1991); *Lieberman Props, Inc. v. Braunstein,* 134 A.D.2d 55, 60 (2d Dept.1987).

> FN3. Plaintiff and Defendants cite New York law in support of their arguments concerning the breach of contract claim against Citicorp Venture. Such "implied consent is sufficient to establish choice of law."*Krumme v. WestPoint Stevens, Inc.,* 238 F.3d 133, 138 (2d Cir.2000); *Am. Fuel*

*Corp. v. Utah Energy Dev. Co.,* 122 F.3d 130, 134 (2d Cir.1997). In addition, the Commitment Letter at issue contained a choice of law provision, providing that New York state law governs the provisions of the Commitment Letter. (Compl. at Ex. 2, p. 3.)

> Similarly, the Parties have both assumed that Delaware law controls the claims of breach of fiduciary duty and aiding and abetting breach of fiduciary duty, thus concluding the choice of law inquiry for those claims.

In its Complaint, Plaintiff has failed to allege, even generally, that the conditions precedent were performed or had occurred.[FN4]Plaintiff only states that Citicorp Venture participated in Citicorp Mezzanine's breach, which amounted to a breach of its own obligation to provided financing. (Compl.¶ 58.) Accordingly, Plaintiff has failed to state a claim for breach of contract against Citicorp Venture in its Second Claim for Relief.

> FN4. Both Parties discuss the doctrine of prevention, which, "excuses a condition precedent when a party wrongfully prevents that condition from occurring."*Cauff, Lippman & Co. v. Apogee Finance Group, Inc.,* 807 F.Supp. 1007, 1022 (S.D.N.Y.1992). Plaintiff argues that Defendant Citicorp Venture and Muqaddam wrongfully prevented the condition precedent of Citicorp Mezzanine financial obligation from occuring. The doctrine of prevention, however, does not cure Plaintiff's pleading defect. Even if Defendants' conduct excuses one condition precedent, Plaintiff is still required to plead the performance or occurrence of all remaining conditions precedent, which it has not.

C. Breach of Implied Covenant of Fair Dealing and Good Faith

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1379596 (S.D.N.Y.)

Plaintiff includes a claim for breach of implied covenant of fair dealing and good faith in the Second Claim for Relief, alleging that Citicorp Venture wrongfully participated in the Citicorp Mezzanine's decision to breach its financing commitment to Glenoit, which was a condition precedent of Citicorp Venture's financing commitment to Glenoit.

**\*5** Defendants argue that this claim should be dismissed because by alleging a breach of this covenant, Plaintiff is seeking to impose obligations upon Citicorp Venture that go beyond those stated in the Citicorp Venture Commitment Letter, which obliged Citicorp Venture only upon funding by Citicorp Mezzanine.

New York law implies a covenant of fair dealing and good faith in all contracts. *SeeGlobal Intellicom, Inc. v. Thomson Kernaghan & Co.,* No. 99 Civ. 342, 1999 WL 544708, at \*18 (S.D.N.Y. July 27, 1999) (citing *Carvel Corp. v. Diversified Management Group, Inc.,* 930 F.2d 228, 230 (2d Cir.1991). In most circumstances, claims for breach of contract and the covenant of good faith and fair dealing are duplicative; however, in some cases "a party may be in breach of its implied duty of good faith and fair dealing even if it is not in breach of its express contractual obligations."*Chase Manhattan Bank v. Keystone Distributors, Inc.,* 873 F.Supp. 808, 815 (S.D.N.Y.1994). The covenant "precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement."*Leberman v. John Blair & Co.,* 880 F.2d 1555, 1560 (2d Cir.1989). Hence, the covenant is violated "when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other of the right to receive the benefits under the agreement."*Don King Productions, Inc. v. Douglas,* 742 F.Supp. 741, 767 (S.D.N.Y.1990)."The implied covenant does not ... operate to create new contractual rights; it simply ensures that parties to a contract perform the substantive, bargained-for terms of their agreement and that parties are not unfairly

denied express, explicitly bargained-for benefits."*Id.* (citations and internal quotations omitted).

Plaintiff's claim of breach of the implied covenant of good faith and fair dealing is based on the conduct of Defendant Muqaddam, who is alleged to have acted on behalf of both Citicorp Mezzanine and Citicorp Venture in discussions with Glenoit about the financing commitment letters. This is separate and apart from the contractual obligation Plaintiff claims Citicorp Venture had to Plaintiff based on its commitment letter. Plaintiff, however, fails to sufficiently allege facts supporting the claim that Muqaddam, as a representative of Citicorp Venture, frustrated the condition precedent, namely Citicorp Mezzazine's financing commitment. The Complaint states that it is "[u]pon information and belief [that] the conduct of [Muqaddam] contributed to and resulted in Citicorp's Mezzanine's decision to breach its financing commitment."(Compl.¶ 58.) Other than this one sentence, nothing in the Complaint indicates that Defendants Muqaddam and Citicorp Venture participated in Citicorp Mezzanine's decision not to fulfill its financial commitment to Glenoit.

Accordingly, Plaintiff has failed to state a claim for breach of the implied covenant of good faith and fair dealing.

### D. Breach of Fiduciary Duty

**\*6** Defendants move to dismiss the breach of fiduciary duty claim against all Defendants.

### 1. Citicorp Mezzanine

Defendant argues that the claim of breach of fiduciary duty against Citicorp Mezzanine must be dismissed with prejudice because no allegation of a fiduciary relationship has been alleged between Citicorp Mezzanine and Glenoit.

"[U]nder established Delaware law, a breach of fi-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1379596 (S.D.N.Y.)

duciary duty claim must be based on an actual, existing fiduciary relationship between the plaintiff and the defendants at the time of the alleged breach."*Omnicare, Inc. v. NCS Healthcare, Inc.,* 809 A.2d 1163, 1169 (Del. Ch.2002).

The Complaint alleges that upon information and belief, Citicorp Mezzanine is a corporate affiliate of Citicorp Venture. (Compl.¶ 13.) Citicorp Mezzanine was not a majority shareholder of Glenoit, as was Citicorp Venture. The Complaint fails to allege any facts of a fiduciary relationship between Citicorp Mezzanine and Glenoit. Accordingly, the breach of fiduciary claim against Citicorp Mezzanine is DISMISSED.[FN5]

> FN5. Plaintiff argues that the breach of fiduciary duty claim against Citicorp Mezzanine withstands Defendants' Motion to Dismiss because "it is well settled that a third party who knowingly participates in the breach of a fiduciary duty becomes liable to the beneficiaries of the trust relationship."*Gilbert v. El Paso Co.,* 490 A.2d 1050, 1057 (Del. Ch.1984), *aff'd*474 A.2d 1131 (Del.1990). Plaintiff is correct in stating that a non-fiduciary may be liable for participating in the breach of a fiduciary duty by a fiduciary; however the proper cause of action is not a breach of fiduciary duty claim, but aiding and abetting breach of fiduciary duty, which is Plaintiff's Fourth Claim for Relief.

2. Citicorp Venture

According to Delaware law "a shareholder owes a fiduciary duty only if it owns a majority interest in or exercises control over the business affairs of the corporation."*Kahn v. Lynch Communications Systems, Inc.,* 638 A.2d 1110, 1113 (Del.1994) (quoting *Ivanhoe Partners v. Newmont Mining Corp.,* 535 A.2d 1334, 1344 (Del.1987).

The Complaint states that Citicorp Venture owned a majority interest over Glenoit, holding at least 80%

of Glenoit's outstanding stock. (Compl.¶ 6.) Thus, it is clear that Citicorp Venture owed a fiduciary duty to Glenoit as a majority shareholder. Defendants, however, move to dismiss the breach of fiduciary claim against Citicorp Venture because they claim that it is redundant of the breach of contract claim against Citicorp Venture. Plaintiff disagrees, and states that Citicorp Venture's contractual obligations, arising from the Commitment Letter it gave to Glenoit, are distinct from its fiduciary duties which arose from the pre-existing legal relationship between Citicorp Venture and Glenoit. (Pl.'s Mem. Law at 17-18.)

"[C]laims sounding in fiduciary duty that cannot be brought independently of claims based on breach of contract will not survive a motion to dismiss."*Bae Systems North America Inc. v. Lockheed Martin Corp.,* No. Civ. A. 20456, 2004 WL 1739522, at *7 (Del. Ch. Aug. 3, 2004)."To allow a fiduciary duty claim to coexist in parallel with an implied contractual claim, would undermine the primacy of contract law over fiduciary law in matters involving essentially contractual rights and obligations of preferred stockholders."*Gale v. Bershad,* No. Civ. A. 15714, 1998 WL 118022, at *5 (Del. Ch. Mar. 4, 1988).

Plaintiff's claim of breach of fiduciary duty against Citicorp Venture is based on the same operative facts as Plaintiff's claims of breach of contract and implied covenant of good faith and fair dealing. Both the fiduciary duty and contractual claims concern the Citicorp Venture's underlying contractual obligations. According to Plaintiff, Citicorp Venture breached both its fiduciary and contractual obligations to Glenoit when it "participated" in the breach of contract by Citicorp Mezzanine.

*7 Plaintiff's argument that the two claims are distinct is unavailing.[FN6] Although the legal relationship between Citicorp Venture and Glenoit pre-existed the covenant between the two, the two claims of breach of implied covenant and breach of fiduciary duty are based on the *same* operative facts. Therefore, because the breach of fiduciary

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1379596 (S.D.N.Y.)

claim cannot exist independently from a breach of contract claim, the Court, mindful of the primacy of contract law, grants Defendants' Motion to Dismiss the breach of fiduciary claim.[FN7]

> FN6. Plaintiff cites one case, *Parfi Holding AB v. Mirror Image Internet, Inc.,* 817 A.2d 149 (Del.2002) in support of its argument. The *Parfi* case is factually inapposite to the case before this Court. In that case, the Delaware Supreme Court reversed a lower court's dismissal of plaintiff's breach of fiduciary duty claims. The lower court had dismissed the breach of fiduciary duty claims on the ground that those claims should have been submitted to the arbitration of the parties dispute pursuant to the Underwriting Agreement. The *Parfi* court was not faced with the issue of whether a breach of contract claim could coexist in parallel with a breach of fiduciary claim in the lower court.

> FN7. Although the Court has dismissed the breach of contract and implied covenant claims, it has done so for pleading deficiencies and has granted Plaintiff's leave to replead those claims.

**3. Muqaddam, Silvestri and O'Mara**

Defendants move to dismiss the breach of fiduciary duty claims against Individual Defendants Muqaddam, Silvestri and O'Mara.

The Complaint states that in the breach of their fiduciary duties, the Individual Defendants "acted solely in the interests of CVC, to the detriment of the rights and interests of Glenoit and its creditors."(Compl.¶ 63.) It is Plaintiff's belief that the Individual Defendants, as officers of "CVC," participated in the decision by CVC not to fund Glenoit's plan of reorganization."

Directors of a corporation are charged with "an unyielding fiduciary duty to protect the interests of

the corporation and to act in the best interests of its shareholders."*Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 360 (Del. Ch.1993). The business judgment rule is a standard by which a director's conduct is judged. The business judgment rule creates a "presumption that in making a business decision, the directors of a corporation acted on an informed basis [i.e., with due care], in good faith and in the honest belief that the action taken was in the best interest of the company."*MM Cos v. Liquid Audio,* 813 A.2d 1118, 1127-28 (Del.2003). Directors are bound to protect the interests of the corporation through the exercise of the duties of due care, good faith, and loyalty. *Malone v. Brincat,* 722 A.2d 5, 10 (Del.1998). This obligation has been described as a duty "not only affirmatively to protect the interests of the corporation committed to [an officer's] charge, but also to refrain from doing anything that would work injury to the corporation.*Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 361 (Del.1993) (subsequent history omitted).

The Complaint appears to conflate Citicorp Venture and Citicorp Mezzanine. Hence, it is not clear what actions were taken by Individual Defendants on behalf of which Citicorp subsidiary, which resulted in a breach of their fiduciary duties. Accordingly, the breach of fiduciary claims against Individual Defendants are DISMISSED for failure to state a claim.

**E. Aiding and Abetting Breach of Fiduciary Duty**

Under Delaware law, a claim for aiding and abetting a breach of fiduciary duty requires plaintiff to plead: (1) the existence of a fiduciary relationship; (2) a breach of that relationship; (3) knowing participation in the breach by the defendant who is not a fiduciary; and (4) damages proximately caused by the breach." *McGowan v. Ferro,* 859 A.2d 1012, 1041 (Del. Ch.2004); *see alsoMalpiede v. Townson,* 780 A.2d 1075, 1097 (Del.2001); *Crescent/Mach 1 Partners, L.P. v. Turner,* 846 A.2d 963, 989 (Del. Ch.2000).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1379596 (S.D.N.Y.)

Page 8

*8 Because Citicorp Venture and Individual Defendants, as majority shareholder and officers of Glenoit, were fiduciaries of Glenoit, they cannot be held liable for aiding and abetting breach of fiduciary duty, which requires that they be non-fiduciaries. The aiding and abetting claims against them are thereby DISMISSED.

Citicorp Mezzanine is the only Defendant who did not owe a fiduciary duty to Glenoit. In addition to the fact that Plaintiff has failed to plead a breach of a fiduciary duty claim against any of the Defendants, Plaintiff has failed to allege facts, other than conclusory statements, that Citicorp Mezzanine knowingly participated in any breach of fiduciary duty by Citicorp Venture and Individual Defendants. Accordingly, the aiding and abetting claim against Citicorp Mezzanine is also DISMISSED.

### F. Leave to Replead

Rule 15(a) of the Federal Rules of Civil Procedure requires that courts freely grant leave to amend "when justice so requires." Fed.R.Civ.P. 15(a)."[I]t is the usual practice upon granting a motion to dismiss to allow leave to replead."*Cohen v. Citibank,* No. 95 Civ. 4826, 1997 WL 88378, at *2 (S.D.N.Y. Feb. 28, 1997). Absent a showing of undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, or the futility of the amendment, a plaintiff should be granted leave to replead. *See Protter v. Nathan's Famous Sys., Inc .,* 904 F.Supp. 101, 111 (E.D.N.Y.1995) (citing *Foman v. Davis,* 371 U.S. 178, 182 (1962)).

If an amendment would be futile, courts can deny leave to amend. *SeeOneida Indian Nation of N.Y. v. City of Sherrill,* 337 F.3d 139, 168 (2d Cir.2003) (citing *Foman v. Davis,* 371 U.S. 178, 182 (1962))."A proposed amendment to a pleading would be futile if it could not withstand a motion to dismiss pursuant to Rule 12(b)(6)."*Id.*(citing *Ricciuti v. N.Y.C. Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991)).

Although the Court has found that Plaintiff has failed to allege breach of contract and breach of implied covenant claims against Citicorp Venture, "the Court cannot determine that the plaintiff could not, under any circumstances, sufficiently allege [these claims]."*Protter v. Nathan's Famous Sys., Inc.,* 904 F.Supp. 101, 111 (E.D.N.Y.1995) (citing *Foman v. Davis,* 371 U.S. 178, 182 (1962)). Similarly, the Court recognizes that it may be possible for Plaintiff to allege breach of fiduciary duty claims against Individual Defendants, and aiding and abetting breach of fiduciary duty claim against Citicorp Mezzanine.

Accordingly, the Court GRANTS Defendants' Motion to Dismiss the Complaint. The breach of fiduciary duty claims against Defendants Citicorp Venture and Citicorp Mezzanine, and the aiding and abetting breach of fiduciary duty claims against Individual Defendants and Citicorp Venture are DISMISSED with prejudice. The Court GRANTS Plaintiff leave to file an Amended Complaint alleging breach of contract and implied covenant against Citicorp Venture, breach of fiduciary duty against Individual Defendants, and aiding and abetting breach of fiduciary duty against Defendant Citicorp Mezzanine within forty (40) days of the date of this Order. Failure to file within this time period shall be a waiver of the right to replead. With regard to any amendment, Plaintiff is cautioned against perfunctory nonsubstantive or cosmetic changes, and against making conclusory allegations which are contradicted by written documents relied upon in the Amended Complaint. Lastly, Plaintiff must be mindful of the constraints imposed by Fed.R.Civ.P. 11.

### III. CONCLUSION

*9 For the foregoing reasons, Defendants' Motion to Dismiss the Complaint is GRANTED. Plaintiff is GRANTED Leave to Replead the breach of contract and implied covenant claims against Citicorp Venture, breach of fiduciary duty claim against Individual Defendants, and the claim of aiding and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1379596 (S.D.N.Y.)

Page 9

abetting breach of fiduciary duty against Citicorp
Mezzanine. Plaintiff shall file the Amended Com-
plaint within forty (40) days of the date of this Or-
der.

S.D.N.Y.,2006.
CVC Claims Litigation LLC v. Citicorp Venture
Capital Ltd.
Not Reported in F.Supp.2d, 2006 WL 1379596
(S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy                                                    Page 1
Slip Copy, 2007 WL 2859702 (W.D.N.Y.)
2007 WL 2859702 (W.D.N.Y.)

Southward Investments, LLC v. V-GPO, Inc.
W.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,W.D. New York.
SOUTHWARD INVESTMENTS, LLC, Plaintiff,
v.
V-GPO, INC., Defendant.
No. 06-CV-6540T.

Sept. 26, 2007.

**DECISION and ORDER**

MICHAEL A. TELESCA, United States District Judge.
*1    Plaintiff   Southward   Investments,   LLC,
("Southward"), brings this action against defendant
V-GPO, Inc., ("V-GPO") claiming that the defendant breached a contract between the parties, and unlawfully converted plaintiff's property. Southward seeks specific performance of the terms of the contract, or, in the alternative, damages for the alleged breach of contract and conversion of property.

Defendant V-GPO moves for summary judgment in its favor on grounds that this court lacks subject matter jurisdiction over the dispute because the amount in controversy is not in excess of $75,000.00. Defendant further contends that plaintiff's cause of action for conversion is untimely, and that its breach of contract claim is defective as a matter of law because Southward failed to perform conditions precedent set forth in the contract.

For the reasons set forth below, I grant defendant's motion for summary judgment.

**BACKGROUND**

Plaintiff Southward Investments, LLC, is an investment company located in Rochester, New York.

Southward is engaged in the business of selling shell corporations. Morris Diamond ("Diamond") is the President of Southward. Diamond was personally   acquainted   with   Casimer   Jaszewski ("Jaszewski"), the owner of controlling interest in a company   known   as   Epicure   Investments ("Epicure"). Epicure was a publicly-traded shell corporation.

In 2001, Jaszewski sought the assistance of Southward   in   selling   Epicure.   Diamond   contacted Douglas Murdock ("Murdock") of Belmont Management Services to inquire whether Murdock knew of any potential buyers for a publicly-traded shell corporation. Murdock indicated that a company affiliated with Belmont, defendant V-GPO, (a privately held corporation) was interested in purchasing Epicure as part of a "reverse merger" transaction whereby V-GPO would merge with Epicure, and in doing so, would become a publicly traded company. A reverse merger transaction is relatively simple way for a privately-held company to become a publicly-traded company in that it avoids several of the administrative, procedural, and regulatory restrictions and requirements imposed on private companies which attempt to become publicly-traded companies. In a reverse merger transaction, because a publicly-traded company already exists, the privately-held company need only merge with the public company to become a public company itself. Typically, once a reverse merger is completed, the name of the merged company is changed to that of the former private company, and the principles of the private company take control of the newly formed public company.

In 2001, Epicure and V-GPO agreed to enter into a reverse merger agreement. Pursuant to the parties' agreements, Jaszewski was to be paid $400,000 for the company. Southward contends that its compensation for arranging the deal was to be paid in 2,000,000 freely-trading, pre-merger stock from Epicure.   Southward   contends   that   because Jaszewski was under financial duress at the time, it

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2859702 (W.D.N.Y.)
2007 WL 2859702 (W.D.N.Y.)

agreed to take its commission in the form of stock, and to pay the transactional costs and attorneys fees related to the merger. Thereafter, Southward contends that it agreed to trade its 2,000,000 shares of freely-trading, pre-merger Epicure Stock for 3,000,000 restricted post-merger shares of the newly formed company that emerged from the merger.

*2 Defendant disputes the plaintiff's claims, and contends that Southward never had an agreement with either Jaszewski, Belmont, or V-GPO to receive 2,000,000 shares of pre-merger Epicure stock, nor was there ever an agreement between any of the parties to exchange 2,000,000 shares of pre-merger Epicure Stock for 3,000,000 post merger shares. Rather, defendant contends that Southward and V-GPO entered into a Stock Purchase Agreement whereby Southward agreed to purchase 3,000,000 shares of post-merger V-GPO par value common stock (valued at $.0001 per share) for $2,500,000. Specifically, the Stock Purchase Agreement provided that:

the Purchaser [Southward] hereby agrees to purchase ... [3,000,000 shares of stock] for an aggregate of $2,500,000 U.S. ("Price"), and Purchaser hereby agrees to pay simultaneously with payment of the Price, all fees, costs, and expenses associated with effecting the transactions related to the Merger Agreement dated the date of this Agreement between the Company [V-GPO] and Epicure Investments, Inc., ... including specifically, but not exclusively, the sale of the [3,000,000 shares of stock] to Purchaser. Company [V-GPO] acknowledges and agrees that the Price for the [3,000,000 shares of stock] shall be provided by the resale of certain shares of Epicure Investments, Inc....under the Stock Sale and Escrow Agreement of even date herewith .... " FN1

> FN1. The Stock Sale and Escrow Agreement referred to in the Stock Purchase Agreement was actually entered into on December 6, 2001. That agreement was

made between Epicure Investments and Belmont Management Services, a company operated by V-GPO.

V-GPO contends that because Southward never paid for the stock pursuant to the Stock Purchase Agreement, it is not entitled to the $3,000,000 shares of stock. Southward contends that the money that was to be used for the purchase of the stock was to be derived from the sale of Epicure that was sold to Belmont pursuant to the Stock Sale and Escrow Agreement.

### DISCUSSION

#### I. Defendant's Motion for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."When considering a motion for summary judgment, all inferences and ambiguities must be resolved in favor of the party against whom summary judgment is sought. *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54 (2nd Cir.1997). If, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party, a grant of summary judgment is appropriate. *Annis v. County of Westchester*, 136 F.3d 239, 247 (2nd Cir.1998).

#### II. Breach of Contract

"To make out a viable claim for breach of contract a 'complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.' " *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2nd Cir.2004) (quoting

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2859702 (W.D.N.Y.)
2007 WL 2859702 (W.D.N.Y.)

*Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir.1996).

**\*3** In the instant case, there is no dispute that Southward and V-GPO were parties to a Stock Purchase Agreement. It is further undisputed that V-GPO did not deliver 3,000,000 shares of $.0001 par value Common Stock to Southward following completion of the merger between V-GPO and Epicure. Assuming that the plaintiff could prove damages from not receiving the 3,000,000 shares of stock, the remaining questions are whether Southward performed under the contract, and whether V-GPO breached the agreement by not delivering the 3,000,000 shares.

The Stock Purchase Agreement clearly states that Southward "agrees to purchase the shares for an aggregate of $2,500,000 ..." It is uncontested, however, that Southward did not pay any amount for the shares. Accordingly, because Southward failed to fulfill a condition precedent to receiving the shares, (paying the $2,500,000 purchase price), Southward cannot establish a claim for a breach of contract.

Southward, however, claims that the parties never intended that it would have to pay for the shares, and that it was understood that the 3,000,000 post-merger shares were to be received by Southward in exchange for the 2,000,000 pre-merger shares that it claims it was entitled to as compensation for arranging the merger, and paying for the associated transactional costs of the merger. In support of this argument, Southward points to that portion of the Stock Purchase Agreement which states that V-GPO "acknowledges and agrees that [$2.5 million] price for the shares shall be provided by the resale of certain shares of Epicure Investments, Inc.... under the Stock Sale and Escrow Agreement of even date herewith."December 10, 2001 Stock Purchase Agreement at ¶ 1.

Southward's argument, however, is unavailing for several reasons. First, there is no evidence in the record that Southward had any agreement with any party under which it would receive 2,000,000 shares of pre-merger Epicure Stock. Although Plaintiff's Complaint alleges that "[p]rior to December, 2001, plaintiff entered into an agreement with Jaszewski pursuant to which, among other things Jaszewski agreed, in consideration of plaintiff arranging for a reverse merger between Epicure and an operating company, that Jaszewski would contribute the use and/or benefit of 2,000,000 of his shares of Epicure ... to facilitate the merger transaction" (Complaint at ¶ 6), Morris Diamond, Southward's President, admitted under oath that in fact Jaszewski and Southward had *never* entered into any agreement pursuant to which Southward would receive *any* pre-merger Epicure stock. Deposition Testimony of Morris Diamond at p. 133, 140.Accordingly, the allegation of that an agreement existed between Southward and Jaszewski as alleged in the Complaint is false, and cannot serve as support for plaintiff's claim that he was to receive 2,000,000 shares of stock in compensation for his role in the merger, or that he agreed to exchange his 2,000,000 shares of pre-merger stock for 3,000,000 shares of post merger stock. Having not received 2,000,000 shares of stock initially, Southward lacked the ability to exchange that stock for post-merger stock. Similarly, because Southward did not have 2,000,000 shares of stock to be sold, absent some agreement to the contrary, it could not benefit from the sale of 2,000,000 shares of stock to be applied towards the purchase price of the post-merger stock.

**\*4** Southward contends, however, that it was to benefit from the resale of stock sold by Jaszewski to Belmont pursuant to the Stock Sale and Escrow Agreement ("SSEA") entered into between Belmont and Jaszewski. The SSEA, however, was the agreement which effectively "sold" Epicure to V-GPO, and provided, generally, that in consideration of Jaszewski's delivery of 2,010,000 shares of Epicure Stock to Belmont, Jaszewski would receive $400,000. Nowhere in that agreement is there any reference to Southward being entitled to receive any stock, or benefit from the sale of Jaszewski's

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2859702 (W.D.N.Y.)
2007 WL 2859702 (W.D.N.Y.)

Page 4

stock. Accordingly, I find Southward's claim of entitlement to the benefit of proceeds from the resale of Jaszewski's stock to Belmont to be wholly unsuported by the record.

The only evidence in the record suggesting that Southward was entitled to either 2,000,000 shares of pre-merger stock or 3,000,000 of post-merger stock is Diamond's testimony that he had oral understandings with Murdock that Southward would receive 3,000,000 shares of stock. Diamond testified that he had "an understanding" with Murdock that Southward would receive stock as its compensation for being "the go-between" in the merger deal. Deposition Testimony of Morris Diamond at pp. 135-136.Diamond testified that his stock compensation deal was "done orally." *Id.* at 140.However, the Stock Purchase Agreement entered into by Diamond on behalf of Southward states clearly and unequivocally that the written agreement constituted "the entire agreement between the parties pertaining to the subject matter as set forth [therein] and supersede[d] any prior understandings or agreements, oral or written. Accordingly, Southward's claims of oral promises collateral to the contract may not be considered by the court. Because V-GPO has demonstrated that Southward failed to perform a condition precedent under the Stock Purchase Agreement, I find that plaintiff has failed to state a claim for breach of contract.

### III. *Conversion and Specific Performance*

For the reasons stated above, I grant defendant's motion for summary judgment with respect to plaintiff's claims for specific performance and conversion. Plaintiff has failed to establish that it is entitled to performance of the Stock Purchase Agreement, and has failed to establish that the defendant has converted its property.

### CONCLUSION

For the reasons set forth above, I grant defendant's

motion for summary judgment, and dismiss plaintiff's complaint with prejudice.

ALL OF THE ABOVE IS SO ORDERED.

W.D.N.Y.,2007.
Southward Investments, LLC v. V-GPO, Inc.
Slip Copy, 2007 WL 2859702 (W.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.